# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **NORFOLK SOUTHERN RAILWAY COMPANY AND WHEELING & LAKE ERIE RAILWAY COMPANY** | ) ) ) ) | **2:11-cv-1588-TFM** |
| **Plaintiffs,** | ) ) ) | |
| **vs.** | ) ) | |
| **PITTSBURGH & WEST VIRGINIA RAILROAD AND POWER REIT**, | ) ) ) | |
| **Defendants.** | ) ) ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

Pending before the Court is a MOTION FOR SUMMARY JUDGMENT (ECF No. 117) filed by Defendant Power REIT with brief (ECF No. 112) in support. Plaintiffs Norfolk Southern Railway Company ("Norfolk Southern") and Wheeling & Lake Erie Railway Company ("Wheeling & Lake Erie") filed a brief (ECF No. 127) in opposition; Power REIT filed a reply brief (ECF No. 149). The factual record with regard to this motion has been thoroughly developed via the submission of Power REIT's Concise Statement of Material Facts ("CSMF") (ECF No. 111) with an appendix (ECF No. 113) and exhibits (ECF No. 114) filed in support; Plaintiffs' Responsive CSMF (ECF No. 128) with an appendix and exhibits in support (ECF No. 129); and Power REIT's Responsive CSMF (ECF No. 150) and supplemental appendix (ECF No. 151). The Court heard oral argument on January 15, 2014, and the transcript (ECF No. 170) has been filed of record.

There are also three other motions pending in this matter:

(1) a MOTION TO JOIN POWER REIT AS A NECESSARY PARTY TO
     PITTSBURGH & WEST VIRGINIA RAILROAD'S SECOND SUPPLEMENT TO

COUNTERCLAIMS (ECF No. 117) filed by Plaintiffs with brief (ECF Nos. 118) in support;

(2) a MOTION TO DEEM ADMITTED CERTAIN PARAGRAPHS OF PLAINTIFFS' ADDITIONAL UNDISPUTED MATERIAL FACTS (ECF No. 156) filed by Plaintiffs with brief in support (ECF No. 157); and

(3) a MOTION FOR LEAVE OF COURT TO FILE AMENDMENT TO SECOND SUPPLEMENT TO COMPLAINT AMENDING THE PRAYER FOR RELIEF (ECF No. 162) filed by Plaintiffs with brief (ECF Nos. 163) in support.

Power REIT filed a response in opposition (ECF Nos. 123, 156, 164) to each motion; Plaintiffs filed reply briefs (ECF Nos. 136, 165) with respect to the Rule 19 and Rule 15 motions.

The issues have been fully briefed and well-argued on behalf of the parties. Accordingly, the motions are ripe for disposition.

## I.  Background

### A.  Factual Background

The following background is taken from the Court's independent review of the motions, the filings in support and opposition thereto, and the record as a whole.[1]

#### 1.  The "Demised Property"

The factual underpinnings of this action date back to 1962 when The Pittsburgh & West Virginia Railway Company, the predecessor of Pittsburgh & West Virginia Railroad ("PWV"), entered into a lease agreement (the "Lease") with Norfolk & Western Railway Company ("Norfolk & Western"), a predecessor of Norfolk Southern, to convey certain properties that it

---

1.  As discussed in greater detail below, the Court will grant in part and deny in part the motion to deem admitted certain paragraphs of Plaintiffs' (Responsive) CSMF.  The following factual recitation reflects that ruling.

owned and operated (the "Demised Property").[2]  *See* Lease at 1, Ex. 1 to Compl., ECF No. 1-2

("*Section 1.* PROPERTY DEMISED."); *see also id.* at 2 ("*Section 2.* PROPERTY NOT DEMISED.").

The Demised Property consists of a 112-mile portion of main line railroad (the "Rail Line") and

approximately twenty miles of branch rail lines that run from Western Pennsylvania through

West Virginia and into Ohio.  *See id.* at 24-26 (describing the properties).  Once the Lease

commenced on October 16, 1964, The Pittsburgh & West Virginia Railway Company ceased

active railroad operations which Norfolk & Western assumed along with all right, title, and

interest to the Demised Property.

In 1990, Norfolk & Western and Wheeling & Lake Erie entered into a sublease (the

"Sublease") through which the latter became the principal operator of the Rail Line and assumed

all rights, title and interest in the Demised Property covered under the Lease.  Norfolk Southern,

which operates 20,000 route miles in twenty-two states and Washington D.C., ultimately became

the successor-in-interest to all rights and obligations of Norfolk & Western.

### 2.     The Lease

The term of the Lease is 99-years, renewable in perpetuity at the option of Lessee absent

a default.  *See id.* at 3-4 ("*Section 3.* TERM OF LEASE.").  The same terms and conditions,

including the economic provisions of the Lease, remain in effect with each renewal.

Rent under the Lease consists of a cash payment fixed at $915,000 per year (Section 4(a)

rent) as well as additional non-cash items attributable to the real properties (Section 4(b) rent).

*See id.* at 4-6 ("*Section 4.* RENT.").  Those additional items characterized as "rent" include (1)

sums equal to the deduction(s) (*e.g.*, for deprecation or amortization with respect to the Demised

---

2. The Lease is dated July 12, 1962.  The shareholders of Pittsburgh & West Virginia Railway Company approved
the Lease at a special meeting on September 28, 1962.  The Interstate Commerce Commission (the "ICC"), the
predecessor regulatory agency of the United States Surface Transportation Board (the "STB"), later issued its
authorization.

Property) allowed to Lessor under the then-effective Internal Revenue Code; and (2) other expenses of the Lessor that it is lawfully required to incur in performing under the Lease except those expenses incurred for the benefit of or reasonably allocated to its shareholders.

The Lease further provides that the Lessee may (subject to some restrictions) sell, lease, or otherwise dispose of that part of the Demised Property which it deems not necessary or not useful to its operation. *See id.* at 11-12 ("*Section 9.* DISPOSITION OF PROPERTY OF LESSOR."). Section 9 requires that the Lessor must execute and deliver the instruments necessary to effectuate those transactions. The proceeds of any disposition of the Demised Property by the Lessee must be paid to the Lessor.

Section 16 of the Lease governs the payment of the sums due as additional rent or the amounts owed from any disposition.[3] *See id.* at 17-19 ("*Section 16.* MISCELLANEOUS."). Those totals or any part thereof may, at the option of the Lessee, be paid either in cash or by crediting Lessor with the same as indebtedness in an account of transaction (*i.e.*, the so-called "Settlement Account") under the Lease. The balance of the Settlement Account is due and payable to the Lessor only upon the termination of the Lease.[4]

---

3. Section 16 of the Lease provides, in relevant part, as follow:

> The portion of the additional rent, or any part thereof, payable to Lessor pursuant to paragraphs (1), (2), (3), and (4) of subdivision (b) of Section 4 ["Rent"] hereof and any amounts, or any part thereof, payable to Lessor pursuant to Section 9 ["Disposition of Property of Lessor"] hereof may, at the option of Lessee, be paid either in cash or by crediting Lessor with the same as indebtedness in an account of transactions under this Lease; provided, however, that the total of such indebtedness owing from Lessee to Lessor, after taking into account the payments of cash hereunder or a balancing of indebtedness under subdivision (b) of this Section 16, or both, shall not exceed at any time an amount equal to 5% of the value at such time of the total assets of Lessor as long as any of the obligations of Lessor which have been assumed by Lessee in this Lease remain outstanding and unpaid.

Lease at 17, Ex. 1 to Compl., ECF No. 1-2. Plaintiffs refer to the "account of transactions" as the "Settlement Account." Defendant(s) have also used this shorthand reference. For simplicity's sake, the Court will do the same.

4. Plaintiffs maintain that the balance of the Settlement Account as of December 31, 2011 was $16,933,338 (a figure Defendant(s) deny) of which approximately $16,676,258 was the result of changes in tax laws unanticipated by the parties at the time of the Lease. *See* Def.'s Responsive CSMF at 5, ECF No. 150.

4

The Lease will terminate upon the proper expiration of its terms or at the Lessor's election upon a default by the Lessee. *See id.* at 14-15 ("*Section 11.* TERMINATION OF LEASE."). A default will occur when the Lessee fails to pay any part of the rent due under Section 4(a) after having been given thirty days' written notice or fails to perform other covenants, agreements, and/or obligations after having been given sixty days' written notice. *See id.* at 15-16 ("*Section 12.* DEFAULT BY LESSEE."). The commencement of any proceedings for relief under any sort of bankruptcy or insolvency law will also constitute a default.

Should the Lessor opt for termination upon default, the Lease provides that the Lessor becomes entitled to the Demised Property as well as all revenues, rents, issues, income and profits therefrom and that the Lessee ceases to have any estate, right, title, or interest in the Demised Property. The Lease further requires that the Lessee turn over to Lessor property and cash sufficient to operate the Demised Property for one year. Additionally, the Lessor is entitled to payment of all damages suffered "by reason of or arising from the breach or default of Lessee or termination of th[e] Lease, with interest thereon at 6% per annum, plus reasonable attorney's fees, costs and expenses of Lessor." *Id.* at 16.

Nevertheless, as long as the Lessee is not in default, the Lessor is subject to several restrictions under the Lease. *See id.* at 8-11 ("*Section 8.* COVENANTS OF LESSOR."). For example, Section 8(a)(2) prohibits the Lessor from issuing any stock (or options to purchase such stock) without the prior written consent of the Lessee, which must not be unreasonably withheld. Section 8 contains other covenants which require the Lessor to take all action within its control necessary to preserve its corporate existence (Section 8(a)(1)) and which restrict its ability to incur debt (Section 8(a)(5)). *See id.* at 8-9. Similarly, Section 8(b)(1) prevents the Lessor from declaring any dividend on its common stock in an amount exceeding (1) the non-demised

property, the proceeds thereof and income therefrom; and (2) the annual rent of $915,000 due pursuant to Section 4(a).

On several occasions during the early years of the Lease, PWV obtained the consent of Norfolk & Western for certain actions required by these covenants, such as when it borrowed $125,000 to pay the expenses of reorganization from a corporation into a trust.[5]  *See* Def.'s Responsive CSMF at 8-9, ¶ 86-90, ECF No. 150.  PWV likewise obtained the consent of Norfolk & Western in the late-1960's to issue shares and assume up to $3,300,000 in obligations in connection with the acquisition of shopping centers.

More recently, PWV has attempted to loosen some of the restrictions in the Lease based on its purported inability to protect or enhance shareholder value in light of the contractual limits coupled with inflationary increases in annual expenses and the promulgation of securities regulations.  In September 2006, Howard Capito (then a member of PWV's Board of Trustees) and Herbert E. Jones, III (then-PWV's President and a member of its Board) traveled to Norfolk, Virginia to meet with representatives of Norfolk Southern regarding its proposals.  Roughly one month later, Norfolk Southern's Director of Strategic Planning sent Capito a letter to inform him that it did not desire to make any changes to the Lease.

### 3.  PWV's Change in Management

From the commencement of the Lease until 1995, the administrative functions of PWV were handled through International Mining, a company affiliated with Lewis Harder, one time Chairman of the Board of Trustees for PWV.  In 1995, PWV moved all administrative functions to the office of Port Amherst in Charleston, West Virginia.  Port Amherst was the family

---

5.  In 1967, PWV was organized as a "business trust" for the purpose of acquiring The Pittsburgh & West Virginia Railway Company.  *See* Pls.' App'x Ex. 10 at Pls.' 0000544, ECF No. 129-10 at 23 ("COMPANY OVERVIEW").  PWV has elected to be treated for tax purposes as a real estate investment trust ("REIT").  *See id.*  In order to maintain qualified status, at least ninety-percent (90%) of ordinary taxable income must be distributed to its shareholders. *See id.*

business of Herbert E. Jones Jr. ("Mr. Jones Jr."), Charles Jones, and Herbert Jones, III ("Mr. Jones III) all of whom served as Trustees at various times since the inception of the Lease. PWV moved its principal place of business to New York in 2011 after David Lesser gained control of the company.

In 2009, Lesser and his affiliated entities began to purchase a sizeable amount of PWV stock. Lesser thereafter expressed his interest to PWV executives about becoming a member of its Board, and he ultimately became a Trustee sometime in 2009.[6]

On July 8, 2010, the Chairman of PWV's Board, Mr. Jones, Jr., passed away. Over the course of his stewardship, the parties and their predecessor entities performed their rights and responsibility in apparent harmony. But this once-amicable relationship apparently turned adversarial soon after new leadership emerged at PWV and corresponding changes in direction occurred at the company.

Two weeks later, on July 22, 2010, Lesser sent Mr. Jones III an e-mail in which he outlined his vision for PWV's future and expressed his desire to serve as the new Chairperson.[7] Moreover, Lesser set forth what he believed to be "three clear paths to deal with the restrictions contained in the [L]ease that need to be explored to determine the best strategy:" (1) PWV could sell its property subject to the Lease; (2) PWV could restructure its operation such that it would become a wholly-owned-subsidiary; or (3) PWV could renegotiate the terms of the Lease. *See* Pls.' App'x. Ex. 41 at D019851, ECF No. 129-41 at 2. Lesser later drafted and circulated among

---

6 The factual circumstances leading up to his inclusion on the ballot and his election to the Board are in dispute, but the allegations focus on Lesser's persistent efforts with Robert R. McCoy, Vice President, Secretary, and Treasurer of PWV, as well as his threat to solicit a proxy fight if he was not named as an applicant and voted upon.

7. At the request of Mr. Jones III, Lesser forwarded this message to another Trustee, Virgil Wenger, on July 22, 2010.

the Trustees a more formal proposed written consent for the issuance of additional stock shares to raise capital for the purpose of restructuring.

Mr. Jones III disagreed with Lesser's intention to restructure PWV, but the Trustees approved the plan nevertheless. On November 30, 2010, Mr. Jones III resigned as Chairman of the Board of Trustees. Later that year, the Board of Trustees selected Lesser to succeed Jones and serve as its Chairman.

### 4. The Rights Offering

Shortly after his election as Chairman, Lesser prepared a document labeled "Board Discussion Outline December 2010." *See* Pls.' App'x Ex. 12, ECF No. 129-12. In his Outline, Lesser identified the "Current Status" of PWV in which he noted that it has no debt and two assets: the "Railroad pursuant to [L]ease ($915,000);" and (2) the "Public company 'shell'" with an annual cost of $165,000 and which required restructuring based on the restrictions of the Lease. *Id.* at D032741, ECF 129-12 at 3. The Outline also set forth several potential areas for growth opportunities, such as "us[ing] the shell to finance additional 'special purpose' assets." *Id.* at D032743, ECF No. 120-12 at 5. This section further indicated that Lesser has a focus on alternative energy assets and that the REIT structure is well-suited to pursue that avenue. Several other pages of the December 2010 Outline are labeled "Power REIT." Lesser labeled the final page "Next Steps" which included several alternatives for evaluation by the Trustees.

In January 2011, Lesser provided to PWV's Board a presentation based in part on his December 2010 Outline.[8] Pls.' App'x Ex. 6, ECF No. 129-6. Arun Mittal, a business consultant who became vice president, treasurer and secretary of PWV in March 2011, assisted Lesser in the preparation of the presentation. Much like the December 2010 Outline, this presentation

---

8. The five members of PWV's Board at this time were David Lesser, Virgil Wenger, Herbert E. Jones, III, Patrick R. Haynes, III and Larry Parsons. Notably, Parsons also served as the Chairman and CEO of Wheeling & Lake Erie, the Sublessee of the Demised Property from Norfolk Southern.

included pages which described the public company "shell," the REIT structure, various options to raise capital, and the proposed reorganization whereby PWV would become a subsidiary of another entity, purportedly without affecting the existing Lessor-Lessee relationship. Other pages indicated that PWV need to "[f]inalize plans for restructuring based on lease restrictions" and "[h]ire REIT taxation expert." *Id.* at Pls.' 0032403, ECF No. 129-6 at 19.

On January 5, 2011, Lesser sent an e-mail to Parsons regarding the January 2011 presentation, attaching a proposed Board resolution which approved his plan. More specifically, the resolution provided, in relevant part, as follows:

> **WHEREAS**, all Trustees of PW have received the PW Board Discussion Packet dated 1/3/2011 (the "Discussion Packet") and have had a chance to review the information with David Lesser.
>
> **RESOLVED**, that the Board hereby votes to proceed with the plan as generally outlined in the Discussion Packet. Specifically, the Board authorizes proceeding with (i) the Rights Offer to shareholders; (ii) retaining Morrison Cohen as general corporate counsel; (iii) formation of an Executive Committee consisting of Virgil Wenger, Patrick Haynes and David Lesser.

Pls.' App'x Ex. 45 at Pls.' 0005826, ECF No. 129-45 at 3. Lesser also requested that Parsons, as Chairman of Sublessee Wheeling & Lake Erie, provide the written consent for the issuance of shares required by Section 8(a) of the Lease. As of January 12, 2011, Parsons had not responded.

Lesser sent Parsons a follow-up e-mail that day in which he acknowledged that "a majority of the Board has already signed the Resolution" and sought the approval of Wheeling & Lake Erie once again. Pls.' App'x Ex. 46 at Pls.' 005824, ECF No. 129-46 at 2. Wheeling & Lake Erie never issued its consent after which Lesser approached Norfolk Southern to obtain the requisite approval. In late January 2011, Lesser began speaking with Randy S. Noe, then-General Attorney at Norfolk Southern, about obtaining the Lessee's consent to issue stock.

Through a series of e-mail exchanges over the next two weeks, Lesser demanded immediate action and Noe continued to press for more information. *See* Pls.' App'x Ex. 13, ECF No. 129-13; Def.'s App'x Ex. 10, ECF No. 114-13.

On February 3, 2011, Noe notified Lesser that Norfolk Southern "would like [him] to offer more details about [his] plan and what [he] intend[ed] to do with the additional working capital so we can get a better understanding how it might affect Norfolk Southern's interest in the assets leased from PVW." Pls.' App'x Ex. 13 at D019869, ECF No. 129-13 at 4. Minutes later, Lesser responded: "I fail to understand how the issuance of equity will impair the asset. I am not sure what additional details you feel you need but we are certainly interested in getting you what we can to get this done. Having said that, I am not sure what more we can give or what you are looking for." *Id.* at D019868, ECF No. 129-13 at 3. The following day, Noe again requested more information after he held a telephone call with Mittal. As Noe wrote, "I understood [Mittal] to say that PWV plans to raise capital to hire consultants, lawyers, and other professionals to explore ways to broaden PWV's business. However, he did not tell me that PWV has any particular business plan in mind. It is this degree of uncertainty along with the size of the offering that warrants further investigation." *Id.*

Lesser responded on February 7, 2011, sending Noe a copy of the Form S-3 Registration Statement that had been prepared ostensibly in connection with the Rights Offering, but which was not yet filed with the Securities and Exchange Commission ("SEC"). *Id.* at D019871, ECF No. 129-13 at 6. In his e-mail, Lesser also represented that "[t]his document [the S-3] contains all available information on PWV's plans at this point" and that it "remain[ed] interested in providing everything possible in an effort to secure the consent." *Id.* Relevant here, the S-3 sent to Noe contained a section entitled "Use of Proceeds," which read, in part, as follows:

The purpose of the rights offering is to raise equity capital in a cost-effective manner that gives all of our stockholders the opportunity to participate. The proceeds of the rights offering will be used to provide working capital for the initial steps of this broadening of PW's business. Specifically, PW will use the proceeds to: hire employees, advisors and/or consultants that will assist it with developing and implementing a new, broader business plan; to undertake diligence on potential business or investment opportunities consistent with its status as a REIT; and for other purposes related to our intended business-broadening, and, to the extent any proceeds remain after the foregoing, for general corporate purposes (including expenses related to our status as a public company).

Pls.' App'x Ex. 10 at Pls.' 0000562, ECF No. 129-10 at 42.[9] The S-3 filing does not specifically mention the proposed corporate reorganization set forth in the December Outline and January Presentation.

One week after the draft S-3 was sent to Noe, Norfolk Southern provided its written consent. In its February 14, 2011 correspondence to Lesser, Norfolk Southern noted that PWV had solicited its consent "to the transaction (the "Transaction") contemplated by that certain draft Form S-3 Registration Statement provided to [it] by [PWV], which [PWV] represented to be in the form to be filed with the [SEC]." Pls.' App'x Ex. 13 at D019872, ECF No. 129-13 at 7. The letter continued: "Pursuant to Section 8(a)(2) of the Lease and subject to the trust and correctness of the foregoing representation, [Norfolk Southern] hereby consents to, and only to, the Transaction as set forth in the Registration Statement, including but not limited to the use of

---

9. In Power REIT's CSMF, it claims that the "Use of Proceeds" section reads as follows:

The purpose of the rights offering is to raise equity capital in a cost-effective manner that gives all of our shareholders the opportunity to participate. The net proceeds of the rights offering will be used to hire employees, advisors and/or consultants that will assist in developing and implementing a new broader, business plan for PW, to undertake diligence of new business or investment opportunities consistent with PW's status as a REIT and for general working capital purposes (including expenses related to our status as a public company). *See* "Use of Proceeds."

Def.'s CSMF at 7, ¶ 24, ECF No. 111 (quoting Lesser Dec. at 6-7 ¶ 20, ECF No. 113-1). For his part, Lesser cites to Power REIT's SEC filing—not the Form S-3 of PWV—as the source of the "Use of Proceeds" language that he quotes. *See* Lesser Dec. at 6-7 ¶ 20, ECF No. 113-1 (quoting Def.'s App'x Ex. 3-12, ECF Nos. 58-4, 114-3). By all accounts, that is simply a typographical error or oversight. The SEC filing of PWV attached to Plaintiffs' Second Supplement to Complaint does, however, set forth the quoted passage in the "Company Overview" section. *See* Ex. 9 to Pls.' Sec. Suppl. to Compl. at 22, ECF No. 58-1 at 23; *see also* Ex. 9 to Pls.' Sec. Suppl. to Compl. at 53, ECF No. 58-1 at 54.

proceeds described therein . . . ." *Id.* Three of the five members of PWV's Board of Trustees authorized the rights offering via a resolution that Lesser first circulated on February 3, 2011.

On February 15, 2011, PWV filed its Form S-3 Registration Statement with the SEC. PWV completed its rights offering on March 16, 2011, raising $1,019,000 in gross proceeds in connection with the sale of additional stock to existing shareholders—primarily to Hudson Bay Partners, LP ("Hudson Bay") of which Lesser is the President. PWV used some of this working capital to retain the services of Caravan Partners (a consulting firm owned by Mittal), four law firms, and an accounting firm.

### 5. The Formation of Power REIT

Power REIT was initially formed as a real estate investment trust on August 26, 2011 under the laws of Maryland. Three days later, on August 29, 2011, Power REIT PA, LLC, a Pennsylvania limited liability company, was formed as a wholly-owned subsidiary of Power REIT for the sole purpose of effecting PWV's corporate reorganization.

On August 31, 2011, PWV filed with the SEC a Preliminary Registration Statement on Form S-4 that listed both itself and Power REIT as the Registrants. The Preliminary S-4 included a prospectus for the shareholders of PWV, stating that PWV desired "to create shareholder value by expanding its business plan . . . ." Pls.' App'x Ex. 21, ECF No. 129-21 at 4. Moreover, the Preliminary S-4 included other additional details—such as the planned "Reincorporation Merger"—not mentioned in PWV's S-3 filed six months earlier. The Preliminary S-4 further stated that "[i]mmediatley following the Reincorporation Merger: [o]ur name will change from 'Pittsburgh & West Virginia Railroad' to 'Power REIT;'" that PWV and Power REIT would share the same West Babylon, NY offices, and that the business and management of PWV would not substantially change. *Id.*, ECF No. 1291-21 at 10. PWV

withdrew the Registration Statement on November 7, 2011 after the SEC informed Lesser that the Form S-4 should have been filed on behalf of Power REIT. Power REIT later filed a similar Registration Statement on Form S-4, which became effective on November 30, 2011 after several minor amendments.

Power REIT, PWV, and Power REIT PA, LLC entered into an Agreement and Plan of Merger on December 1, 2011 (the "Merger Agreement"). The Merger Agreement provided that "[t]he Surviving Trust [PWV] shall succeed, without other transfer, to all of the purposes, rights, privileges and powers and shall possess all assets and property (real, personal, and mixed) of [PWV] and Merger Sub, and the Surviving Trust [PWV] shall become subject to and responsible for all debts and obligations of [PWV] and Merger Sub . . . ." Def.'s App'x Ex. 15 at § 1.5, ECF No. 114-18 at 8.

On December 2, 2011, PWV effected a corporate reorganization whereby it purportedly became a wholly-owned subsidiary of Power REIT through a reverse triangular merger. In this type of transaction, the acquiring company (Power REIT) creates a subsidiary or a "merger-sub" (Power REIT PA, LLC) into which the target company (PWV) merges; the target survives as the wholly-owned subsidiary with its outstanding shares converting into securities of the acquirer. According to Power REIT, the reverse triangular merger in this case was no different: each outstanding common share of beneficial interest of PWV converted into one common share of beneficial interest of Power REIT; and Power REIT in turn became the sole shareholder of PWV.

Several other aspects of their relationship following the reorganization are notable. For example, Power REIT and PWV now share a CEO and Chairman of the Board, the same directors and management, and headquarters in West Babylon, NY. PWV has also agreed to indemnify Power REIT for all matters related to its business, although the "agreement" is a

verbal understanding between the entities that has not been memorialized in any writing. Other changes include Power REIT assuming the ticker symbol ("PW") of PWV and its SEC reporting history pursuant to Rule 12g-3(a). Separate bank accounts were also created for the parties, and the rent PWV received under the Lease initially generated all of Power REIT's revenue.

The record also includes what appears to be a Joint Press Release in which Power REIT represented that "[it] is the reincorporated, successor company to Pittsburgh & West Virginia Railroad." Pls.' App'x Ex. 3 at Ex. 99.1, ECF No. 129-3 at 35. The Press Release further states that "[i]n many cases infrastructure assets are supported by long term contracts with credit worthy counterparties. For example, Power REIT leases its existing railroad asset to Norfolk Southern Corporation pursuant to a 99-year lease." *Id.* Power REIT nevertheless maintains that it succeeded to only the SEC reporting history of PWV, which purportedly still remains a party to the Lease, owns the Demised Property, and collects the rents paid to it by Plaintiff(s).

### 6.    The West-End Branch Dispute

Beginning in October 2007, the Pennsylvania Department of Transportation ("PennDOT") undertook the construction of a $52.6M project at the West-End Circle in Pittsburgh Pennsylvania, an area in which PA Route 51, Carson Street, South Main Street, and Steuben Street all converge. Over the course of the construction, PennDOT encountered at least one issue: an unused railroad trestle over a ramp that connects Steuben and South Main Streets which forced PennDOT to keep one lane of the ramp closed, causing significant traffic congestion. Of significance, this trestle was located on the West End Branch that is part of the Rail Line but which is no longer essential to Wheeling & Lake Erie's operation.

To alleviate the traffic congestion, Wheeling & Lake Erie and PennDOT reached an agreement whereby the latter would acquire the West End Branch and remove the impeding

trestle.  The parties were first required to seek authority from the STB to abandon the common carrier obligation(s) associated with the West End Branch, which required the participation of PWV as the owner of the property.  In mid-August 2011, PWV and Wheeling & Lake Erie jointly filed a verified notice of exemption before the STB for PWV to abandon and for Wheeling & Lake Erie to discontinue its rights over the West End Branch.  The abandonment was consummated in October 2011, and the sale of the West End Branch to PennDOT netted Wheeling & Lake Erie approximately $580,000.  After the parties could not reach an amicable agreement regarding the legal and financial consequences of the disposition, this suit followed.

### 7.  Investor Presentations

Plaintiffs commenced this action by filing a Complaint in Declaratory Judgment on December 15, 2011 in which they sought the Court's intervention to resolve the dispute(s) over the terms of the Lease in anticipation of Defendant(s) declaring a default and seeking the available remedies.  Since that time, Power REIT has posted several investor presentations to its website.  For example, on September 3, 2013, Power REIT issued a "Litigation Update" that charts the "POSSIBLE RANGE OF LITIGATION OUTCOMES."  The chart depicts that a "Win" by PWV would have a total value of approximately $24,600,000 to Power REIT's shareholders, resulting in an over 181% increase in per share value.

### B.  Procedural History

This case has evolved significantly since December 2011 with numerous amendments, supplements, counterclaims, motions, and briefs having been filed.[10]  At present, there are no less then eleven operative pleadings spread across fourteen separate filings in which the parties

---

10.  This action had been initially assigned to Chief Judge Gary L. Lancaster, but it was transferred to the undersigned on May 23, 2013.

set forth eight counts and twelve counterclaims—a bit of a procedural morass.  The following is an overview of this litigation's somewhat protracted history.

### 1.  Complaint in Declaratory Judgment (ECF No. 1)

Plaintiffs first frame the dispute in their December 2011 Complaint in which they aver that the Defendants maintain "that the sale of the West End Branch to PennDOT will result in significant additional rent obligations of Plaintiffs to pay rent to Defendants pursuant to Sections 9 and 4(b)(7) of the Lease Agreement" and that "Defendants claim that Plaintiffs are required to pay the legal expenses pursuant to Section 4(b)(6) of the Lease."  *See* Pls.' Compl. at 11, 14, ECF No. 1.  Plaintiffs submit that the Defendants' calculation of additional "rent" obligations is based entirely on its own obligations necessary to maintain its REIT status and that the attorneys' fees demand was related to a proposed amendment solely for the benefit of the shareholders.  Accordingly, Plaintiffs refuse to pay either amount which implicate the default provisions and seek a judicial determination that they are fully compliant with their obligations under the Lease.

### 2.-3.  PWV's Answer, Affirmative Defenses and Counterclaims (ECF No. 16); Power REIT's Answer and Affirmative Defenses (ECF No. 55)

PWV filed its Answer, Affirmative Defenses and Counterclaims on February 15, 2012.  From its perspective, PWV offers its position as to the historical relationship between the parties:

> 116.  For decades, Norfolk Southern and W&LE have dominated and controlled PWV and used various PWV transactions as a means of booking certain transactions on the books of PWV in a manner that would be tax advantageous to Norfolk Southern and/or W&LE and disadvantageous to PWV.  As more fully explained below, this tax treatment means that, to date, Norfolk Southern has shifted taxable income totaling in excess of $16 million from Norfolk Southern to PWV.  Norfolk Southern has labeled these sums as "indebtedness" but has no intention to repay these amounts to PWV.  Norfolk Southern's scheme has been to orchestrate certain tax treatment of sales and other obligations through its control of PWV's books and records that advance its own tax position.  In so doing, Norfolk Southern has created a massive debt from it to PWV which it has stated that it has no obligation to repay.  Norfolk Southern has deprived PWV of the

economic benefits due to a creditor; namely that PWV's loan to Norfolk Southern is devoid of an economic return in the form of interest and has no maturity.

117. Norfolk Southern seeks to treat the impending sale of the West End Branch (the "West End Branch Sale") consistent with Norfolk Southern's past practices with respect to its sales of PWV's assets. In other words, Norfolk Southern seeks to take the proceeds of this sale, book the proceeds as "indebtedness" but then have no corresponding obligation to repay. Norfolk Southern resists any changes to the parties' relationship and seeks to pressure PWV, a much smaller company, to continue with the status quo. When PWV questioned the propriety of this treatment, Norfolk Southern commenced this declaratory judgment action.

Def.'s Answer, ECF No. 16 at 11-12. *See also id.* at 16, ¶ 138 ("For each Asset Sale, upon information and belief, Norfolk Southern took the sales proceeds and paid no income taxes on its receipt of the proceeds because it recorded the receipt of such proceeds as indebtedness due to PWV and not as income to itself.").

PWV pleads three counterclaims based on those allegations in which it seeks (1) a declaration that Plaintiffs are in in default for failing to pay its legal fees incurred in connection with its review of the contractual and tax issues related to the proposed sale of the West End Branch to PennDOT; (2) a declaration that Plaintiffs are in default for failing to pay income taxes arising from the sale of PWV's assets as additional rent; and (3) alternatively, in the event that the Lease is not deemed terminated by (1) or (2) and thus the indebtedness owed by Norfolk Southern is not deemed immediately due and owing to PWV, such indebtedness is due on demand with interest accruing at the Alternate Federal Rate.

The same day as PWV filed its responsive pleading, Power REIT filed a Rule 12(b)(6) Motion to Dismiss. Power REIT argued that "Plaintiffs have failed to state a claim against it because it is a separate legal entity from PWV, which is a party to the Lease, and because Power REIT is not a successor in interest to PWV." Mem. Op. at 2, ECF No. 48. In response, Plaintiffs submitted "that they were not pursuing an action by which Power REIT would be found liable

for the actions of PWV, but rather declaratory relief as to the rights and obligations of the parties under the Lease, which is Power REIT's sole asset." *Id.* Judge Lancaster found it plausible that the declaratory judgment Plaintiffs seek applies to Power REIT and denied the motion. Power REIT thereafter filed its Answer and Affirmative Defenses on April 30, 2012.

### 4. Plaintiffs' Supplement to Complaint (ECF No. 34)

Plaintiffs filed a Supplement to their Complaint on March 12, 2012 in which they add a second declaratory judgment count as to the Defendants based on a demand for access to their books and records pursuant to Section 8(a)(3) of the Lease for the first time in the nearly fifty-year history of the agreement.[11] The demand letter, sent from Mittal to Norfolk Sothern's general counsel, sought inspection upon two business days' notice and stated that Defendants also intended to perform a track inspection. Three days after the letter was received, Plaintiffs' counsel responded, informing Defendants' counsel that the request was not reasonable and that the proper method for the exchange of information would be through the discovery process.

Accordingly, Plaintiffs seek to have this Court declare that Norfolk Southern is not in default of the Lease by failing to agree to provide Defendants with access to all of the books and records which Defendants requested and that Defendants may not conduct a track inspection.

### 5. PWV's Answer to Supplement to Complaint in Declaratory Judgment and Supplement to Counterclaims (ECF No. 40)

PWV supplemented its filings on March 27, 2012, adding a fourth counterclaim that seeks this Court to declare (1) that Norfolk Southern is in default of Section 8(a)(3) of the Lease

---

11. Section 8(a)(3) of the Lease states as follows:

> Lessor shall permit at any and all reasonable times such person or persons as Lessee may designate to inspect the books and records of Lessor for any purpose whatsoever and Lessee shall permit at any and all reasonable times such person or persons as Lessor may designate to inspect the books and records of Lessee for any purpose whatsoever.

Ex. 1 to Compl., ECF No. 1-2

based on its failure and/or refusal to provide Defendant with access to the books and records; (2) that Plaintiffs may not prohibit and/or prevent PWV from conducting a track inspection; and (3) that Norfolk Southern is in breach of the Lease based on its refusal to permit PWV to conduct a track inspection.

Plaintiffs also filed a motion to dismiss PWV's counterclaims on April 23, 2012 on the ground that it failed to join Power REIT as a necessary party. In response, Power REIT argued that it not a party to the Lease and submitted that, in the alternative, joinder was a more appropriate remedy than dismissal. Relying on his earlier opinion, Judge Lancaster denied the motion and ordered joinder of Power REIT to each of PWV's four counterclaims. *See* Mem. Op. at 4, ECF No. 70 ("Norfolk's well-pled allegations that the defendants did not observe corporate formalities, and thus that piercing of the corporate veil may be appropriate, are as applicable to PWV's counterclaims as to Norfolk's own claims.").

### 6.-10. Plaintiffs' Second Supplement to Complaint (ECF No. 58); Defendants' Answer to Second Supplement to Complaint (ECF No. 63); Defendants' Amended Answer, Affirmative Defenses, and Counterclaims (ECF No. 71); Plaintiffs' Answer and Affirmative Defenses to Amended Counterclaims (ECF No. 72); and Plaintiffs' Answer and Affirmative Defenses to Supplement to Counterclaims (ECF No. 73)

Plaintiffs filed a Second Supplement to their Complaint on May 10, 2012 in which they set forth two additional counts. First, Plaintiffs submit that Defendants breached the Lease when it filed in April 2012 a preliminary Form S-3 Registration Statement in contemplation of a shelf registration enabling it to sell a combination of shares, rights, and warrants aggregating up to $100 million. Second, Plaintiffs aver a fraud claim against the Defendants in connection with the consent it obtained from Norfolk Southern and the creation of Power REIT to allegedly avoid the restrictions of the Lease.

Defendants filed their Answer to the Second Supplement to Complaint on June 19, 2012 and amended it on December 7, 2012 for the sole purpose of joining Power REIT.[12] Two weeks later, on December 21, 2012, Plaintiffs filed their Answers and Affirmative Defenses to the amended counterclaims and to the supplement to counterclaims.

### 11.-12. PWV's Second Supplement to Counterclaims (ECF No. 11); Plaintiffs' Answer and Affirmative Defenses to PWV's Second Supplement to Counterclaims (ECF No. 115)

Following a yearlong discovery process during which over 60,000 pages of documents were produced and twenty five witnesses were deposed on twenty-nine separate dates in six states, Plaintiffs turned over an additional 23,000 pages of documents to PWV in early April 2013. These documents apparently relate to hundreds of transactions Norfolk Southern and Wheeling & Lake Erie engaged in as Lessee and Sub-lessee. From the perspective of PWV, the contents of that mass production exposed Plaintiffs' secret practice of disposing of its property for decades by permitting companies to drill for oil and gas or mine for coal without permission or legal authority. On May 17, 2013, PWV moved for leave of Court to file a second supplement to counterclaims relative to those events. Plaintiffs opposed this motion in its entirety.

By Memorandum Opinion and Order, the Court granted PWV's motion on August 29, 2013. The same day, PWV filed its second supplement in which it added eight counterclaims. (ECF No. 105). Plaintiffs filed their Answer and Affirmative Defenses on October 2, 2013.

Five of the counterclaims sound in common law theories: (1) "breach of contract as against Norfolk Southern based on [its] intentional underreporting of the Settlement Account in violation of Sections 9 and 16 of the Lease;" (2) "breach of contract as against Norfolk Southern

---

12. The Order of Court issued by Judge Lancaster states that "Defendant P&WV is ordered to JOIN defendant Power REIT to its counterclaim and supplemental counterclaim." Order at 1, ECF No. 70 at 6. However, Defendants' Amended Answer, Affirmative Defenses and Counterclaims does not include the fourth declaratory judgment counterclaim set forth in the Answer to Supplement to Complaint (ECF No. 40).

for disposing of PWV's property without paying the proceeds from such a disposition to PWV in cash as required by Section 16(a) of the Lease;" (3) "fraud as against Norfolk Southern based on its yearly false representations of the amount of the Settlement Amount and/or indebtedness and concealment of transactions relating to PWV's property;" (4) "conversion as against Wheeling & Lake Erie for improperly depriving PWV of its right in, use of or possession of PWV's property when allowing third-parties to drill for oil and gas and/or extract coal on the property;" and (5) "breach of contract as against Norfolk Southern for failing and/or refusing to pay PWV additional rent for the year 2012 under Section 4(b)(1)." Def.'s Sec. Suppl. at 19, 23, ECF No. 92.

The remaining three counterclaims are brought pursuant to the Declaratory Judgment Act in which PWV seeks determinations: (1) "that Norfolk Southern is in default of the Books and Records Provisions based on its failure and/or refusal to provide PWV with full and complete access to the books and records included in the March 5 B&R Demand;" (2) "that Norfolk Southern is in default of Section 4 of the Lease based on its failure and/or refusal to reimburse PWV for legal fees incurred as demanded on March 23, 2012;" and (3) "that Norfolk Southern is in default under Section 4(b)(1) of the Lease for failing to pay PWV $341,768 in additional rent for the year 2012."

### 13.-14.    Plaintiffs' First Amended Complaint (ECF No. 153); Defendants' Answer to First Amended Complaint (ECF No. 159).

In response to the Second Supplement to Counterclaims, Plaintiffs moved for leave of court to file a First Amended Complaint. Defendants opposed the motion. The Court granted the motion for leave on December 13, 2013. Plaintiffs filed their amended pleading three days later; Defendants filed their Answer on December 30, 2013.

The First Amended Complaint incorporates by reference Paragraphs 1-206 of the Complaint, Supplement to Complaint and Second Supplement to Complaint and all exhibits attached thereto. The First Amended Complaint seeks this Court to determine (1) the rights and obligations of the parties with regard to the subsurface portion of the land; and (2) that Norfolk Southern is not in default under the Lease for failing to (a) comply with the Books and Records demand by PWV on March 5, 2013; (b) pay the attorneys' fees of opposing counsel; and (c) make a cash payment of additional rent.

\*     \*     \*

Several motions are pending before the Court: Power REIT moves for summary judgment as to Counts One-Four; Plaintiffs request that this Court order joinder of Power REIT to the Second Supplement to Counterclaims; Plaintiffs ask this Court to deem admitted certain paragraphs of their Responsive CSMF; and Plaintiffs seek leave to amend their prayer for relief. The following legal standards govern the resolution of those motions.

## II.     Legal Standards

### A. Federal Rule of Civil Procedure 56

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant must identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

To withstand a motion for summary judgment, the nonmoving party must show a genuine dispute of material fact for trial by citing to particular parts of material in the record. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). *See Celotex Corp.*, 477 U.S. at 322 ("[T]he plain language of Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–248. *See Matsushita*, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56[ ], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."); *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) ("To survive summary judgment, a party must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue.").

The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c)(1)(A), or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact," Fed. R. Civ. P. 56(c)(1)(B). In reviewing all of the record evidence submitted, the court must draw all reasonable inferences

therefrom in the light most favorable to the nonmoving party.  *Matsushita*, 475 U.S. at 587.

The court is not permitted to weigh evidence or to make credibility determinations at this stage.  *Anderson*, 477 U.S. at 255.  Those functions are for the jury, not the court.  *Id.*  Thus, the court is limited to deciding whether there are any disputed issues and, if so, whether they are both genuine and material.  *Id.*

### B.  Federal Rule of Civil Procedure 19

Federal Rule of Civil Procedure 19 specifies the limited circumstances in which the joinder of a particular party is compulsory.  *See General Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 312 (3d Cir. 2007).  More specifically, Rule 19 provides that a person or entity is a "required party" if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).  The Court must treat clauses (A) and (B) in the disjunctive just as the rule phrases them.  *Gen. Refractories Co.*, 500 F.3d at 313

Under Rule 19(a)(1), the Court must also "ask whether complete relief may be accorded to those persons named as parties to the action in the absence of any unjoined parties."  *Id.*  As the United States Court of Appeals for the Third Circuit has noted, "we necessarily limit our Rule 19(a)(1) inquiry to whether the district court can grant complete relief to persons already named as parties to the action; what effect a decision may have on absent parties is immaterial."  *Id.* (citing *Angst v. Royal Maccabees Life Ins. Co.*, 77 F.3d 701, 705 (3d Cir. 1996)).  Additionally, "in making its analysis under Rule 19(a)(1), a court should consider the interests of 'the public in avoiding repeated lawsuits on the same essential subject matter.'"  *Id.* at 315

(quoting Fed. R. Civ. P. advisory committee's notes). Rule 19(a)(1) does, however, "similarly 'stresses the desirability of joining those persons in whose absence the court would be obliged to grant partial or "hollow" rather than complete relief to the parties before the court.'" *Id.* (quoting Fed. R. Civ. P. advisory committee's notes).

### C. LCvR 56

The Local Civil Rules of Court of the United States District Court for the Western District of Pennsylvania effective February 1, 2013 govern all applicable proceedings brought in this Court. LCvR 1.1.C. Such rules carry the force of law and bind the litigants as well as the court. *See generally* 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, 12 Federal Practice and Procedure § 3153 (2d ed. & Suppl. April 2013).

Local Rule 56 requires that a motion for summary judgment be accompanied by a Concise Statement of Material Facts in which "[a] party must cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record supporting the party's statement, acceptance, or denial of the material fact." LCvR 56.B.1. Likewise, the opposing party must file a Responsive Concise Statement setting forth the basis for the denial if any fact contained in the moving party's Concise Statement of Material Facts is not admitted in its entirety (as to whether it is undisputed or material), with appropriate reference to the record (See LCvR 56.B.1 for instructions regarding format and annotation) . . . ." LCvR 56.C.1.b. The same rules apply to a reply. *See* LCvR 56.D.

Local Rule 56.E sets forth the consequences for failing comply with LCvR 56.C. *See* 56.E. As the Rule states:

> Alleged material facts set forth in the moving party's Concise Statement of Material Facts or in the opposing party's Responsive Concise Statement, which are claimed to be undisputed, will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise

controverted by a separate concise statement of the opposing party.

*Id.* Courts have applied this sanction for noncompliance with the Local Rules. *See, e.g.*, *Kimberly v. Borough of W. Newton*, CIV.A 08-603, 2010 WL 231789, at *2 (W.D. Pa. Jan. 12, 2010); *see also Kabacinski v. Bostrom Seating, Inc.*, 98 F. App'x 78, 82 n.3 (3d Cir. 2004) (noting the "District Court's power to impose even harsh penalties for violation of local rules") (citation omitted).

In the exercise of its discretion, a district court may depart from the strictures of its own Local Rules. *United States v. Eleven Vehicles, Their Equip. & Accessories*, 200 F.3d 203, 214-15 (3d Cir. 2000). But that discretion is not unfettered. *See id.* (collecting cases). The Court of Appeals for the Third Circuit has instructed that a district court may depart when "(1) it has a sound rationale for doing so, and (2) so doing does not unfairly prejudice a party who has relied on the local rule to his detriment." *Id.* at 215.

### D. Federal Rule of Civil Procedure 15

Federal Rule of Civil Procedure 15 provides, in relevant part, that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a). This liberal approach to pleading is not unbounded, and the decision whether to grant or to deny a motion for leave ultimately rests with the sound discretion of the trial court. *Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir. 1990).

Certain basic principles guide the exercise of this discretion. *See, e.g.*, *Lincoln Gen. Ins. Co. v. Kingsway Am. Agency, Inc.*, 1:11-CV-1195, 2013 WL 214634, at **4-5 (M.D. Pa. Jan. 18, 2013). A district court may deny leave to amend a complaint where "it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2)

the amendment would be futile, or (3) the amendment would prejudice the other party." *Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Among the equitable Rule 15 considerations, the United States Court of Appeals for the Third Circuit has "consistently recognized [ ] that 'prejudice to the non-moving party is the touchstone for the denial of an amendment.'" *Arthur v. Maersk, Inc.*, 434 F.3d 196, 204 (3d Cir. 2006) (quoting *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir. 1993)). In determining what constitutes prejudice to the non-moving party, the Court must consider whether the assertion of an additional claim would "'(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the [party] from bringing a timely action in another jurisdiction.'" *Long v. Wilson*, 393 F.3d 390, 400 (3d Cir. 2004) (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)). *See Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001) ("The issue of prejudice requires that we focus on the hardship to the defendants if the amendment were permitted.") (citation omitted). Merely claiming prejudice is insufficient. *Dole*, 921 F.2d at 487. "In the absence of substantial or undue prejudice, denial instead must be based on bad faith or dilatory motives, truly undue or unexplained delay, repeated failures to cure the deficiency by amendments previously allowed, or futility of amendment." *Lorenz*, 1 F.3d at 1414 (citation omitted).

## III. Discussion

### A. Motion for Summary Judgment

Power REIT presents several arguments in support of its motion for summary judgment. As a threshold matter, Power REIT avows that direct liability cannot exist because it is not in privity with either Plaintiff. Power REIT thus takes the position that Plaintiffs must prove that it

is liable as the successor-in-interest to PWV—an impossible task from Power REIT's perspective because its subsidiary still exists and successor liability cannot result from the reverse triangular merger. Power REIT further argues that the fraud claim (Count Four) must fail because the alleged misrepresentations preceded the formal creation of Power REIT and the Plaintiffs have otherwise not been damaged.[13]

Plaintiffs focus their attention on successor liability and veil piercing principles, arguing that genuine issues of material fact exist regarding Power REIT's "accountability" for their claims so as to preclude the entry of summary judgment. Plaintiffs likewise contend that genuine issues of material fact exist with respect to their damages, but they also request permission to amend their prayer for relief.

### 1. Successor Liability

The ordinary rule of corporate successor liability "states that a firm that buys assets from another firm does not assume the liabilities of the seller merely by buying its assets." *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 464 (3d Cir. 2006) (citing *Luxliner P.L. Export Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69 (3d Cir. 1993); *Polius v. Clark Equip., Co.*, 802 F.2d 75 (3d Cir. 1986); 15 WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 7122 ((perm. ed., rev. vol. 2004)). There are, however, four traditional exceptions. *Id.*

The general rule of non-liability may be overcome if (1) the purchaser expressly or implicitly agrees to assume liability; (2) the transaction was entered into fraudulently for the purpose of escaping liability; (3) the purchase amounts to a consolidation or merger; or (4) the

---

13. Power REIT notes that "[t]o the extent Plaintiffs are asserting a claim for aiding and abetting fraud . . . there is no cause of action for aiding and abetting fraud under Pennsylvania law." Members of this Court have reached a contrary conclusion. *See Panthera Rail Car LLC v. Kasgro Rail Corp.*, CIV.A. 13-679, 2013 WL 4500468, at *9 (W.D. Pa. Aug. 21, 2013) (collecting cases). This Court finds the analysis set forth by Judge Fischer persuasive.

purchaser is a mere continuation of the seller.[14]  *See Cont'l Ins. Co. v. Schneider, Inc.*, 873 A.2d 1286, 1291 (Pa. 2005) (citations omitted); *see also Berg Chilling Sys., Inc.*, 435 F.3d at 464-65. The third and fourth exceptions "are generally treated identically . . . as both arise where there is continuity of identity between the buyer and seller."  *Berg Chilling Sys., Inc.*, 435 F.3d at 464-65 (citing *Ruiz v. Blentech Corp.*, 89 F.3d 320, 325 (7th Cir. 1996); *Luxliner P.L. Exp., Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 73 (3d Cir. 1993)).  Plaintiffs invoke the fraudulent purpose and de facto merger/mere continuation exceptions.

Several outside jurisdictions have recognized that the continued existence of a predecessor forecloses the availability of successor liability.[15]  *See In re Welding Fume Products Liab. Litig.*, 1:03-CV-17000, 2010 WL 2403355, at *7 (N.D. Ohio June 11, 2010) ("Of course, if the original entity still exists, there is no successor—and no successor liability."); *White v. Cone-Blanchard Corp.*, 217 F. Supp. 2d 767, 772 (E.D. Tex. 2002) ("'It is axiomatic that to establish corporate successor liability there must in fact be a corporate successor.'") (quoting *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 879 F. Supp. 407, 410 (D. Vt. 1995)).  Moreover, other courts have held that the transfer of all or substantially all of the assets of one corporation to another is a prerequisite to corporate successor liability.  *See Nat'l Soffit & Escutcheons, Inc. v.*

---

14.  Pennsylvania law also recognizes other exceptions not applicable in this case.  *See Cont'l Ins. Co. v. Schneider, Inc.*, 873 A.2d 1286, 1291 n.8 (Pa. 2005) ("This Commonwealth has also recognized a 'product-line' exception to the general rule against successor liability, which permits successor liability to be imposed for injuries caused by defective products manufactured by a predecessor if the successor continues to manufacture the product."); *see also Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 465 n.3 (3d Cir. 2006) ("Some states recognize transfer for inadequate consideration as an additional exception, *see, e.g., Lopata v. Bemis Co., Inc.*, 383 F. Supp. 342 (E.D. Pa. 1974); however, this seems more properly viewed as a form of constructive fraud.").

15.  Power REIT has not cited and this Court has not independently found any controlling authority on this "prerequisite" issue.  The United States District Court for the Eastern District of Pennsylvania has concluded that, in the context of an de facto merger analysis, a corporation need not completely cease to exist; rather, the "cessation of ordinary business operations" factor may be found when the predecessor does not dissolve, but is reduced to an assetless shell.  *See Lehman Bros. Holdings, Inc. v. Gateway Funding Diversified Mortgage Servs.*, L.P., CIV.A. 11-6089, -- F. Supp. 2d --, 2013 WL 6667733, at *20 (E.D. Pa. Dec. 17, 2013); *see also Fink v. EdgeLink, Inc.*, 553 F. App'x 189 (3d Cir. 2014) (passing on the question of "whether a transfer is a formal prerequisite for successor liability or merely one important factor among several" under New Jersey law).

*Superior Sys., Inc.*, 98 F.3d 262, 266 (7th Cir. 1996) ("In order for one corporation to be deemed a successor corporation in the first place, it must be a successor to all, or substantially all, of another corporation's assets."); *Grand Labs., Inc. v. Midcon Labs of Iowa*, 32 F.3d 1277, 1281 n.5 (8th Cir. 1994) ("Most jurisdictions hold that a prerequisite to the imposition of liability against a corporation under any of the four exceptions to the nonliability of successors is a transfer or sale of all, or substantially all, the assets of the predecessor to the successor.") (citing *Acheson v. Falstaff Brewing Corp.*, 523 F.2d 1327, 1329-30 (9th Cir. 1975); *Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1132 (10th Cir. 1991)); *see also Carreiro v. Rhodes Gill & Co., Ltd.*, 68 F.3d 1443, 1448 (1st Cir. 1995) (collecting cases). Of course, none of those cases bind this Court.

Similarly, Power REIT points to other non-binding authorities which have held that a reverse triangular merger does not create successor liability.[16] *See Baldwin Enterprises, Inc. v. Retail Ventures, Inc.*, 09-CV-0159-MJR-PMF, 2010 WL 624261, at **5-8 (S.D. Ill. Feb. 18, 2010); *Saginaw Prop., LLC v. Value City Dep't Stores, LLC*, 08-13782-BC, 2009 WL 3536616, **8-9 (E.D. Mich. Oct. 30, 2009); *Kaufmann v. LVA Holdings, Inc.*, 2006 U.S. Dist. LEXIS 49499, at **1-3 (D. Colo. July 20, 2006); *Morgan v. Powe Timber Co.*, 367 F. Supp. 2d 1032, 1035-40 (S.D. Miss. 2005); *see also Allstate Ins. Co. v. Countrywide Fin. Corp.*, 842 F. Supp. 2d 1216, 1231-33 (C.D. Cal. 2012); *In re Welding Fume Products Liab. Litig.*, 2010 WL 2403355, at *7 n.67; *Binder v. Bristol-Myers Squibb, Co.*, 184 F. Supp. 2d 762, 771-72 (N.D. Ill. 2001); *Equity Grp. Holdings v. DMG, Inc.*, 576 F. Supp. 1197, 1203-05 (S.D. Fla. 1983). Those cases do, however, suggest that a finding of fraud may lead to a contrary result. *See Baldwin*

---

16. At least one court of appeals has noted that lack of clarity in the law on this issue. *See Hermanns v. Albertson's, Inc.*, 203 F. App'x 916, 919 n.4 (10th Cir. 2006) ("The parties cited to several cases in an attempt to establish whether reverse triangular mergers permit the parent to be considered the target's successor-in-interest. Contrary to the parties' assertions, the law on this issue is not clear, nor need we make it so here given the arbitrator's parenthetical qualification of his use of the term 'successor.'").

*Enterprises, Inc.*, 2010 WL 624261, at *7 ("[T]here is no evidence in the record before this Court that the triangular merger was employed to *fraudulently* escape liability or to defraud shareholders.") (emphasis in original).

Plaintiffs attempt to distinguish this matter by calling it "unique," highlighting that none of those decisions cited by Power REIT contained evidence of fraud. To the Plaintiffs, the record in this case supports such a finding, creating a genuine dispute of material fact. Plaintiffs also advocate that Power REIT is attempting to elevate the form of the transaction over its actual substance and practical effect—a critical inquiry under Pennsylvania law. *See Polius v. Clark Equip. Co.*, 802 F.2d 75, 78 (3d Cir. 1986) ("[W]hen the form of the transfer does not accurately portray substance, the courts will not refrain from deciding that the new organization is simply the older one in another guise."); *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 310 (3d Cir. 1985) ("It is the duty of the court to examine the substance of the transaction to ascertain its purpose and true intent."); *see also Knapp v. N. Am. Rockwell Corp.*, 506 F.2d 361, 370 (3d Cir. 1974) (Rosenn, J., concurring) ("In the present day of complex corporate reorganizations and acquisitions, the intrinsic nature of a transaction cannot be ascertained merely from the form in which it is structured. Courts therefore must examine the substance of the transaction to ascertain its purpose and true intent.").

The Court finds that genuine disputes of material fact do exist. Those disputed issues of fact raised by Plaintiffs include, *inter alia*, whether the planned restructuring and/or reorganization was part of a scheme to defraud; whether Power REIT was created to circumvent the restrictions in the Lease; whether the reverse triangular merger left PWV as a "neutered, nonfunctioning shell;" and/or whether Power REIT represented itself (aside from the SEC filings) as the corporate successor to PWV. These are fact-intensive questions unresolvable on

this record.  Indeed, the Court cannot resolve those disputes without first weighing the evidence—a function prohibited at this stage.  Thus, the Court will deny summary judgment to Power REIT on the question of successor liability.

## 2.  Veil Piercing

There is a strong presumption under the law against piercing the corporate veil, as doing so undermines the well-established rule that corporations enjoy a legal existence separate from their owners.  *See Lumax Indus., Inc. v. Aultman*, 669 A.2d 893, 895 (Pa. 1995).  Veil piercing may be appropriate when it is necessary to "prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime."  *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001) (quoting *Zubik v. Zubik*, 384 F.2d 267, 273 (3d Cir. 1967)).  *Accord Ragan v. Tri-Cnty. Excavating, Inc.*, 62 F.3d 501, 508 (3d Cir. 1995) ("Pennsylvania courts have largely embraced the flexible tenor of the *Ashley* standard, holding, for instance, that no finding of fraud or illegality is required before the corporate veil may be pierced, but rather, that the corporate entity may be disregarded whenever it is necessary to avoid injustice.") (citation omitted).

Courts have expanded on that general principle by developing various tests to determine when veil piercing is warranted.  The tests go by various titles: the "alter ego" theory, the "integration" doctrine, the "identity doctrine," to name just a few.  *Id.* at 484 n.2.  Plaintiffs purport to proceed under the "alter ego" theory, but in practice "the formulations are generally similar, and courts rarely distinguish them."[17]  *Id.*  No matter the theory upon which Plaintiff is

---

17.  Plaintiffs submit that "[t]hough Power REIT is vicariously liable under the doctrine of successor liability, it is also vicariously liable under the veil piercing doctrine."  Pls.' Br. in Opp. at 34, ECF No. 127.  Veil piercing is distinct from successor liability, but the analyses are closely related.  *See In re Welding Fume Products Liab. Litig.*, 1:03-CV-17000, 2010 WL 2403355, at *8 (N.D. Ohio June 11, 2010) ("Successor liability and corporate veil-piercing, while based on many overlapping factors, are separate legal doctrines with distinct legal consequences.") (citation omitted).  To the extent that Power REIT argues that the allegation of veil piercing is a "new implied theory of liability," it is somewhat mistaken.  *See* Def.'s Br. in Support at 25 n.12, ECF No. 112.  Judge Lancaster's earlier

proceeding, a court must consider several factors in deciding whether to disregard the corporate form:

> the failure to observe corporate formalities; non-payment of dividends; insolvency of debtor corporation; siphoning the funds from corporation by dominant shareholders; non-functioning of other officers and directors; absence of corporate records; whether the corporation is a mere façade for the operations of a common shareholder or shareholders; and gross under-capitalization.

*Eastern Minerals & Chemicals Co. v. Mahan*, 225 F.3d 330, 333 n.7 (3d Cir. 2000) (quoting *Wheeling-Pittsburgh Steel Corp. v. Intersteel, Inc.*, 758 F. Supp. 1054, 1059 (W.D. Pa. 1990)). As our court of appeals has further explained in the context of an alter ego analysis, Pennsylvania law requires a showing that the subordinate company 'acted robot- or puppet-like in mechanical response to the controller's tugs on its strings or pressure on its buttons.'" *Ragan v. Tri-Cnty. Excavating, Inc.*, 62 F.3d 501, 508 (3d Cir. 1995) (quoting *Culbreth v. Amosa (Pty) Ltd.*, 898 F.2d 13, 15 (3d Cir. 1990)). This inquiry is highly fact-specific. *See* 1 WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 41,10 ("The propriety of piercing the corporate veil is highly dependent of the equities of the situation, and the inquiry tends to be highly fact-driven.") (collecting cases); *see also id.* at § 43 (discussing veil piercing in the parent-subsidiary context).

The Court finds that Plaintiffs have alleged facts sufficient to present a genuine dispute of material fact as to whether the corporate veil should be pierced. Those disputed issues of material fact include, *inter alia*, whether Power REIT and PWV intermingle their assets and liabilities (*e.g.*, Power REIT's purported representation that its shareholders stand to gain from a "Win" by PWV in this litigation); whether they disregard corporate formalities (*e.g.*, the alleged oral indemnification agreement between Lesser and Mittal as the corporate officers of

---

Memorandum Opinions denying the motions to dismiss (ECF Nos. 48, 70) both reference and rely upon veil piercing principles.

Defendants); and/or whether demands under the Lease were for the exclusive benefit of the parent' shareholders (*e.g.*, the demand of Defendant(s) for recursive tax payments). Accordingly, the Court will deny summary judgment to Power REIT on the veil piercing issue.

### 3. Damages

The final argument of Power REIT is that Plaintiffs have not been damaged, claiming that their failure to plead damages with reasonable certainty or to include nominal damages in their prayer for relief warrants the entry of summary judgment as to the breach of contract and fraud claims. The Court is not persuaded.

"Under Pennsylvania law, if a party is able to prove breach of contract but can show no damages flowing from the breach, the party is entitled to recover nominal damages." *Haywood v. Univ. of Pittsburgh*, 976 F. Supp. 2d 606, 645 (W.D. Pa. 2013) (citations omitted). "A grant of summary judgment on the sole basis of absence of provable damages, therefore, is generally improper." *Thorsen v. Iron and Glass Bank*, 476 A.2d 928, 931 (Pa. Super. Ct. 1984). *See, e.g.*, *Zeno v. Ford Motor Co., Inc.*, 480 F. Supp. 2d 825, 834 (W.D. Pa. 2007) ("'In light of the law of Pennsylvania allowing nominal damages for a breach of contract, summary judgment cannot be granted for failure to show damages.'"); *Albert Rolland, S.A. v. Smithkline Beckman Corp.*, CIV. A. 85-3217, 1990 WL 90492, at *1 (E.D. Pa. June 27, 1990) (awarding nominal damages of one-dollar, although the plaintiff "never requested nominal relief during the course of the trial or in its proposed findings of fact and conclusions of law"); *Nemitz v. Reuben H. Donnelley Corp.*, 310 A.2d 376, 379 (Pa. Super Ct. 1973) (en banc) ("While appellant did not ask for nominal damages, we believe that appellant did more than just prove a breach of contract.").

Nominal damages are also available as a remedy for fraud under Pennsylvania law. *See Peerless Wall & Window Coverings, Inc. v. Synchronics, Inc.*, 85 F. Supp. 2d 519, 536 (W.D. Pa.

2000), *aff'd*, 234 F.3d 1265 (3d Cir. 2000) (citing *Sands v. Forrest*, 434 A.2d 122, 124 (Pa. Super. Ct. 1981)); *see also Sites v. Nationstar Mortgage LLC*, 646 F. Supp. 2d 699, 713 (M.D. Pa. 2009) ("Likewise, it is well established that the 'failure to prove damages [is] not determinative of the substantive issue of [a defendant's] alleged liability for fraud . . . .'") (quoting *Sands*, 434 A.2d at 123) (alteration in original). Moreover, as the Superior Court of Pennsylvania stated in *Sands*, "[i]f plaintiffs were entitled to a verdict on the cause of action alleged, but were unable to prove damages, they were nevertheless entitled to a verdict for nominal damages." 434 A.2d at 124.

The Court recognizes that some decisions have foreclosed a plaintiff's ability to recover nominal damages when the relief was not requested in the Complaint. *See, e.g.*, *Cohen v. Resolution Trust*, 107 F. App'x 287, 289-90 (3d Cir. 2004) ("[P]laintiffs requested only compensatory and punitive damages in their amended complaint, and *nothing in the record suggests that they asked to amend their complaint to include nominal damages.*") (emphasis added); *c.f. Alexander v. Riga*, 208 F.3d 419, 429 (3d Cir. 2000) ("This entitlement [to nominal damages for a violation of a constitutional right] is not automatic, however, 'but rather, it is incumbent upon the plaintiff to make a timely request for nominal damages.'") (quoting *Campos-Orrego v. Rivera*, 175 F.3d 89, 98 (1st Cir. 1999)). But, unlike those cases, Plaintiffs timely seek leave to amend their prayer for relief to include nominal damages. Thus, at a minimum, nominal damages are proper should Plaintiffs prevail as to liability.[18]

Accordingly, the Court will not grant summary judgment based on Power REIT's theory that Plaintiffs have not been damaged or are not otherwise entitled to nominal damages.

---

18. Federal Rule of Civil Procedure 54 embodies this concept. As the rule states, "[e]very other final judgment [i.e., not a default judgment] should grant the relief to which each party is entitled, *even if the party has not demanded that relief in its pleadings*." Fed. R. Civ. P. 54(c) (emphasis added). *See Kirby v. U.S. Gov't, Dep't of Hous. & Urban Dev.*, 745 F.2d 204, 207 (3d Cir. 1984) ("The rule requires that a court ascertain whether the plaintiffs are entitled to any remedy, not whether they have asked for the proper remedy.").

### B. Motion to Join Power REIT as a Necessary Party

Plaintiffs have moved the Court to join Power REIT as a necessary party to PWV's Second Supplement to Counterclaims (*i.e.*, the most-recently filed eight counterclaims), calling Judge Lancaster's prior judicial decision as the "Law of the Case" and citing the considerations set forth in Rule 19(a). Power REIT opposes this motion. As the parties all recognize, this issue has significant overlap with the summary judgment motion. *See* Def.'s Br. in Opp. at 1 ("In seeking to join Power REIT as a counterclaimant on PWV's Second Supplement to Counterclaims, Plaintiffs ask the Court to rule on the precise issue that is presently before the Court on Power REIT's Motion for Summary Judgment.").

The Court will order joinder under Rule 19(a). As the Court previously explained, complete relief could not be accorded if the Court finds that Power REIT is the corporate successor to PWV or that vicarious liability principles otherwise apply. Power REIT is already a party to this action, and therefore, no jurisdictional or procedural bars preclude its joinder. Accordingly, the Court will grant the motion to join Power REIT as a necessary party.

### C. Motion to Deem Certain Paragraphs Admitted

Plaintiffs ask this Court to deem admitted nearly eighty (80) of the two-hundred-and-thirty-five (235) paragraphs set forth in their Responsive CSMF based on Power REIT's purported failure to follow the Local Rules. To summarize, Plaintiffs contends that Power REIT fails to include proper record citations to support its denials.

In response, Power REIT argues that the majority of Plaintiffs' "facts" are immaterial to its motion for summary judgment, repeatedly stating: "**No response is necessary in that this statement fails to comply with Local Rule 56(C)(1)(c). To the extent a response is required, it is denied as immaterial to Power REIT's motion for summary judgment.**" As to the few

remaining "facts," Power REIT asserts that it inadvertently failed to include a reference to the record, and that its denials with regard to Norfolk Southern's mental state based on its lack of knowledge or information are sufficient.

The Court will grant in part and deny in part Plaintiffs' motion. As an initial matter, not all of the eighty contested responses are outright denials. Some of the responses are instead limited admissions to the basic fact(s) asserted. *See, e.g.*, Def.'s Responsive CSMF at ¶¶ 95, 97, *98*, 226, and 273, ECF No. 150.

Other responses are legitimate denials, are supported in the record, or correctly label the facts as irrelevant to the summary judgment motion. *See, e.g.*, *id.* at ¶¶ 160, 169, 182, and 183 (denying knowledge or information sufficient to admit or deny the allegations relating to what Norfolk Southern believed or thought); ¶¶ 146-150 (denying as immaterial a description of an article that discusses an umbrella partnership real estate investment trust ("UPREIT"), a common operating structure for REITs which Power REIT has not formed). Thus, as reflected in the recitation above, those facts have been disregarded.

But many of Power REIT's denials simply miss the mark. The materiality of facts at the summary judgment stage is determined by the relevant substantive law: here, successor liability / veil piercing. The continued presence of Power REIT in this litigation will (most likely) turn on a determination as to whether those doctrines apply. *See Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). Power REIT nevertheless denies as immaterial facts which may inform the analysis, including facts regarding the planned restructuring, the motivations for that decision, representations made in the SEC filings, the effect of the reverse triangular merger, and the "Litigation Updates." The Court cannot agree

that these matters are immaterial to the motion for summary judgment or that it should deny the facts as alleged by Plaintiffs; rather, the Court has deemed admitted those statements to which Power REIT did not respond with an appropriate reference to the record.

### D. Motion for Leave of Court to File Amendment to Second Supplement to Complaint

Plaintiffs move for leave of Court to amend the prayer for relief of the Second Supplement to Counterclaim. More specifically, Plaintiffs seeks to add requests for the following relief: (1) nominal damages; (2) the enjoinment of Power REIT from taking actions in breach of the Lease Agreement; (3) the withdrawal of Norfolk Southern's consent to the issuance of additional shares by PWV; and (4) the undoing of the reverse triangular merger funded by the proceeds of that share issuance. Power REIT opposes this request in its entirety.[19]

The Court finds that Defendants would be prejudiced by the granting of the motion with one exception: the request to add nominal damages to the prayer for relief. Plaintiffs' other proposed remedies would inject novel issues into this case that were not explored during fact discovery. Moreover, as Defendants highlight, fact discovery on Plaintiffs' Second Supplement to Complaint did not cover the possibility of irreparable harm to Plaintiffs absent the sought-for injunction related to the April 2012 Form S-3 or the (in)feasibility of unwinding a long closed merger involving a publically traded company. To be sure, these substantive amendments would inevitably delay the resolution of this action and needlessly increase the costs of this litigation.

The Court further finds that the request is untimely. Where, as here, a party claims undue delay, our appellate court has instructed as follows:

---

19. The parties dispute whether the Court should analyze the motions under Rule 16 or Rule 15. The January 22, 2014 Case Management/Scheduling Order relied upon by Defendants does not address amendments to pleadings, as it relates only to the re-opening of discovery relative to the eight counterclaims. Therefore, the Court will analyze the motion under the more liberal standards of Rule 15(a).

Delay alone does not justify denial of a motion to amend. *Long*, 393 F.3d at 400. Rather, denial of a motion under Rule 15 is appropriate where delay becomes "undue" in that it places an unfair burden on the court. *Adams v. Gould, Inc.*, 739 F.2d 858, 868 (3d Cir. 1984); *see also Frolow v. Wilson Sporting Goods, Co.*, Civ. Action No., 2009 WL 904049, at *6 (D.N.J. April 1, 2009). In determining undue delay, the Court is guided by the actions of the moving party, as well as its reasons for not moving sooner . . . . Without discounting the expense involved in litigating a case for eleven months, only one appellate court uncovered in our research has approved of denial of leave to amend based on a delay of less than one year. *See Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 141-42 (5th Cir. 1993) (nine months); *cf. Jones v. Robinson Prop. Group, L.P.*, 427 F.3d 987, 994-95 (5th Cir. 2005) (affirming denial of leave based on delay of one year); *Lewis v. Fresne*, 252 F.3d 352, 360 (5th Cir. 2001) (same). There is, of course, no presumptive period in which a motion for leave to amend is deemed "timely" or in which delay becomes "undue."

*Arthur v. Maersk, Inc.*, 434 F.3d 196, 204-05 (3d Cir. 2006). Plaintiffs initiated this action two years before this motion and filed their Second Supplement to Complaint six months after their initial pleading. The Court cannot glean any new facts not known to the Plaintiffs at that time. Nevertheless, Plaintiffs had ample opportunity to amend their pleading(s) before the parties' agreed-upon deadline of June 15, 2012 or before the close of discovery in January 2013, but they elected to wait until January 2014 to make this request.[20]

Finally, Rule 54(c) does not save the day for Plaintiffs. "The rule was meant to protect a plaintiff from clumsy pleading, which, through technical oversight, might deprive it of a deserved recovery. 'The [rule's] most common usage is when the amount of the award varies from the demand for relief.'" *USX Corp. v. Barnhart*, 395 F.3d 161, 165 (3d Cir. 2004) (quoting 10 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2664 (3d ed. 1998)). Here, by contrast, Plaintiffs are seeking to introduce complex issues relative to a permanent injunction and rescission. The failure to include those remedies is wholly distinguishable from the omission of nominal damages from the prayer for

---

20. Judge Lancaster entered the final pretrial order on February 11, 2013. This Court vacated that order after Plaintiffs produced an additional 23,000 pages of documents to PWV in April 2013, resulting in the reopening of discovery in this matter.

relief, particularly when nominal damages is the default remedy for a contractual breach absent a showing of compensatory damages. Accordingly, the Court will grant the motion to the extent that Plaintiffs seek to add nominal damages to their prayer relief, but it will deny the request in all other respects.

## IV.    Conclusion

For the reasons hereinabove stated, the Court will deny Power REIT's motion for summary judgment; grant the Plaintiffs' motion to join Power REIT as a necessary party to PWV's Second Supplement to Counterclaims; grant in part and deny in part the motion to deem admitted certain paragraphs of Plaintiffs' Responsive CSMF; and grant in part and deny in part the motion for leave of Court to file an amendment to the Second Supplement to Complaint.

The Court will also schedule a status conference to discuss the future course of this litigation and explore options to "secure the just, speedy, and inexpensive determination of [this] action." Fed. R. Civ. P. 1.

An appropriate Order follows.


McVerry, J.

NORFOLK SOUTHERN RAILWAY
COMPANY AND WHEELING & LAKE ERIE
RAILWAY COMPANY

    Plaintiffs,

    vs.

PITTSBURGH & WEST VIRGINIA
RAILROAD AND POWER REIT,

    Defendants.

)
)
)
) 2:11-cv-1588
)
)
)
)
)
)
)
)
)

## ORDER OF COURT

AND NOW, this 19th day of June, 2014, in accordance with the foregoing Memorandum

Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** as follows:

(1) DEFENDANT POWER REIT'S MOTION FOR SUMMARY JUDGMENT (ECF

No. 117) is **DENIED**;

(2) PLAINTIFFS' MOTION TO JOIN POWER REIT AS A NECESSARY PARTY TO

PITTSBURGH & WEST VIRGINIA RAILROAD'S SECOND SUPPLEMENT TO

COUNTERCLAIMS (ECF No. 117) is **GRANTED**, and Defendant PWV shall **JOIN**

Defendant Power REIT to its Second Supplement to Counterclaims on or before July

9, 2014;

(3) PLAINTIFFS' MOTION TO DEEM ADMITTED CERTAIN PARAGRAPHS OF

PLAINTIFFS' ADDITIONAL UNDISPUTED MATERIAL FACTS (ECF No. 156)

is **GRANTED IN PART AND DENIED IN PART**; and

(4) PLAINTIFFS' MOTION FOR LEAVE OF COURT TO FILE AMENDMENT TO

SECOND SUPPLEMENT TO COMPLAINT AMENDING THE PRAYER FOR

RELIEF (ECF No. 162) is **GRANTED IN PART AND DENIED IN PART,** and

Plaintiffs shall file their amended pleading on or before Wednesday July 2, 2014.

**IT IS FURTHER ORDERED** that a Status Conference (by telephone if requested) is

hereby **SCHEDULED** for Friday July 11, 2014 at 10:00 am during which the Court will discuss

with counsel potential options to secure the just, speedy, and inexpensive determination of this

action.

BY THE COURT:

s/Terrence F. McVerry
United States District Judge

cc:   **Stanley Parker**
      Email: stanley.parker@bipc.com
      **Bradley J. Kitlowski**
      Email: bradley.kitlowski@bipc.com
      **Kathleen J. Goldman**
      Email: kathleen.goldman@bipc.com
      **Renee M. Schwerdt**
      Email: renee.schwerdt@bipc.com
      **Samuel W. Braver**
      Email: samuel.braver@bipc.com

      **Edward P. Gilbert**
      Email: egilbert@morrisoncohen.com
      **Brett D. Dockwell**
      Email: bdockwell@morrisoncohen.com
      **Patricia L. Dodge**
      Email: pld@muslaw.com
      **Nicholas J. Bell**
      Email: njb@muslaw.com