# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **NORFOLK SOUTHERN RAILWAY COMPANY and WHEELING & LAKE ERIE RAILWAY COMPANY,** | ) ) ) ) | **2:11-cv-1588-TFM** |
| **Plaintiffs,** | ) ) ) |  |
| **vs.** | ) ) ) |  |
| **PITTSBURGH & WEST VIRGINIA RAILROAD and POWER REIT**, | ) ) ) ) | |
| **Defendants.** | ) |  |

## MEMORANDUM OPINION AND ORDER OF COURT

Pending before the Court is a MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 196) filed by Defendants/Counterclaim Plaintiffs Pittsburgh & West Virginia Railroad and Power REIT; a MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 198) filed by Plaintiffs/Counterclaim Defendants Norfolk Southern Railway Company and Wheeling & Lake Erie Railway Company; and PLAINTIFFS' SUPPLEMENTAL MOTION TO DEEM ADMITTED CERTAIN PARAGRAPHS OF PLAINTIFFS' STATEMENT OF MATERIAL FACTS AND TO STRIKE OBJECTIONS (ECF No. 226).[1]  The issues have been fully briefed and well-argued by the parties in their memoranda (ECF Nos. 197, 199, 210, 213, 217, 220, 221, 229, 230), and the factual record has been thoroughly developed via their Concise Statements of Material Facts ("CSMF"), appendices, exhibits, and Responsive Statements of Facts ("RSOF") (ECF Nos. 200, 201, 202, 203, 204, 207, 208, 209, 211, 212, 216, 218, 224).  The Court heard

---

1.  The Motion for Partial Summary Judgment filed on behalf of Defendant(s) is styled as "DEFENDANT PITTSBURGH & WEST VIRGINIA RAILROAD'S MOTION FOR PARTIAL SUMMARY JUDGMENT" with no mention of Power REIT despite it having been joined to the counterclaims that are the subject of this motion.  *See* ECF Nos. 70, 71, 187, 191.  Where appropriate, the Court will refer to "Defendants."

oral argument on December 16, 2014, and the transcript has been filed of record (ECF No. 231).

Accordingly, the motions are ripe for disposition.

## I. Background

### A. Factual Background[2]

The following background is taken from the Court's independent review of the motions for summary judgment, the filings and arguments in support and opposition thereto, and the record as a whole.

#### 1. The Parties

This action concerns a lease entered into between The Pittsburgh & West Virginia Railway Company ("Pittsburgh & West Virginia") and Norfolk and Western Railway Company

---

2. Plaintiffs' motion the Court to deem admitted one-hundred-and-thirty-nine (139) paragraphs of their CSMF (ECF No. 200) and Statement of Additional Undisputed Facts (ECF No. 207) and strike, or in the alternative overrule, all objections thereto due to Defendants' alleged noncompliance with Local Civil Rule of Court 56, namely their failure to support denials with citations to the record and improper use of evidentiary objections in their responsive statements of material facts (ECF Nos. 209, 224). For example, the majority of Defendants' denials set forth the following response, with some slight variation as to the evidentiary objection(s):

> Denied as the document cited by Plaintiffs do not support this statement. Moreover, this statement is denied based upon Plaintiffs' mischaracterizations of the cited document. Finally, Defendants object to the allegations set forth in paragraph [*n*] as irrelevant, (Fed. R. Evid. 401, 402, 403), (b) inadmissible hearsay (Fed. R. Evid. 801, 802) and/or (c) Ex. [*n*] is not properly authenticated (Fed. R. Evid. 901).

*See, e.g., id.* at ¶¶ 35, 36, 37, 38, 39, 40, 42, 43, 50, 54, 72, 73, 74, 75, 77, 78, 109, 137, 139, 142, 151, 158, 167, 174, 177, 184, 185, 186, 187, 188, 189, 190, 194, 195, 196, 197, 198, 200, 201, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 220, 227, 228, 229, 230, 231, 237, 238, 239, 242, 243, 253, 258, 259, 265, 268, 269, 270, 271, 273, 281, 283, 301, 305, 306, 308, 322, 323, 334, 341, 353, 354, 359, 367, 371, 372, 374, 378, 379, 380, 398, 399, 400, 403, 404, 405, 413. For others, Defendants respond in a similar fashion:

> Denied to the extent the allegations contained in Paragraph [*n*] refer to writings, documents which speak for themselves and the allegations are, therefore, denied to the extent that the allegations do not accurately and completely reflect the writings. Defendants object to the allegations set forth in paragraph [*n*] as irrelevant (Fed. R. Evid. 401, 402, 403).

*See, e.g., id.* at ¶¶ 96, 103, 168, 254, 255, 294, 370, 401. Nowhere do Defendants include an appropriate reference to the record to support the basis of these denials. The Court is instead left guessing. At the same time, the Court is reluctant to resolve the cross-motions for summary judgment based on a procedural technicality rather than merits of the claims, and therefore, it will deny Plaintiffs' motion. Accordingly, the Court has conducted an independent review of the record and has included those facts that are material, supported by the evidence and are otherwise admissible at trial.

("Norfolk and Western") in 1962 (the "Lease"). Under the Lease, Pittsburgh & West Virginia conveyed to Norfolk and Western all of its right, title, and interest in and to certain of its properties, including a 112-mile portion of main line railroad (the "Rail Line") and approximately twenty miles of branch rail lines that run from Western Pennsylvania through West Virginia and into Ohio.

Norfolk Southern Railway Company ("Norfolk Southern") is the successor to the interest of Norfolk and Western in the Lease. Wheeling & Lake Erie Railway Company ("Wheeling & Lake Erie") became the Sublessee on May 17, 1990 when it entered into an agreement with Norfolk Southern to assume the rights, interest, duties, obligations, liabilities, and commitments of Norfolk and Western as lessee, including the role of being principal operator of the Rail Line (the "Sublease"). *See* Pls.' App'x Ex. 2 at 1-2, ECF No. 201-2.

Pittsburgh & West Virginia Railroad ("PWV") is a business trust and the successor-in-interest to The Pittsburgh & West Virginia Railway Company. Power REIT is a real estate investment trust which was formed in 2011 as part of a reverse triangular merger of PWV. After that reorganization, PWV became a wholly-owned subsidiary of Power REIT.

## 2. The Lease

The Lease is dated July 12, 1962 and contains a pre-printed "SEAL" notation following the parties' signatures. *See* Pls.' App'x Ex. 1 at 1, 19, ECF No. 201-1. The term of the Lease is 99-years, renewable in perpetuity at the option of the Lessee absent a default. *See id.* at 3-4. The same terms and conditions, including the economic provisions of the Lease, remain in effect with each renewal. *See id.* at 4.

### a. The Property (Not) Demised

Section 1 sets forth the parties' agreement as to what comprises the "Demised Property" under the Lease:

> Except for such property as shall be hereinafter specifically excluded by Section 2 hereof, Lessor does hereby lease, assign, transfer and deliver to Lessee, its successors and assigns, for the term hereinafter set forth, and Lessee does hereby accept from Lessor all of Lessor's right, title and interest in and to all its property, real, personal and mixed, including equipment, machinery, tools, materials and supplies, cash, investments, securities, claims, intangibles, choses in action, rights (contractual or otherwise), obligations, interests, leaseholds and franchises, and including without limitation:
>
> (a) The railroad properties consisting of real estate owned and operated by Lessor and described in Schedule A attached hereto.
>
> (b) The additional property of a miscellaneous nature described in Schedule B attached hereto.
>
> (c) All property acquired in replacement of or substitution for, and all additions, betterments and improvements to and extensions of, the property covered by this Section 1, and all after-acquired property of Lessor, acquired during the term of this Lease and appurtenant to or useful upon or in connection with the property covered by this Section 1, except for after-acquired property acquired by Lessor with the proceeds of the rent paid or payable by Lessee pursuant to subdivision (a) of Section 4 hereof . . . .

*Id.* at 1. Section 1 also provides that "Lessor will execute and deliver all such instruments, if any, as may be necessary to assign or confirm to Lessee any of the property demised . . . ." *Id.*

Schedule A describes Lessor's "Real Estate Railroad Properties" to be "[a]ll right, title and interest of The Pittsburgh & West Virginia Railway Company in and to any and all land and improvements or other inherently permanent structures situate thereon which may be under, along or adjacent to [(1) the Rail Line and (2)-(6) branch lines of railroad known as the Donora Branch, Clairton Branch, Mifflin Branch, West End Branch, and Bell Branch]." *Id.* at 24-26. Schedule B describes Lessor's "Additional Properties" to be

> All right, title and interest of The Pittsburgh & West Virginia Railway Company, whether legal or equitable, in and to all equipment, machinery, tools, material and supplies, cash, investments, securities, claims, intangibles, choses in action, rights (contractual or otherwise), interests, franchises and all other property owned by The Pittsburgh & West Virginia Railway Company, excepting real properties listed on Schedule A hereto and property not demised listed in Section 2 hereof.

*Id.* at 26. As the Sublessee, Wheeling & Lake Erie presently holds all right, title and interest in the property covered under the Lease.

Section 2 excludes the following property (the "Nondemised Property") of Lessor from the Lease:

> (a) Motive power and rolling stock owned by Lessor at the commencement of the term of this Lease as provided in Section 3 hereof . . . .

> (b) Shares of stock issued by Lessor and held in its treasury at the commencement of the term of this Lease as provided in Section 8 hereof.

> (c) Books and records of Lessor which are needed by Lessor in order to carry out its obligations under this Lease.

> (d) Rights, privileges and franchises of Lessor requisite for the preservation of its corporate existence and for the proper performance by it of the terms and provisions of this Lease or of any obligations imposed by law.

> (e) After-acquired property acquired by Lessor with the proceeds of the rent paid or payable by Lessee pursuant to subdivision (a) of Section 4 hereof.

*Id.* at 2. The final clause of Section 2 permits Lessor, without first securing the consent of Lessee, to "sell, lease, mortgage, pledge, transfer, dispose of, invest and reinvest all or any part of the nondemised property covered by this Section 2, except that covered by subdivisions (a) and (b) hereof, or the proceeds thereof or the income therefrom." *Id.*

**b. Rent**

Rent under the Lease consists of a cash payment fixed at $915,000 per year (Section 4(a)) as well as additional items attributable to the real properties (Section 4(b)). *See id.* at 4-6. Relevant here, the "Additional rent" includes the following:

(1)     Sums equal to the deduction for depreciation or amortization with respect to the demised property allowed to Lessor for such year under the provisions of the then effective United States Internal Revenue Code . . . .

(5)     Except as otherwise provided in Section 5 hereof, all interest, expenses, fees and any other sums (except for principal, sinking fund payments or other sums to be paid or advanced pursuant to Section 7 hereof and except for any obligations incurred by Lessor solely for the benefit of its stockholders or reasonably allocable thereto) payable by Lessor and regardless of whether accrued or payable in respect of a period prior to the commencement of the term of this Lease.  The foregoing sums shall be paid or discharged by Lessee as and when they become due and payable.

(6)     Such sums, if any, as may be required to pay all obligations reasonably incurred by Lessor for the doing of all acts and things which Lessor may be lawfully required to do or perform under the provisions of this Lease or of any law or by any public authority, or for the doing of all acts and things necessary or desirable for the protection during the existence of this Lease of Lessor's rights in the demised property or the rentals or other sums payable pursuant to this Lease, except such obligations incurred by Lessor solely for the benefit of its stockholders or reasonably allocable thereto, or in connection with nondemised property or reasonably allocable thereto.

(7)     All taxes, assessments and governmental charges, ordinary and extraordinary, regardless of whether relating to or accrued or payable in respect of a period prior to the effective date of this Lease, which are lawfully imposed upon Lessor or the demised property or its income or earnings or upon any amount payable to any security holder of Lessor which Lessor has agreed to pay or discharge, except for any income taxes of Lessor incurred with respect to rent paid pursuant to Section 4(a) hereof, any taxes arising after commencement of the term of this Lease in respect of nondemised property or the income therefrom, or any taxes incurred by Lessor solely for the benefit of its stockholders or reasonably allocable thereto.  The foregoing sums shall be paid or discharged by Lessee as and when they become due and payable.

*Id.* at 4-5.  Additional rent also includes sums equal to the tax deductions allowed to Lessor for retirement or abandonment of depreciable Demised Property of Lessor solely on account of

casualty, abnormal obsolescence or other cause not taken into consideration in determining the rate of depreciation or amortization (Section 4(b)(2)); for retirement or abandonment of non-depreciable Demised Property of Lessor (Section 4(b)(3)); and for amortization of discount and expense on funded debt and equipment or other obligations of Lessor (Section 4(b)(4)). *Id.*

### c. Indebtedness

Several sections of the Lease outline the rights and obligations of the parties with regard to indebtedness. The relevant provisions are as follows:

### i. Operation, Maintenance, Extensions and Improvements

Section 6 requires Lessee, at its own expense and without deduction from the rent, to "maintain, manage and operate the demised property in the manner required by law" and to "[i]ndemnify and hold Lessor harmless from all claims, demands, suits, causes of action, loss, damage, liability or expense which Lessor may incur or for which it may become liable, except to Lessee or to Lessor's stockholders . . . ." *Id.* at 7. In addition, Section 6 calls for Lessee to make extensions, additions, betterments and improvements to the Demised Property that it, in its discretion, considers necessary or desirable. *Id.* Any such extensions, additions, betterments and improvements constitute an indebtedness of Lessor to Lessee. *Id.*

### ii. Debts of Lessor

Under Section 7, Lessee agrees "to pay or discharge on behalf of Lessor, as and when the same shall become due and payable, all obligations of Lessor for payment of principal and sinking funds as well as any other payments which Lessor may be obligated to make by reason of its guaranties or its agreements to make advances or its agreements to purchase real or personal property of any kind . . . ." *Id.* at 7-8. All sums paid by Lessee in accordance with Section 7 are a "debt obligation" of Lessor to Lessee. *See id.* at 8.

### iii. Disposition of Property of Lessor

Section 9 of the Lease states as follows:

> Such demised property as shall not in the opinion of Lessee be necessary or useful may be sold, leased or otherwise disposed of by Lessee, and Lessor shall execute and deliver such instruments as may be necessary or appropriate to effectuate such transactions; provided, however, that such sales, leases or other dispositions of property shall be made in compliance with the applicable provisions of any mortgage or other agreement of Lessor relating thereto. The proceeds of sale, condemnation, or other disposition of the demised property of Lessor shall, subject to the provisions of any mortgage or other agreement relating to such property, be paid to Lessee and shall be indebtedness of Lessee to Lessor. Lessee shall also be indebted to Lessor for the salvage value of demised property upon its retirement or abandonment or other disposition or use to the extent that salvage value thereof is not included in the proceeds referred to in the preceding sentence.

*Id.* at 11-12.

### iv. Miscellaneous

Section 16 addresses the payment and accounting of certain sums due as additional rent under Section 4(b) or the amounts owed from Section 9 dispositions:

> (a)     The portion of the additional rent, or any part thereof, payable to Lessor pursuant to paragraphs (1), (2), (3), and (4) of subdivision (b) of Section 4 hereof and any amounts, or any part thereof, payable to Lessor pursuant to Section 9 hereof may, at the option of Lessee, be paid either in cash or by crediting Lessor with the same as indebtedness in an account of transactions under this Lease provided, however, that the total of such indebtedness owing from Lessee to Lessor, after taking into account the payments of cash hereunder or a balancing of indebtedness under subdivision (b) of this Section 16, or both, shall not exceed at any time an amount equal to 5% of the value at such time of the total assets of Lessor as long as any of the obligations of Lessor which have been assumed by Lessee in this Lease remain outstanding and unpaid. All cash payments made by Lessee to Lessor as provided in this subdivision (a) shall immediately be used by Lessor to pay and discharge such indebtedness of Lessor to others as may be designated by Lessee.

*Id.* at 17. In turn, Section 16(b) requires that "[f]rom time to time a balance of the indebtedness arising under this Lease of Lessor to Lessee and of Lessee to Lessor shall be determined . . . ."

*Id.* at 18.

### d. Covenants of Lessor

As long as the Lease remains in effect, the parties agree to abide by several covenants, two of which are relevant to the pending motions. First, Section 8(a)(3), often referred to as the "Books and Records Provision," provides as follows:

> (a) From the date of this Lease through the initial term thereof and during any renewal thereof, as long as Lessee is not in default hereunder and subject to any necessary governmental approval: . . .

> (3) Lessor shall permit at any and all reasonable times such person or persons as Lessee may designate to inspect the books and records of Lessor for any purpose whatsoever, and Lessee shall permit at any and all reasonable times such person or persons as Lessor may designate to inspect the books and records of Lessee for any purpose whatsoever.

*Id.* at 8-9. Second, Section 8(b)(4) of the Lease provides that the Lessor assist the Lessee with certain agreements concerning the Demised Property:

> Lessor shall when requested by Lessee, to the extent permitted by law, modify, extend, terminate, abandon or surrender any existing leases, agency, trackage or other contracts or agreements made by Lessor or any of its predecessors in title, or enter into any such new agreements, whenever in the judgment of Lessee such modification, extension, termination, abandonment, surrender or making of a new agreement would be beneficial to Lessee, but not in disregard of any mortgages or other agreements covering such demised property.

*Id.* at 11. This latter covenant applies only "[a]fter the commencement of the term of th[e] Lease and during any renewal thereof." *Id.* at 10.

### e. Termination of Lease & Default by Lessee

The Lease will terminate upon the expiration of its initial term (in 2063) or any renewal thereof or at the option of Lessor in the event of a default by Lessee. *See id.* at 14-15. At the end of the Lease, whether by expiration, default or termination for any other reason, Section 11 requires that "the demised property, or such portion thereof as shall remain . . . shall be returned

to Lessor in the same condition as it is in at the commencement of the term of th[e] Lease, reasonable wear and tear excepted . . . ." *Id* at 14.

Section 12 sets forth the circumstances under which Lessor may declare a default. A default will occur when Lessee fails to pay any part of the rent due under Section 4(a) after having been given thirty days' written notice, fails to perform in whole or in part any other covenant, agreement, or obligation after having been given sixty days' written notice, or commences any proceedings for relief under any bankruptcy or insolvency law. *Id.* at 15. If Lessor declares the Lease terminated, it is entitled to the "demised property and all revenues, rents, issues, income and profits therefrom . . . [and] to payment of all damages suffered by reason of or arising from the breach or default of Lessee or termination of th[e] Lease, with interest thereon at 6% per annum, plus reasonable attorney's fees, costs and expenses of Lessor." *Id.* at 16. Lessee has no right to have the Demised Property returned or the Lease reinstated by making a tender or rent or other offer to cure its default under the Lease. *See id.*

### 3. The Formation of the Lease[3]

Before the execution of the Lease, Pittsburgh & West Virginia had sustained years of operating deficits which impaired its working capital and general financial condition, resulting in some doubt as to its future as an independent carrier. Beginning in 1960, Pittsburgh & West Virginia took several steps in an attempt to reduce costs but was unsuccessful despite its efforts. By 1962, Pittsburgh & West Virginia was burdened by significant debt obligations which it was unable to service and had not operated at a profit for at least the past five years. Given its

---

3. Defendants object to any consideration of the circumstances surrounding the formation of the Lease, contending that this factual material is irrelevant and barred by the parol evidence rule. The Court does not agree. *See Pacitti v. Macy's*, 193 F.3d 766, 773 (3d Cir. 1999) ("[T]he court reads the contract in the context in which it was made."); *see also* Richard A. Lord, 11 Williston on Contracts § 32:7 (4th ed. Supp. 2014) ("[A]lthough the parties may not, because of the parol evidence rule, testify as to agreements they made before or contemporaneously with the execution of the contract, the circumstances surrounding the execution of the contract bear on the contract's meaning.") (citing *Sanford Inv. Co., Inc. v. Ahlstrom Machinery Holdings, Inc.*, 198 F.3d 415 (3d Cir. 1999)).

financial straits, Pittsburgh & West Virginia's leadership initiated efforts to affiliate it with a larger rail carrier system.[4]

Around this same time, Norfolk and Western was in the process of completing its own rail unification project. From 1961 to 1962, Norfolk and Western filed applications with the Interstate Commerce Commission (the "ICC"), the predecessor regulatory agency of the Surface Transportation Board (the "STB"), as part of its efforts to acquire the Wabash Railroad Company ("Wabash"), the Sandusky, Ohio branch of the Pennsylvania Railroad and the Akron, Canton & Youngstown Railroad. In addition, Norfolk and Western and The New York, Chicago and St. Louis Railroad Company ("Nickel Plate") filed a joint application with the ICC on March 17, 1961 for authority to merge the properties of Nickel Plate into Norfolk and Western. Nickel Plate was considered to be Pittsburgh & West Virginia's most important connection.

In early 1961, Chairman and President of Pittsburgh & West Virginia R.N. Shields reported to its Board of Directors the merger proposals of the various railroads and the possible effects of such mergers on the company. Shields advised that the Executive Committee of the Board of Directors had recommended to the Board that it authorize management to intervene in any merger proceedings in which Pittsburgh & West Virginia may have an interest. The Board unanimously approved the recommendation.

With that authority, Pittsburgh & West Virginia filed a petition with the ICC in September 1961 to intervene in the Norfolk and Western rail unification proceedings. The ICC permitted the request, and Pittsburgh & West Virginia represented that it supported the prospective unification of Norfolk and Western, Nickel Plate, Wabash and the Sandusky Line

_____

4. On January 1, 1962, Charles T. Jones (then-First Vice President of Port Amherst Coal Company) and Lewis B. Harder (then-Chairman of the Board of International Mining Corp.) were elected to the Board of Pittsburgh & West Virginia. Herbert E. Jones, Jr. (then-President of Port Amherst Coal Company) was elected to the Board on May 23, 1962.

but that the merger would impair its interest if it were not included in the new system. In response, Norfolk and Western apparently indicated its willingness to negotiate with Pittsburgh and West Virginia.

On March 16, 1962, Shields presented to the Board a letter from John P. Fishwick, Vice President – Law, of Norfolk and Western that memorialized a February 15, 1962 meeting between the parties at which Pittsburgh & West Virginia suggested that Norfolk and Western consider leasing its properties at an annual cash rental.[5] The letter also confirmed that Norfolk and Western was willing to lease the assets of Pittsburgh & West Virginia and assume its liabilities, subject to various terms outlined in the correspondence. Pittsburgh & West Virginia's Board resolved to defer any action on the proposal pending discussions with the President of Norfolk and Western as to alternative methods of affiliation. The Board convened again on March 26, 1962 to further discuss and consider the proposed lease. Thomas W. Pomeroy Jr., general counsel of Pittsburgh & West Virginia, attended both the March 16 and 26, 1962 meetings, to report on the ongoing negotiations with Norfolk and Western and the implications of the Lease.

On May 7, 1962, the Board held another meeting at which Pomeroy once again reported in detail on the proposed lease of Pittsburgh & West Virginia's assets to Norfolk and Western. At the meeting, Pomeroy also distributed to the Board a brief outline of the salient features of the proposed agreement. After hearing from Pomeroy and considering the proposal, the Board approved the Lease subject to the authorization of its shareholders and the ICC.

On September 28, 1962, the shareholders of Pittsburgh & West Virginia voted in favor of the Board's resolutions relating to the approval, adoption and ratification of the Lease. By Order

---

5. Plaintiffs allege that, although Norfolk and Western initially considered acquiring Pittsburgh & West Virginia, it ultimately concluded that a merger or cash purchase would dilute its earnings because the "entire railroad is worth far less than the book value." Pls.' App'x Ex. 139 at 6, ECF No. 201-139.

of the ICC, hearings were then held regarding the Lease on October 30 and 31, 1962. Approximately six months later, Hearing Examiner Lester R. Conley issued a Report and Order in which he found that the Lease was consistent with the public interest. The Lease was ultimately approved.

### 4. The Performance of the Lease

The Lease became effective on October 16, 1964.[6]  At that time, Lewis B. Harder was Chairman of the Board of Directors of Pittsburgh & West Virginia, Charles T. Jones was President, Herbert E. Jones, Jr. ("Mr. Jones, Jr.") was Vice President, Louis B. Stein was Secretary – Treasurer, and Joseph C. Bennett was Assistant Secretary – Assistant Treasurer. After the Lease went into effect, Pittsburgh & West Virginia closed its general and operational offices and ceased active railroad operations.

On February 18, 1967, PWV was organized as a business trust for the purpose of acquiring the assets of Pittsburgh & West Virginia, which allowed the Lessor to receive more favorable tax treatment.[7]  Unlike its predecessor, PWV would not be taxable as a corporation for federal income tax purposes, allowing it to pass on intact the cash rental received under the

---

6.  In a memorandum dated October 8, 1964, Pomeroy outlined the ongoing functions of Pittsburgh & West Virginia following the commencement of the Lease.  As part of the transitional steps in consummating the Lease, the memorandum itemized that Pittsburgh & West Virginia would have to transfer to Norfolk and Western "various agreements with third parties, including side-track agreements, public utility cross agreements, etc."  Pls.' Ex. 120 at 2, ECF No. 201-120.  Under the heading "things to be done by P & WV as lessor under the lease to N & W," the memorandum further advised that Pittsburgh & West Virginia was responsible for "[c]ollection of cash rental installment[s]," the "[e]stimate of non-cash rental under Section 4(b)" and to "police the application of non-cash rental under Section 4(b) from year to year and perform the calculations stipulated in Section 16(a) in regard to the same."  *Id.*  Citing to Section 8(b)(4) of the Lease, the memorandum also noted that Pittsburgh & West Virginia would have to "[m]odify leases or agreements or enter into new ones upon request of Lessee . . . ."  *Id.* at 3.

7.  In its filings with the ICC and the Internal Revenue Service ("IRS") related to its proposed reorganization, Pittsburgh & West Virginia made references to the Lease.  For example, in a February 14, 1967 Request for Ruling sent to the IRS, Pittsburgh & West Virginia represented that "[it] transferred substantially all its assets to Norfolk and Western" under the Lease.  Pls.' Ex. 144 at 2, ECF No. 201-144; *see also* Pls.' Ex. 82 at 9, ECF No. 201-82 (mentioning, in a March 19, 1967 application to the ICC, the "federal income tax deductions allowed to N&W for depreciation and amortization with respect to leased property and PWV's funded debt . . . .").  Pittsburgh & West Virginia did not advise the IRS that it had reserved any rights to receive income from third-party agreements concerning the Demised Property, such as licenses, leases, easements, oil and gas leases, or coal leases.

Lease in the form of direct payments or distributions to its shareholders. PWV acquired all of the assets and assumed all of the obligations of Pittsburgh & West Virginia on December 29, 1967.

### a. Third-Party Agreements

The parties and their predecessors have entered into numerous third-party agreements in the form of licenses, easements, and leases throughout the fifty-year history of the Lease as well as in the decades preceding its effective date. Aside from these transactions, the (Sub)-Lessee(s) have also sold portions of the Demised Property in accordance with Section 9 of the Lease.

### i. Licenses

The licenses include agreements for the right to build and maintain pipelines, electrical wires, cable transmission lines and access roads crossing the Demised Property. For example, on June 27, 1951, Pittsburgh & West Virginia granted The Manufacturers Light & Heat Company ("Manufacturers") a license to lay a gas pipe under a portion of the Rail Line in Union Township, Washington County. The license agreement with Manufacturers sets forth requirements for the depth of the pipeline and provides that it must maintain the pipeline so as to not interfere with the operation of the railroad. After the Lease commenced, Norfolk and Western assumed responsibility of the license. As of 1965, Norfolk and Western was receiving $328 per year from Manufacturers for various licenses on the Rail Line, including $132 annually from the 1951 agreement. Manufacturers later merged into Columbia Gas Transmission Corp. ("Columbia Gas"). Once it became the Sublessee, Wheeling & Lake Erie negotiated with Columbia Gas in 1992 and in 2002 for increases in the rent payable under the agreement.

In addition, Pittsburgh & West Virginia entered into a license agreement on October 13, 1947 with West Penn Power Co. ("West Penn") for the construction and maintenance of a pole

and power line over its property. The license requires West Penn to alter, improve, repair, renew, remove or relocate the power line or pole if reasonably necessary or required for the proper, safe and convenient operation of the railroad. In 2002, Wheeling & Lake Erie negotiated an increase in the rent payable under this agreement.

The parties have also entered into new license agreements since the commencement of the Lease: Norfolk and Western granted licenses to West Penn in 1966 and to Columbia Gas in 1984; and Wheeling & Lake Erie granted Columbia Gas a license 2008.

### ii. Easements

As with the licenses, the parties have granted easements relating to the Demised Property. In the mid-to-late 1970's, the Board of Public Education of the School District of Pittsburgh (the "Board of Education") began a construction project for the John A. Brashear High School and sought a temporary license from Norfolk and Western to build a pipeline and sewer system under the Rail Line. Norfolk and Western granted the temporary license, which the Board of Education later sought to replace with an easement. At a meeting of its Board of Directors, Norfolk and Western resolved to grant the Board of Education an easement pursuant to Section 9 of the Lease in exchange for $5,000. However, a landslide and related engineering problem during the construction project delayed the execution of the easement agreement between the parties. After the issues were resolved several years later, Norfolk and Western obtained the signatures of PWV's trustees to execute the agreement. The Board of Education, with PWV aware of the facts, paid the $5,000 consideration to Norfolk and Western.

More recently, on September 15, 1997, Wheeling & Lake Erie entered into an agreement in which it granted Equitrans, L.P. an easement to construct and maintain a natural gas pipeline under the Demised Property. This agreement addresses the disruption to rail operations that may

result from its implementation or operation by including a provision for the furnishing of flagmen and watchmen.

### iii. Land Leases

Aside from licenses and easements, the parties have entered into land leases. The earliest agreement dates back to January 2, 1919 when Pittsburgh & West Virginia leased to Monongahela Southern Railroad Co. ("Monongahela Southern") a piece of land in Mifflin Township, Allegheny County in exchange for an annual rental. Monongahela Southern later became Union Railroad Co. ("Union Railroad"), which constructed a track that connected to the Rail Line. After the Lease commenced, Norfolk & Western negotiated a rent increase with Union Railroad. Wheeling & Lake Erie and Union Railroad later replaced the original agreement with a new land lease.

Similarly, on January 1, 1960, Pittsburgh & West Virginia leased to Mark Lumber & Supply Company ("Mark Lumber") a sidetrack and an adjacent area along the Demised Property. On January 1, 1968, Norfolk and Western and Mark Lumber agreed to enter into a new lease to facilitate the expansion and modernization of facilities on the leased premises with Mark Lumber, as lessee, paying an annual rental to Norfolk and Western, as lessor. Mark Lumber later changed its name to Tot'um Lumber & Supply Company ("Tot'um Lumber") and entered into a lease extension with Norfolk and Western in 1978.

As Sublessee, Wheeling & Lake Erie has likewise entered into third-party lease agreements. On April 10, 2007, Wheeling & Lake Erie leased to Modern Transportation Services ("Modern") sidetrack and several parcels of the Demised Property, one of which includes a warehouse building that Modern uses for loading, unloading and storing its goods.

Wheeling & Lake Erie also entered into a land lease with the Lamar Companies ("Lamar") on September 16, 2010 for a portion of the Demised Property to use and occupy for a billboard sign.

There was further discussion of billboards on the Demised Property in 2010 when Matt Larson, a consultant with MRL Investments, Ltd., proposed a reorganization of PWV, which involved leases Wheeling & Lake Erie had entered into with outdoor advertising companies. On May 6, 2010, PWV's officers and Board of Trustees, including David Lesser and Virgil Wenger, scheduled a conference call to discuss Larson's proposal. Afterward, Wegner sent to those who participated in the conference call an e-mail in which he referenced the income Norfolk Southern generates from its billboard locations on the Demised Property. The Larson proposal was ultimately rejected.

### iv.   Oil and Gas Leases[8]

Oil and gas leases are among the agreements that pertain to the subsurface rights of the Demised Property. One such agreement originated in February 5, 1942 when David and Bessie Wells leased to Jane Rankin the oil and gas rights for a parcel of land that they owned. Monongahela Valley Area Enterprises, Inc. later acquired from the Wells' their title to the land, which it sold to Pittsburgh & West Virginia in 1958. The Peoples Natural Gas Company ("Peoples") acquired the lessee's interest at some point before 1960.

After the commencement of the Lease, Peoples initially withheld royalty payments from Norfolk and Western pending receipt of a Notice of Transfer form from Pittsburgh & West Virginia. On June 1, 1966, Bennett, the then-Vice President and Assistant Secretary – Assistant

---

8.  In addition to the oil and gas leases discussed below, the summary judgment record includes other examples whereby Wheeling & Lake Erie permitted third-parties to extract subsurface minerals from the Demised Property. *See, e.g.*, Defs.' Ex. 84, ECF No. 203-13 (a March 11, 2010 lease entered into between Dale Property Services Penn, L.P. and Wheeling & Lake Erie); Ex. 113, ECF Nos. 71-74 (a June 22, 2012 oil and gas lease entered into between Chesapeake Exploration, L.L.C. and Wheeling & Lake Erie). Wheeling & Lake Erie apparently received royalties and bonus payments as consideration for the agreements, although the details of those transactions are not clear. *See* Defs.' Ex. 112, ECF No. 203-70 (reproducing a spreadsheet listing "one time payments").

Treasurer of Pittsburgh & West Virginia and a member of its Board, executed a form entitled "Notice of Transfer Oil and Gas Lease Rental and/or Royalty," which was attested to by Stein, the then-Secretary –Treasurer of Pittsburgh & West Virginia and a member of its Board. The Notice states that Pittsburgh & West Virginia has leased certain parcels of land to Norfolk and Western "reserving nothing, including all [its] right, title and interest in and to the oil and gas underlying the premises conveyed and the rentals, royalties or other income and benefits arising from same, . . . " subject to the 1942 oil and gas lease. Pls.' App'x Ex. 97, ECF No. 201-97 at 3. The Notice further authorized Peoples to pay to Norfolk and Western, its successors or assigns the gas rentals or royalties under the 1942 lease. A fully executed Notice of Transfer was provided to Peoples on March 2, 1967. Norfolk and Western/Norfolk Southern or Wheeling & Lake Erie have since received rentals, royalties or other income arising from the 1942 lease.

PWV has made similar representations regarding the Lease on other occasions as well. In 1987, PWV received an inquiry from Questa Petroleum Company ("Questa"), an independent oil and gas drilling company, expressing interest in leasing acreage in Perry Township, Fayette County, Pennsylvania. In response, PWV advised Questa that "all properties of Pittsburgh & West Virginia Railroad are leased to Norfolk and Western Railway Company" and that it would forward the inquiry to Norfolk and Western. Pls.' App'x Ex. 106 at 2, ECF No. 201-106.

As Sublessee, Wheeling & Lake Erie entered into an oil and gas lease with KIS Oil & Gas, Inc. ("KIS") on October 18, 2006. The lease includes provisions for royalty payments and a signing bonus to be paid to Wheeling & Lake Eire. As with the other third-party agreements, this lease addresses the operational issues of oil and gas exploration near the Rail Line.

### v. Coal Leases

Coal leases are the last of the third-party agreements related to the Demised Property. On October 11, 1973, Norfolk and Western entered into a lease with Twilight Industries Division of U.S. Natural Resources Inc. ("Twilight"), which granted it the right to mine a certain seam of coal on a tract of the Demised Property. In exchange, Twilight agreed to provide to Norfolk and Western a one-time payment of $174.30, plus a royalty of $0.50 per ton of coal mined. After receiving a request from Norfolk and Western, Stein executed the coal lease in January 1974 and arranged for two other trustees of PWV to sign the agreement.

Approximately seven years later, Norfolk & Western sent PWV a correspondence regarding a proposed coal lease with The Youghiogheny and Ohio Coal Co. ("Y&O"). In the January 13, 1981 letter, Norfolk and Western stated that "Section 9 of the 1962 Lease between [the parties] does not require execution of the contract on behalf of PWV. Any proceeds received by NW as a result of the proposed lease should be subject to the P&WV First Mortgage." Pls.' App'x Ex. 156 at 1, ECF No. 201-156. Norfolk and Western and Y&O entered into the coal lease on February 1, 1981.

### b. The Settlement Account

The so-called "Settlement Account" is a term historically used by the parties to refer to an accounting mechanism for tracking indebtedness under Sections 4(b)(1)-(4), Section 6, Section 7, Section 9 and Section 16(a). The term appears nowhere in the Lease.

From at least 1980 through 2011, Norfolk and Western/Norfolk Southern assisted with the preparation of PWV's tax returns and financial statements, and in doing so, calculated the balance of the Settlement Account on an annual basis. Beginning in the mid-2000's, PWV sent requests to Norfolk Southern asking for it confirm the balance of the Settlement Account to

PWV's certified public accountants, Gibbons & Kawash, as part of an audit of its financial statements, which were later reported to the Securities and Exchange Commission ("SEC") and public shareholders. Shortly after Norfolk Southern commenced this action, it advised PWV that it would no longer provide its services.

As of December 31, 2012, the Settlement Account reportedly had a balance of $16,660,850.63 in favor of PWV. At that time, PWV's asset value was $9,150,000 according to its audited financial statements.[9]

Norfolk and Western/Norfolk Southern have consistently represented the balance of the Settlement Account without tracking the income that the (Sub)-Lessee has received from the third-party agreements—*i.e.*, the licenses, easements and leases. Norfolk and Western/Norfolk Southern have, however, reflected the proceeds from sales of portions of the Demised Property in the Settlement Account.

Until this litigation, PWV never disputed the treatment of the Settlement Account, submitted a demand for all or part of the indebtedness tracked by the Settlement Account, or requested payments that related to any third-party party agreements concerning the Demised Property. PWV likewise never demanded or asserted prior to this lawsuit that Norfolk Southern owed interest on indebtedness tracked in the Settlement Account.

### c. Debt Obligations

Around the time that the Lease commenced, PWV's total debt obligations amounted to approximately $6,200,000. Until those obligations were satisfied in full, Norfolk and Western

---

9. In a February 15, 2013 letter from Norfolk Southern to PWV, Michael F. Cox, Assistant Vice President – Tax Administration, represented that the following adjustments had been made to the Settlement Account since December 31, 2011 when it had a balance of $16,236,808.66: $341,768.00 in Section 4(b)(1) depreciation; $69,663.00 for 2006 capital gains tax entry; and $12,610.97 for gain related to 2011 land sales, totaling $16,660.850.63 as of December 31, 2012. *See* Defs.' App'x Ex. 34, ECF No. 202-35 at 1-2. PWV contends that it is entitled to be paid in cash any amount that exceeds that 5% Cap Provision, which includes the $341,768.00 in depreciation and amortization as "additional rent."

used the proceeds from sales of parcels of the Demised Property to pay down PWV's debt. For each sale, Norfolk and Western had Mellon Bank, N.A. ("Mellon Bank"), the successor to the party that issued the debt obligations, execute a form titled "Partial Release of Lien of Mortgage." Norfolk and Western, PWV and Mellon Bank handled the 1973 Twilight coal lease in a similar fashion. By August 1, 1982, PWV's debt obligations were paid in full, and Mellon Bank discharged PWV of all debt obligations.

### d. Tax & Accounting Changes

In contrast, the indebtedness of Norfolk and Western to PWV grew significantly in PWV's favor throughout the 1970's and 1980's following changes to tax and accounting laws that the parties apparently did not anticipate in 1962. The Tax Reform Act of 1976 changed amortization rules for railroads, which increased the additional (non-cash) rent for PWV under the Lease.[10] The Economic Recovery Tax Act of 1981 likewise allowed new depreciation deductions of track structure cost, resulting in another increase of the additional (non-cash) rent. Additionally, the ICC issued an order in 1983 that required railroads to change their accounting method for track structures, which also affected the Settlement Account.

On May 10, 1985, Norfolk Southern sent to PWV a letter in which it requested direction and/or agreement in accounting for a deferred credit based on the recent tax and accounting changes. Norfolk Southern also suggested that PWV discuss the credit with its auditors, Peat, Marwick, Mitchell & Co. ("Peat Marwick"). On July 29, 1985, Sigmund Levine, PWV's then-

---

10. Defendants consistently object to references of "non-cash rent," as the term appears nowhere in the Lease. Much like the "Settlement Account," the parties have historically used the term "non-cash rent" in reference to Section 4(b) "Additional rent." *See* June 18, 1982 Letter from Norfolk Southern, Pls.' Ex. 163, ECF No. 163 at 1 ("The Internal Revenue agents conducts these [audit] examinations have specifically examined the [L]ease between NW and PWV and have determined that non-cash rent payments claimed by NW in its tax returns are properly allowable in the computation of taxable income."); *supra* n.6 (Pomeroy Memo, Oct. 8, 1964, Pls.' Ex. 120, ECF No. 120); *see also* Report of Gibbons & Kawash, March 24, 2008, Defs.' Ex. 135 at F-8, ECF No. 204-38 ("Under the terms of the [L]ease, a noncash [S]ettlement [A]ccount is maintained to record amounts due to or due from Norfolk Southern upon termination of the [L]ease.").

Secretary – Treasurer, informed Norfolk Southern that PWV agreed with the proposed method of handling the matter.

### e. PWV's Historical Representations

Over the course of the Lease, PWV has made representations to its shareholders, the ICC, and SEC regarding the payment of its debt by and receipt of income under the Lease.

### i. Shareholders

PWV has consistently represented to its shareholders that the annual cash rental is fixed at the rate of $915,000. For example, in a November 1969 letter to shareholders recommending that they approve the acquisition of shopping centers, PWV cited the "fixed cash rent of $915,000" and noted its need to diversify to counteract the effect of inflation on the purchasing power of its income. Pls.' App'x Ex. 71 at D005706, ECF No. 201-71. Minutes from annual shareholder meeting, such as those in 1977 and 1984, similarly reflect PWV's position that the tax and accounting changes did not entitle it to any additional rental because the only cash income available under the Lease was the fixed amount of $915,000. In fact, PWV acknowledged at annual shareholder meetings that Norfolk and Western received the particular tax benefits under the Lease from the rent and depreciation deductions. PWV also responded to numerous inquiries from its shareholders in the mid-to-late-1980's regarding the tax and accounting changes, explaining that the $915,000 cash rental was the only income available under the Lease, with PWV shares tantamount to a bond.

### ii. Regulatory Bodies

In addition to its shareholders, PWV has made several representations about the terms of the Lease to the ICC and SEC. In a March 21, 1967 Return Questionnaire related to its application for authorization to reorganize into a business trust, PWV stated that, to the extent

that Norfolk and Western's payment of debt exceeded PWV's tax deductions for depreciation and amortization, PWV is indebted to Norfolk and Western, but that amount "is payable only out of income after termination of the [L]ease." Pls.' App'x Ex. 79 at 11, ECF No. 201-79.

Almost twenty years after PWV reorganized into a business trust, the SEC received a complaint from a shareholder who alleged that the Trust was not distributing 90% of its ordinary taxable income to its shareholders, as it must do to maintain qualified status. After receiving the complaint sometime in July 1985, the SEC directed PWV to respond with its version of the facts. Two weeks later, Harder wrote to the SEC on behalf of PWV: "In summary, we have always paid out all our taxable income which is the cash rental from Norfolk and Western less expenses." Pls.' App'x 169 at D007126, ECF No. 201-169.

More recently, on November 16, 2005, Vice President and Secretary – Treasurer of PWV Robert A. Hamstead wrote to SEC Branch Chief Daniel Gordon to provide information about the perpetual nature of the Lease.[11] Hamstead's letter to the SEC noted that PWV's Audit Committee, which was comprised of Hamstead as well as trustees Larry Parsons and Virgil Wenger, spent significant time discussing the terms of the Lease during an October 25, 2005 meeting. At the time, the Audit Committee discussed the timing of payment of the Settlement Account and whether interest accrued on the balance. The Audit Committee ultimately determined that the historical treatment of the Settlement Account was proper and that PWV should convince the SEC to maintain the "status quo." Pls.' App'x Ex. 178 at 1, ECF No. 201-178. As Hamstead stated in his letter to the SEC, "[t]he Trustees and Audit Committee believe

_____

11. The SEC had apparently requested that PWV record the Lease without regard to any renewals after the original 99-year term. The information provided to the SEC by Hamstead was consistent with a report authored by Robert Denyer, the Gibbons & Kawash accountant who served as the director in charge of the PWV account, who concluded that the Lease should be considered a "capital lease" for accounting purposes. *See* Pls.' App'x Ex. 180, ECF No. 201-180. In the Gibbons & Kawash Report, it also acknowledged that "a noncash settlement account is maintained to record amounts due to or due from Norfolk Southern upon termination of the lease"—*i.e.*, an "indeterminate settlement date." *Id.* at F-8.

there is sufficient penalty upon the Lessee that the [L]ease will be renewed into perpetuity."
Pls.' App'x Ex. 179 at 3, ECF No. 201-179.

### iii. Annual Reports

The Annual Reports of PWV shed additional light on its historical treatment of the Lease. In Pittsburgh & West Virginia's 1962 and 1963 Annual Reports, it indicated that the additional rental obligation of Norfolk and Western (for depreciation or amortization deducted for federal income tax purposes) over the term of the Lease would equal approximately the amount of the indebtedness discharged on behalf of the Lessor. Under this scheme, the balance of the Settlement Account would be relatively insignificant at the expiration of the Lease. Pittsburgh & West Virginia nevertheless changed its outlook in its 1964 Annual Report (the first after the Lease became effective), predicting that "the additional rental over the term of the Lease would exceed the amount of indebtedness to be paid by Norfolk and Western." Pls.' App'x Ex. 7 at 6, ECF No. 201-7.

Beginning in 1981, PWV's Annual Report reflects that the balance of the Settlement Account swung in its favor. That year, PWV advised its shareholders:

> [t]he sole business of the Trust is the collection of rent on the railroad properties subject to the [L]ease. The rent is fixed at $915,000 per year and is not subject to change for the life of the [L]ease. The [L]ease also provides that certain additional amounts be recorded as rent income, although there is no requirement for payment by Norfolk & Western of such noncash items.

Pls.' App's App'x Ex. 24 at 0018206, ECF No. 201-24. As of 1983, PWV no longer included the value of the Settlement Account in its reports because it would have distorted its financial picture had it done so. *See* Pls.' App'x Ex. 26 at F-7, ECF No. 201-26 ("At December 1, 1983, the non-cash [S]ettlement [A]ccount had a balance of $3,900,000 receivable from Norfolk and Western; however, because the account will not be settled until the expiration of the [L]ease, no

value has been reported in 1983 for the balance of the account or the transactions affecting the balance.").

Moreover, beginning in its 1983 Annual Report and continuing thereafter, PWV has repeatedly stated that "[f]or financial reporting purposes, only the cash income is reported, as the non-cash items, although recorded under the terms of the [L]ease, have no financial value because of the unlimited settlement date." *Id.* at 1. PWV has also repeatedly stated in its Annual Reports (and 10-K's)—as recently as 2010—that "[a]lthough the [L]ease provides for additional rentals to be recorded, these amounts do not increase cash flow or net income as they are charged to [Norfolk Southern's] [S]ettlement [A]ccount with no requirement for payment except at termination of the [L]ease." Pls.' App'x Ex. 53 at D025370, ECF No. 201-53.

From 1983 through 2010, PWV made no mention in its Annual Reports of a limit on the size of the Settlement Account. As the 1983 Annual Report reflects, all of PWV's third-party debt assumed by Norfolk and Western had been paid off in 1982.

### 5. PWV's (New) Management[12]

Herbert Jones, III ("Mr. Jones III") served as PWV's President from 2005 until early 2011 and as a member of its Board of Trustees from 2004 through 2011. During his tenure, PWV never hired a law firm, but it continued to retain Gibbons & Kawash as its outside accountant auditing firm.

From 2004 through early 2011, Larson Parsons served as one of the five PWV trustees as well as the Chairman and Chief Executive Officer of Wheeling & Lake Erie. PWV's then-management was fully aware of Parons' position with Wheeling & Lake Erie when it invited him

---

12. The parties incorporate by reference their respective Responsive Statement of Material Facts (ECF Nos, 128, 150) filed alongside Power REIT's motion for summary judgment and the opposition thereto. In its Memorandum Opinion denying that motion, the Court documented PWV's 2011 change of management, the rights offering, and the formation of Power REIT. *See* Mem. Op. at 6-14, June 19, 2014, ECF No. 186. The Court incorporates that discussion by reference.

to become a trustee.  As a PWV trustee, Parsons was a member of its audit committee, which was responsible for overseeing PWV's financial affairs.  In this capacity, Parsons preferred that PWV not change its business plan despite modest increases in costs and corresponding decreases in profits.  Moreover, Parsons did not use his position on the Board to alter the longstanding operations of PWV or otherwise change the way it historically functioned since the commencement of the Lease.  PWV's Board chose not re-nominate Parsons as a trustee in 2011.

David Lesser became a PWV trustee sometime in 2009 and the Chairman of the Board in late 2010.  Arun Mittal became vice president, treasurer and secretary of PWV in March 2011, replacing Robert R. McCoy who had resigned that spring.  Along with PWV's new management, Lesser expressed an interest in "modernizing" the Lease soon after they came onboard.

### 6. The West End Branch Dispute

Beginning in October 2007, the Pennsylvania Department of Transportation ("PennDOT") undertook the construction of a $52.6 million dollar project at the West-End Circle in Pittsburgh Pennsylvania, an area where PA Route 51, Carson Street, South Main Street, and Steuben Street all converge.  As part of the construction project, PennDOT sought to purchase a segment of the Rail Line known as the West End Branch, which was no longer essential to Wheeling & Lake Erie's operation.  As Sublessee, Wheeling & Lake Erie agreed to sell the West End Branch pursuant to its rights under Section 9 of the Lease.  To complete this sale, Wheeling & Lake Erie was required to obtain the STB's authority to discontinue service and abandon the common carrier obligation(s) associated with the West End Branch, which required the participation of PWV as the owner of the property.

In a December 8, 2010 letter addressed to McCoy, a lawyer representing Wheeling & Lake Erie before the STB sought a power of attorney from PWV to expedite the process.  In a

series of correspondences over the next several months, Lesser requested information related to the sale, declined to execute the power of attorney, and raised concerns about "tax issues" that could result from the transaction. Wheeling & Lake Erie's counsel complied with the document requests.

On March 15, 2011, Lesser sent an e-mail to Wheeling & Lake Erie's counsel in which he reiterated that PWV would not execute a power of attorney related to the transaction but that it would sign documents to effect the transfer so long as Norfolk Southern made the request.[13] Lesser also expressed his ongoing concerns with related to the tax treatment of the sale and advised that PWV had retained counsel to work with its accounting firm on this matter pursuant to Section 4(b)(6) of the Lease.

On July 7, 2011, PWV ultimately agreed to allow Wheeling & Lake Erie's counsel to also represent it in the abandonment process before the STB. The representation was expressly limited to the "ministerial act" of extinguishing PWV's common carrier obligation on the West End Branch. Pls.' App'x Ex. 274 at D027009, ECF No. 212-25.

### 7. The Tax Memorandum & Demands for Payment of Attorneys' Fees

On June 23, 2011, Mittal sent to Randal S. Noe, a General Attorney at Norfolk Southern, a letter with which he attached a "Tax Memorandum" that outlined alleged issues related to the proposed sale of the West End Branch. The Tax Memorandum set forth PWV's position that Wheeling & Lake Erie's sale of the West End Branch for approximately $580,000 would require Norfolk Southern, under Section 4(b)(7) of the Lease, to pay to PWV between $980,000 and

---

13. Norfolk Southern sent a letter addressed to Lesser on March 28, 2011, directing PWV to immediately execute and deliver certain documents to Wheeling & Lake Erie in accordance with its obligations under Section 9 of the Lease: to "execute and deliver such instruments as may be necessary or appropriate to effectuate" certain transactions. In addition, Norfolk Southern noted that "PWV is of course entitled to investigate the tax treatment of the proposed sale to PennDOT . . . [b]ut the terms of the Lease do not permit PWV to withhold the [d]ocuments either while that investigation is pending or as a result of any finding it may produce." Defs.' Ex. 45, ECF No. 202-46.

$2,000,000 (depending on the tax basis in the property) in additional rent in order to compensate the Trust for capital gains taxes.[14] Moreover, the Tax Memorandum outlined PWV's view that "the Trust believes that its tax returns were improperly prepared [by Norfolk Southern] and did not reflect the ordinary taxable income created by NSC's 4(b)(7) additional rent payments in prior years." Defs.' App'x Ex. 50, ECF No. 202-51. PWV thus proposed an amendment to the Lease to "eliminate [Norfolk Southern's] considerable additional rent obligation" and to "reduce the Trust's tax burden (and its concerns related to continued REIT qualification as a result of the [t]ransaction or future transactions)." *Id.* In closing, PWV once again reiterated its position that "[it] believes that the Lease needs to be updated . . . ." *Id.*

Mittal also attached to the June 23, 2011 letter an invoice that totaled $4,487.50 in attorneys' fees for services rendered by Peter Anglum and Richard Baumann of Morrison Cohen, LLP ("Morrison Cohen") as of March 31, 2011, allegedly "in connection with the review of the Lease and the tax issues related to the proposed sale." Defs.' App'x Ex. 50, ECF No. 202-51. Mittal submitted that Norfolk Southern was responsible for paying these expenses under Section 4(b)(6) of the Lease, which requires the Lessee to pay PWV's expenses related to "the doing of

14. In an October 3, 2011 letter to Plaintiffs' counsel, Mittal characterized these payments as "recursive":

> As we advised NS during the course of many conversations and in writing, the contemplated sale will generate capital gains for PWV. Pursuant to Section 4(b)(7), NS is required to pay, as additional rent, PWV's taxes incurred as a result of the sale. However, each such additional rent payment from NS creates additional taxable income for PWV and additional rent payment obligations for NS. We have been advised by both counsel and accountants that the tax reimbursement provisions of the lease result in the recursive calculation we have described to NS.

Defs.' App'x Ex. 53, ECF No. 202-54. In their CSMF, Plaintiffs submit that "[a]t some point after the initiation of this litigation, Defendants abandoned the position that PWV is entitled to the $1.3 million recursive payments set forth in the Tax Memorandum that it demanded from Norfolk Southern." Pls.' CSMF at 66, ¶ 273, ECF No. 200 (citing Dep. of Lesser, Pls.' App'x Ex. 226 at 51; Dep. of Mittal, Pls.' App'x Ex. 230 at 148-49). Defendants deny this fact "as the evidence cited by Plaintiffs does not support this statement" and "based upon Plaintiffs' mischaracterizations of the cited evidence." *See* Defs.' RSOF at 96, ECF No. 209. A review of the deposition transcripts supports Plaintiffs' position. *See, e.g.*, Dep. of Lesser, Pls.' App'x Ex. 226, ECF No. 201-226 at 51 ("Q. Does P&WV contend, as you sit here today, that there is a $1.3 million additional rent obligation that's owed to P&WV based upon the disposition of the West End Branch? A. I don't believe that's the case. Q. You're not contending that. A. No.").

all acts and things necessary and desirable for the protection during the existence of this Lease of Lessor's rights in the demised property or the rentals or other sums payable pursuant to the Lease."[15]

Norfolk Southern refused to pay the invoice, taking the position that "[t]he claimed attorneys' fees related to the evaluation by Morrison & Cohen [ ] of P&WV's proposal to amend the Lease" and that "these legal expenses are solely related to the benefit of P&WV's stockholders." Pls.' App'x Ex. 277 at 3, ECF No. 212-28. On October 3, 2011, PWV reiterated its request and indicated that it may declare a default unless Norfolk Southern promptly remitted payment, although it "remain[ed] interested in an amicable resolution of the issues . . . ." Defs.' App'x Ex. 53 at D024684, ECF No. 202-54. This suit followed.

Plaintiffs commenced this action on December 15, 2011 by filing a Complaint in Declaratory Judgment in which they sought the Court's intervention to resolve the disputes over the terms of the Lease in anticipation of PWV declaring a default and seeking the available remedies. Prior to this lawsuit, PWV never demanded or asserted that Norfolk Southern owed any additional rent or "recursive payments" for sales of portions of the Demised Property under Section 4(b)(7) of the Lease, as the June 23, 2011 Tax Memorandum suggests.

On March 23, 2012, Defendants demanded that Plaintiffs reimburse them for over $90,000 in legal fees that they had incurred because of this litigation. Plaintiffs once again denied Plaintiffs' request for payment. To date, Plaintiffs have not paid the legal fees incurred by Defendants because of this litigation.

---

15. PWV claims that the "legal review commenced by PWV led to Norfolk Southern's admission that it committed significant accounting errors related to the calculation of indebtedness owed by Norfolk Southern to PWV." Defs.' RSOF at 21, ¶ 52, ECF No. 207; *see also* Defs.' Br. at 43, ECF No. 197("But for the mere $4,487.50 in legal fees incurred, PWV would never have learned about Norfolk Southern's costly mistakes."). Those "accounting errors" were addressed twenty months after Baumann and Anglum rendered their legal services by Norfolk Southern's Assistant Vice President, Tax Administration, Michael Cox who testified that, during the course of this litigation, Norfolk Southern uncovered that it incorrectly reduced the Settlement Account by $69,000 in 2006 and learned of a mistake in the tax returns for that year. *See* Pls.' App'x Ex. 254 at 40-42, ECF No. 212-5.

### 8. The Books and Records Demands

Local counsel for Defendants entered an appearance in this action on January 5, 2012 and filed a motion to admit out-of-state-counsel *pro hac vice* the following day. On January 6, 2012, Defendants also filed a stipulation with the Court regarding an agreed-upon extension of time to respond to the Complaint.

### a. The January 2012 Books and Records Demand

That same day, Mittal wrote a letter to Noe demanding an inspection of the books and records of Norfolk Southern, as the Lessee, under Section 8(a)(3) of the Lease. The letter indicated that "[w]e will plan on the inspection taking place at Three Commercial Place, Norfolk, Virginia, 23510 on [Tuesday] January 11, 2012 starting at 10:00 AM and plan and staying through the end of the week." Defs.' App'x Ex. 68 at 1, ECF No. 202-69. Within two business days, Defendant(s) sought access to Norfolk Southern's books and records related to financial statements and supporting documents; tax returns; a historical accounting of the Settlement Account, including each addition and subtraction as well as supporting documentation; all details related to all sales of PWV property and all tax reimbursement payments related thereto; railway volume metrics; customer lists; track maintenance; track condition reports; machinery, equipment, supplies, motive power, rolling stock and cash needed to operate the railroad; property descriptions, plans and specifications; correspondences related to the Lease or PWV; ICC, STB, and other governmental records; any existing or pending litigation related to the railroad; and insurance. In addition, PWV stated its intention to perform a track inspection in the near future.

The January 6, 2012 Books and Records Demand set off an extensive back and forth between the parties through their counsel of record. On January 9, 2012, Plaintiffs responded to

the Books and Record Demand, asserting that "[u]nder no circumstances would Mittal's requests be deemed to be 'reasonable' under the Lease . . . ." Defs.' App'x Ex. 71 at 1, ECF No. 203-1. Plaintiffs maintained that Mittals's request—apparently the first Books and Records Demand in the history of the Lease—was an attempt to circumvent the Federal Rules of Civil Procedure in light of the ongoing litigation. Plaintiffs thus concluded that "there will be no document inspection on January 11 as [PWV] has unilaterally and improperly demanded." *Id.* at 2.

PWV replied to Plaintiffs' correspondence on January 11, 2012. In the letter, PWV reiterated its right under Section 8(a)(3) of the Lease, emphasizing that it could inspect the books and records of Lessee "for any purpose whatsoever." PWV also invited Plaintiffs to provide legal authority to support their position and offered them additional time to gather the books and records it requested.

Two days later, on January 13, 2012, Plaintiffs sent another letter to PWV regarding Mittal's January 6, 2012 Books and Records Demand. Plaintiffs maintained that they would not produce any of the documents requested outside of this litigation. In support, Plaintiffs cited *Entertainment Technology Corp. v. Walt Disney Imagineering*, No. CIV.A. 03-3546, 2003 WL 22519440 (E.D. Pa. Oct. 2, 2003), a decision in which the district court denied a motion for leave to conduct expedited discovery.[16] From Plaintiffs' perspective, the material sought in Mittal's letter was "far more extensive than the singular request denied by the [c]ourt in *Entertainment Technology*" and "amounts to an attempt by [PWV] to obtain discovery before responding to the Complaint and to avoid the mandates of Rule 26." Defs.' App'x Ex. 73, ECF No. 203-2.

---

16. In *Entertainment Technology Corp. v. Walt Disney Imagineering*, Plaintiff requested leave "to conduct expedited discovery of, among other requests, the following documents: All documents concerning the testing or analysis of the safety, functioning or performance of the Ride, including all components of the Ride, whether or not such testing or analysis was performed by Disney or another person or entity." No. CIV.A. 03-3546, 2003 WL 22519440, at *1 (E.D. Pa. Oct. 2, 2003).

On January 17, 2012, PWV responded to Plaintiffs' latest position. PWV noted that *Entertainment Technology Corp.* did not involve a contractual provision authorizing a Books and Records inspection, distinguishing it from the parties' dispute. Further, PWV advised that "[Plaintiffs'] refusal to provide access to the books and records constitutes a failure to perform an obligation under the Lease that was properly noticed by P&WV on January 6, 2012." Defs.' App's Ex. 74, ECF No. 203-3.

The next correspondence (in the record) did not occur until February 22, 2012 when Plaintiffs offered to produce to Defendants "a refined list of documents, both in terms of categories and in terms of time period relating to the operation of the Lease." Defs.' App's Ex. 75, ECF No. 203-4. Plaintiffs similarly requested that Defendants produce to them "all documents in their possession relating to such categories enumerated in the refined list, as well as such other categories related to the Lease that [they] may designate." *Id.*

Notwithstanding this offer, PWV rejected the proposed accommodation in a February 27, 2012 letter. Once again, PWV emphasized that Section 8(a)(3) of the Lease states that a Books and Records inspection may be "for any purpose whatsoever." PWV thus demanded that Plaintiff(s) make available the Books and Records that Norfolk Southern maintained on behalf of the Lessor and those documents that related to the condition, maintenance and operation of the Rail Line. In response to Plaintiffs' Books and Records request, PWV noted that they may review the documents at any time and upon reasonable notice irrespective of whether they are on PWV's list.

According to PWV, Plaintiffs have not yet produced documents responsive to the January 2012 Books and Records Demand regarding (1) "railway volume in terms of car loadings, tons transported, revenues and other metrics tracked by Lessee on a per customer and per category

basis" or (2) "customer lists including billings/usage." Defs.' CSMF at 21-22, ECF No. 202. In response, Plaintiffs assert that there is no obligation for either party to produce any documents under Section 8(a)(3) of the Lease, contend that they nevertheless complied with the request through discovery in this litigation, and allege that Defendants' new management used the Books and Records Demand to manufacture a default of the Lease and achieve a windfall by terminating the Lease and collecting the balance of the Settlement Account. *See generally* Pls.' Br. in Opp. at 14, ECF No. 210 ("Needless to say, Plaintiffs' counsel felt sandbagged by the inspection demand, particularly because Rule 34 allows 30 days to respond to a request for the production of documents and Defendants sought documents on only two business days' notice.").

### b. The March 2013 Books and Records Demand

On August 14, 2012, Defendants served both Norfolk Southern and Wheeling & Lake Erie with document requests under Federal Rule of Civil Procedure 34. The requests sought production of all documents and/or communications concerning their financial statements, PWV's tax returns and financial statements, other leases of railroad property and related litigation material, the Settlement Account or other indebtedness between the parties, and sales of the Demised Property. Plaintiffs lodged numerous objections in their September 2012 response(s), and it remains unclear whether they produced any documents pursuant to this discovery request.[17]

On January 10, 2013, PWV's current management was contacted by Larry Skrzysowski, a representative of Chesapeake Appalachia, LLC ("Chesapeake Appalachia"), seeking

---

17. Around this time, the parties were also litigating a motion to quash the subpoena of C. Howard Capito, a former PWV trustee and a financial consultant for Wheeling & Lake Erie, in the United States District Court for the Eastern District of Tennessee. This Court has previously outlined the background of that dispute in two other Memorandum Opinions. *See* Mem. Op. at 11-13, July 17, 2013, ECF No. 102; Mem. Op. at 3-6, Aug. 29, 2013, ECF No. 105.

ratification of an oil and gas lease it entered into with Wheeling & Lake Erie. Apparently, this instance was the first time anyone from PWV's current management team had learned of third-party leases related to the Demised Property.

The current management of PWV became aware of other third-party leases during Parson's January 29, 2013 deposition. During his deposition, Parsons confirmed that numerous entities aside from Chesapeake Appalachia have drilled for oil and gas on the Demised Property pursuant to lease agreements with Wheeling & Lake Erie. Through counsel, PWV thereafter requested that Plaintiff(s) produce any leases relating to drilling on the Demised Property, characterizing the extraction of material as tantamount to a sale.

Over the next several days, counsel corresponded with each other regarding why the third-party agreements were not produced during fact discovery which originally closed on January 25, 2013. Plaintiffs took the position that the third-party agreements were not tantamount to a sale and that they were never requested in discovery. PWV disputed that account, contending that the third-party agreements were responsive to its requests for documents relating to financial statements, revenues and sales. After the parties exchanged several additional letters in which they continued to share their opposing views, PWV made another demand under Section 8(a)(3) of the Lease.

By letter dated March 5, 2013 from Lesser to Noe, PWV sought to inspect the Books and Records of Norfolk Southern regarding: any documents and communications that related to any grant, conveyance or assignment by Norfolk Southern and/or Wheeling & Lake Erie to any third party of any right or interest in the Demised Property; communications between or among Plaintiffs and any third party concerning the lease or sublease of any right or interest in the Demised Property; any leases and/or subleases entered into by Norfolk Southern and/or

Wheeling & Lake Erie with third parties relating to property adjacent or proximate to the Demised Property; subsurface rights relating to the Demised Property; and any revenue or consideration received by Norfolk Southern and/or Wheeling & Lake Erie from any third party for the use or occupancy of any portion of the Demised Property. *See* Defs.' Ex. 90, ECF No. 203-19. PWV proposed that Norfolk Southern gather this information and produce it by March 20, 2013 or make it available for inspection on March 25, 2013.

On March 11, 2013, Norfolk Southern represented that it had produced to PWV all documents related to the Lease and Sublease in its possession, meeting its obligations under Section 8(a)(3) of the Lease. Norfolk Southern further advised that PWV's "letter appears to request documentation which, if such documents exist, may be in the possession of W&LE, please be advised that Mr. Lesser's letter has been forwarded to W&LE pursuant to W&LE's assumption of certain rights and obligations under the Sublease." Pls.' App'x Ex. 200, ECF No. 201-200.

Wheeling & Lake Erie ultimately located in storage numerous boxes that contained over 23,000 documents and proposed dates for the demanded in-person inspection to PWV, to which they suggested other dates due to a scheduling conflict and indicated its preference to have the documents copied and mailed.[18] Some of the documents were files for leases, licenses and easements that PWV transferred to Norfolk Southern at the commencement of the Lease and that Norfolk Southern transferred to Wheeling & Lake Erie after they entered into the Sublease. Other documents were more recent third-party agreements, such as those outlined above.

---

18. In a March 13, 2013 letter, Wheeling & Lake Erie informed PWV that the documents would be available for inspection at its offices in Brewster, Ohio on March 21, 28 and/or 29, 2013. Defs.' App'x Ex. 70, ECF No. 202-71. On March 15, 2013, PWV proposed April 2, 3, 4, or 5, 2013 as the date(s) for inspection, but stated that "it would be more efficient if WLE and/or NS would simply send the required information." Defs.' App'x Ex. 91, ECF No. 203-20. Wheeling & Lake Erie replied on March 21, 2013, advising that it had "decided to scan all the documents which W&LE located and send them to you as supplement production in the litigation." Defs.' App'x Ex. 92, ECF No. 203-21.

On April 1 and 3, 2013, Wheeling & Lake Erie sent to PWV photocopies of financial and accounting records relating to licenses, leases, easements, and subsurface rights. Wheeling & Lake Erie also produced documents that it uncovered in the process of assembling materials for the Books and Records Demand and that it identified as responsive to discovery requests made during this litigation.[19]

On April 22, 2013, PWV sent to Norfolk Southern a letter in which it requested a "proper accounting" and access to an alleged database/computer system maintained by Wheeling & Lake Erie to track sales and/or leasing of the Demised Property. PWV pressed for this inspection to occur within one week to ten days of its demand at Wheeling & Lake Erie's office. Another round of letters/e-mails between counsel soon followed.

On April 25, 2015, Wheeling & Lake Erie noted its objection to the timing of the inspection and its position that Section 8 does not require the Lessee (or the Sublessee in this case) to permit unfettered access to its data systems that contain information entirely unrelated to the Lease. Wheeling & Lake Erie thus asked PWV to provide some specificity regarding its claim that the April production was incomplete and requested PWV to advise what Lesser sought to accomplish during a visit to its office.

Later that day, PWV responded to the request for "some level of detail" by asserting that its recent letters were "clear." In sum, PWV claimed that it "ha[d] not received Plaintiffs' accounting records concerning payments made to [them] as a result of these leases, sales and/or other dispositions of PWV's property." Defs.' App'x Ex. 97, ECF No.203-28. Because the requests for those documents was made under the Lease, PWV asserted that this issue was between the entities themselves and suggested that a Wheeling and Lake Erie representative

_____

19. The Court has addressed the parties' disputes relative to fact discovery in an earlier Memorandum Opinion and Order in which it denied PWV's motion for protective order shifting the costs of additional discovery to the plaintiffs and motion for sanctions. *See* Mem. Op., Dec. 17, 2013, ECF No. 154.

contact Lesser directly so that they can work out the logistics of the inspection without the involvement of counsel. *See id.* ("I do not believe it is appropriate or efficient for the lawyers to be in the middle of this back and forth.").

Following further communications, counsel continued to discuss this issue with each other. On May 1, 2013, PWV sent a letter to follow-up on a recent telephone conversation during which Wheeling & Lake Erie apparently maintained that the pending document request was "unclear" and that all relevant information had been produced. PWV considered these positions "disingenuous at best" and notified Wheeling & Lake Erie of Lesser's efforts to coordinate the inspection with Michael Mokodean, its Chief Financial Officer. Defs.' App'x Ex. 98, ECF No. 203-29. Based on PWV's understanding that Wheeling & Lake Erie did not intend to comply with the inspection, it declared that Plaintiff(s) once again failed to comply with a Books and Record Demand in breach of Section 8 of the Lease.

The letters between counsel continued: on May 2, 2013, Wheeling & Lake Erie assured PWV that it does not maintain its accounting records in such a manner that would allow it to readily discern transactions regarding only the Demised Property, reiterating its position that the Lease does not confer PWV with unfettered access to unrelated information. Wheeling & Lake Erie nevertheless stated that it was evaluating means to isolate information concerning receivables relative to the Demised Property and that it would provide this information in an agreeable format fairly soon. Additionally, Wheeling and Lake Erie reemphasized that counsel should handle all communications related to the Books and Records Demand—a request first made in an April 29, 2013 letter which Lesser disregarded in his outreach to Mokodean—in light of PWV pleading a counterclaim over same.

As the exchange of letters and e-mails between counsel persisted, PWV viewed Wheeling & Lake Erie's efforts as a tacit concession that the Sublessee had the ability to segregate accounting information relating to the Demised Property and pressed for its immediate production in no uncertain terms. *See* Defs.' App'x Ex. 101 at 1, ECF No. 203-32 ("PWV does not intend to cut some sort of deal – as your letter implies it must – in order to obtain information it is entitled to under the terms of the Lease. The accounting information should be provided expeditiously."). In the meantime, PWV maintained that there remained a violation of the Lease.

On May 7, 2013, Wheeling & Lake Erie disputed that it "tacitly conceded" its abilities to segregate accounting information. *See also* Pls.' App'x Ex. 239, ECF No. 201-239 ("Moreover, there is no obligation under the Lease to maintain accounting records in a format acceptable to Mr. Lesser."). Once again, Wheeling & Lake Erie explained that it proposed creating some sort of accounting in an attempt to resolve this issue and stop the exchange between counsel. Wheeling & Lake Erie also detailed its unsuccessful efforts to solicit input and its apparent dissatisfaction with the results. *See id.* ("The only response I get is that Mr. Lesser is 'entitled' to an inspection. So it appears that you are unwilling to discuss the matter further. That is unfortunate."). PWV responded in kind on May 8, 2013. Later that day, Wheeling & Lake Erie informed PWV that it "[would] endeavor to create an accounting." *Id.*

At present, PWV insists that Plaintiffs continue to withhold information related to the March 2013 Books and Records Demand and that it never received a complete accounting from Wheeling & Lake Erie in violation of Section 8(a)(3). Moreover, PWV also claims that Plaintiffs' failure to produce documents or to notify it of certain transactions until December 2013 or January 2014 (*i.e.* more than sixty days since March 2013) constitutes an incurable default under the Lease.

### c. The December 2013 – February 2014 Document Production

On August 29, 2013, this Court granted Defendants' motion for leave to file a Second Supplement to Counterclaim, which relate to the third-party agreements that their current management allegedly did not become aware of until January 2013. Because of this ruling, the Court ultimately reopened fact discovery and imposed a May 2014 deadline for its completion.

The parties thereafter exchanged several thousand pages of documents. In September 2013, PWV served both Plaintiffs with a Second Request for Production pursuant to Federal Rule of Civil Procedure 26 and 34, asking for many of the same documents previously sought by the March 2013 Books and Records Demand. In response, Plaintiff(s) produced over 57,000 pages of documents on no fewer than nine occasions.[20] These documents included third-party agreements entered into by Wheeling & Lake Erie that related to the Demised Property. *See* Defs.' CSMF at 34-41, ECF No. 202 (citing examples of third-party agreements that Wheeling & Lake Erie produced in December 2013 or January 2014 but that were in its possession in March 2013).

As part of this discovery, Wheeling & Lake Erie also produced four documents that it created in March 2013 concerning revenues or other consideration it received relating to the Demised Property, entitled (1) Statement of Earnings for Ohio; (2) Oil & Gas Royalties on the

---

[20] Defendants assert that Plaintiff(s) produced these documents on no less than eighteen dates from December 2, 2010 through August 25, 2014. *See* Defs.' CSMF at 33-34, ECF No. 202. However, Defendants' appendix only includes nine cover letters from Plaintiffs' counsel from December 2013 (2), January 2014 (2), February 2014, April 2014, July 2014 (2), and August 2014, *see* Defs.' App'x Ex. 105, ECF No. 203-36, as well as a roughly one-thousand page subset of the December 2013 – February 2014 production, *see* Defs.' App'x Ex. 138, ECF Nos. 204-41–204-57. Defendants also maintain that tens of thousands of pages of documents were not produced by Plaintiffs until January and February 2014 even though counsel assured the Court that they would accomplish this task by the end of December 2013. *See* Oral Arg. Tr., Dec. 13, 2013 at 43 ("THE COURT: [Plaintiffs' counsel's] going to assure me in a minute that she'll have those documents to you before the end of this month; isn't she? PLAINTIFFS' COUNSEL: Yes, Your Honor. We're hand coping all of the documents."); *see also* Mem. Op., Dec. 17, 2013 (discussing alleged discovery abuses by Plaintiffs and denying PWV's motion for protective order shifting the costs of additional discovery and its motion for sanctions). For their part, Plaintiffs assert that they produced documents in January and February as they could get them copied and that the spring and the summer productions were made pursuant to their continuing duty to supplement and related to third-party agreements that went into effect post-production as well as an updated Statement of Earnings. *See* Pls.' RSOF at 53-54, ECF No. 207.

Pittsburgh & West Virginia Railway Company Property; (3) Wheeling & Lake Erie Railway Statement of Earnings for Pennsylvania and West Virginia; and (4) One Time Payments PWV. The information contained within these documents was based, in part, on information that Wheeling & Lake Erie possessed in January 2012 and/or March 2013. According to PWV, Wheeling & Lake Erie actively concealed this information from disclosure in violation of the Books and Records Provision of the Lease.[21]

### B. Procedural History

The Court has detailed this litigation's extensive procedural history in its June 19, 2014 Memorandum Opinion (ECF No. 186 at 15-22) and incorporates that discussion by reference.[22] Following that decision, the parties supplemented the record with several additional pleadings to comply with the Court's directives: on June 25, 2014, Plaintiffs filed their Amendment to Second Supplement to Complaint Amending the Prayer for Relief (ECF No. 188); on July 9, 2014, Defendants filed their Amended Second Supplement to Counterclaims (ECF No. 191); and on July 21, 2014, Plaintiffs filed their Answer and Affirmative Defenses to Defendants' Amended Second Supplement to Counterclaims (ECF No. 194). The parties have since filed cross-motions for partial summary judgment.

---

21. PWV alleges that the total earnings to Wheeling & Lake Erie reflected in the production amount to $6,238,748.38 but that the "accounting" is incomplete, particularly the document entitled One Time Payments PWV. In that document, PWV contends that the two line items dated "6/22/2012" do not properly reflect $7.6 million in royalty payments received from Chesapeake but instead states "PWV Portion TBD." Defs.' App'x Ex. 112, ECF No. 203-70 at 0073689. Wheeling & Lake Erie maintains that there was no "willful concealment." As for the $6 million sum, Wheeling & Lake Erie contends that the earnings statements included proceeds from agreements that PWV gave to and facilitated for Norfolk and Western, and therefore, PWV was well-aware of the earnings. Wheeling & Lake Erie further maintains that the "accounting" is not incomplete in light of its practice not to track certain information, and it disputes that it should have included royalty payments in a document entitled "One Time Payments," as there is no requirement under the Lease to do so.

22. The Court filed an Amended Memorandum Opinion on June 24, 2014 (ECF No. 187) to reflect the correct docket entry of Power REIT's motion for summary judgment. The Memorandum Opinions are otherwise identical.

## II. Legal Standard

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant must identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

To withstand a motion for summary judgment, the nonmoving party must show a genuine dispute of material fact for trial by citing to particular parts of material in the record. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–248.

The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c) (1)(A), or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact," Fed. R. Civ. P. 56(c)(1)(B). In reviewing all of the record evidence submitted, the court must draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587.

The court is not permitted to weigh evidence or to make credibility determinations at this stage. *Anderson*, 477 U.S. at 255. Those functions are for the jury, not the court. *Id.* The court is thus limited to deciding whether there are any disputed issues and, if so, whether they are both genuine and material. *Id.*

## III. Discussion

Plaintiffs move for summary judgment on Declaratory Judgment Counts One, Two, Five, Six, Seven and Eight and Counterclaims One-Twelve; Defendants move for summary judgment on their First, Third, Fourth, Fifth, Eighth, Ninth, Tenth, Eleventh, and Twelfth Counterclaims as well as Counts One, Two, Five, Six, Seven and Eight. The resolution of these counts and counterclaims turns on the interpretation and construction of the terms of the Lease. The parties agree that Pennsylvania law controls.

Under Pennsylvania law, "a lease is a contract and 'is to be interpreted according to contract principles.'" *Huang v. BP Amoco Corp*, 271 F.3d 560, 564 (3d Cir. 2001) (quoting *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 389 (Pa. 1986)). The "interpretation of a written agreement is a task to be performed by the court rather than a jury . . . so long as the words of the contract are clear and unambiguous, or the extrinsic evidence is conclusive." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009) (citations omitted). On the other hand, "[i]f the contract as a whole is susceptible to more than one reading, the factfinder resolves the matter." *Pacitti v. Macy's*, 193 F.3d 766, 773 (3d Cir. 1999) (citing *Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir. 1994)). "Pennsylvania law on contract interpretation and ambiguity is somewhat complicated; while the broad principles are clear, it is not a seamless web." *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 92 (3d Cir. 2001).

Be that as it may, "'[t]he paramount goal of contract interpretation is to determine the intent of the parties.'" *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 75 (3d Cir. 2011) (quoting *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009)). Pennsylvania contract law begins with the "'firmly settled'" principle that the "'the intent of the parties to a written contract is contained in the writing itself.'" *Bohler-Uddeholm Am., Inc.*, 247 F.3d at 92 (quoting *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. Ct. 1993) (citing *Steuart v. McChesney*, 444 A.2d 659 (Pa. 1982))). "The whole instrument must be taken together in arriving at contractual intent. Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed." *Great Am. Ins. Co. v. Norwin Sch. Dist.*, 544 F.3d 229, 243 (3d Cir. 2008) (quoting *Murphy v. Duquesne Univ. Of The Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001)). "'When the words are clear and unambiguous,' the intent of the parties must be determined from 'the express language of the agreement.'" *Am. Eagle Outfitters*, 584 F.3d at 587 (quoting *Steuart*, 444 A.2d at 661). And "'[w]here the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence.'" *Bohler-Uddeholm Am.*, Inc., 247 F.3d at 92 (quoting *Steuart*, 444 A.2d at 661).

A court may, however, look outside the "four corners" of the contract and to extrinsic evidence in determining whether an ambiguity exists.[23] *See id.* (citing *Krizovensky*, 624 A.2d at 642). "[A] contract 'will be found ambiguous if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning.'" *Id.* at 93

---

23. As the Court of Appeals has explained, "[a]mbiguity in a contract can be either patent or latent." *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 93 (3d Cir. 2001). A "patent ambiguity appears on the face of the instrument," while "a latent ambiguity arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous." *Bohler-Uddeholm Am., Inc.*, 247 F.3d at 93 (citations and quotation marks omitted).

(quoting *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir. 1995)). In contrast, "'[a] contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction.'" *Bohler-Uddeholm Am.*, Inc., 247 F.3d at 92. To make this determination, "the court may consider 'the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning.'" *Id.* (quoting *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir. 1980)).

At the same time, the Supreme Court of Pennsylvania has recognized that the "course of performance is always relevant in interpreting a writing." *Atl. Richfield Co. v. Razumic*, 390 A.2d 736, 741 n.6 (Pa. 1978); *see also Pennsylvania Eng'g Corp. v. McGraw-Edison Co.*, 459 A.2d 329, 332 (Pa. 1983) ("[Plaintiff's] contention is premised on an erroneous belief that a writing must be ambiguous in order to justify consideration of the parties' post-agreement conduct."). As the Supreme Court explained, "'[t]he parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning.'" *Atl. Richfield Co.*, 390 A.2d at 741 n.6 (quoting Restatement (Second) of Contracts § 228 cmt. g (Tent. Draft No. 5, 1970)).[24]

Our court of appeals has likewise observed that "[a] court always may consider the course of performance as evidence of the intent of the parties." *In re Old Summit Mfg., LLC*, 523 F.3d 134, 137-38 (3d Cir. 2008) (citation omitted); *see also Langer v. Monarch Life Ins. Co.*, 879 F.2d 75, 81 & n.8 (3d Cir. 1989) ("[E]ven if the contract was not patently ambiguous, we would

---

24. Although the Pennsylvania Supreme Court cites a tentative draft of the Restatement (Second) of Contracts, § 228 appears as § 202 in the Official Text. *See* Restatement (Second) of Contracts Par. Tables (1981).

consider the parties' course of performance, and in light of that evidence conclude that it is latently ambiguous as to the party to bear the risk of loss if the insurance was not obtained.") (citations omitted). District courts within the Third Circuit have also followed this approach. *See, e.g.*, *U.S. for the Use of Pioneer Const. Co. Inc. v. Pride Enterprises, Inc.*, No. 3:CV-07-0994, 2009 WL 4429802, at **6-7 (M.D. Pa. Nov. 27, 2009); *Pathmark Stores, Inc. v. Gator Monument Partners, LLP*, No. CIV.A 08-3082, 2009 WL 5184483, at **7-8 (E.D. Pa. Dec. 21, 2009); *Giampolo v. Somerset Hosp. Ctr. For Health, Inc.*, No. CIV. A. 95-133J, 1998 WL 608243, at **11-12 (W.D. Pa. May 29, 1998). Against this backdrop, the Court turns to the cross-motions for summary judgment.[25]

### A. The Third-Party Agreements

At Count Five of Plaintiffs' First Amended Complaint, they seek to have this Court declare that Norfolk Southern is not in default of the Lease due to a variety of transaction it engaged in with third parties, including the granting of leases for oil and gas or mineral extraction, the execution of license agreements relating to the Demised Property, the granting of easements over the Demised Property, and the entry into leases of portions of the Demised Property; and to declare that Defendants have no rights to the proceeds resulting therefrom. Defendants' Eighth Counterclaim seeks to hold Wheeling & Lake Erie liable for conversion only with regard to the third-party agreements that pertain to the subsurface rights. For the reasons that follow, the Court concludes that the Lease affords the Lessee (and thus its Sublessee) the right to enter into, control, and receive the benefits from third-party agreements, including those agreements that relate to the subsurface.

---

25. Because of the significant overlap between many (if not most) of the counts and counterclaims, the Court will address them together where appropriate. The Court must also address several of the counts and counterclaims on multiple occasions in light of the parties' style of pleading. *See, e.g.*, First Am. Compl. at 14-15, ECF No. 153 (requesting seven declarations relating to multiple sections of the Lease under the umbrella of a single count for declaratory judgment).

### 1.  The Language of the Lease

The unambiguous language of Section 1 of the Lease sets forth the breadth of Pittsburgh & West Virginia's transfer: except for such property specifically excluded by Section 2, Pittsburgh & West Virginia leased, assigned, transferred and delivered to Norfolk and Western "**all of [its] right, title and interest in and to all its property, real, personal and mixed**, including equipment, machinery, tools, materials and supplies, cash, investments, securities, claims, intangibles, choses in action, **rights (contractual or otherwise)**, obligations, interests, leaseholds and franchises, and including without limitation" the railroad and additional properties described in Schedules A and B.  Pls.' App'x Ex. 1 at 1, ECF No. 201-1 (emphasis added).  Schedule A provides that the Lessor leased, assigned, transferred and delivered to the Lessee "[a]ll right, title and interest of [the Lessor] in and to any and all land and improvements or other inherently permanent structures situate thereon which be under, along or adjacent to" the Rail Line and branch lines.  *Id.* at 24.  And Schedule B provides that the Lessor leased, assigned, transferred and delivered to the Lessee "[a]ll right, title and interest of [the Lessor], whether legal or equitable, in and to all equipment, machinery, tools, material and supplies, cash, investments, securities, claims, intangibles, choses in action, rights (contractual or otherwise), interests, franchises and all other property owned by [the Lessor], excepting real properties listed on Schedule A hereto and property not demised listed in Section 2." *Id.* at 26.

In Section 2, Pittsburgh & West Virginia did not reserve any rights or interests related to the real property, the coal, oil, gas or mineral estate, or the proceeds of any existing or anticipated agreements.  Pittsburgh & West Virginia instead limited the Nondemised Property to "[m]otive power and rolling stock" owned by Lessor and "[s]hares of stock issued by Lessor and held in its treasury" at the commencement of the Lease, "[b]ooks and records of Lessor which

are needed by Lessor in order to carry out its obligations under the Lease," "[r]ights, privileges and franchises of Lessor requisite for the preservation of its corporate existence and for the proper performance by it of the terms and provisions of this Lease or of any obligations imposed by law," and "[a]fter-acquired property acquired by Lessor with the proceeds of the rent paid or payable by Lessee" pursuant to Section 4(a)."[26] *Id.* at 2.

When read as a whole, the Lease also indicates that the original parties intended the broad transfer to include the ability to control all aspects of the Demised Property. For example, Section 6 requires the Lessee to "maintain, manage and operate" the Demised Property and to indemnify Lessor for claims in connection with "the leasing of the [D]emised [P]roperty, the title to the [D]emised [P]roperty, the condition of the [D]emised [P]roperty, or the use of or operations over the [D]emised [P]roperty." *Id.* at 7. In addition, Section 8(b)(4) requires the Lessor, when requested by Lessee, to "modify, extend, terminate, abandon or surrender any existing leases, agency, trackage or other contracts or agreements made by Lessor or any of its predecessors in title, or enter into any such new agreements, whenever in the judgment of Lessee such modification, extension, termination, abandonment, surrender or making of a new agreement would be beneficial to Lessee . . . ." *Id.* at 13.

At the same time, however, Section 11 requires that, at the end of the Lease, whether upon termination by expiration or by default, "the [D]emised [P]roperty, or such portion thereof as shall remain . . . shall be returned to Lessor in the same condition as it is in at the commencement of the term of this Lease, reasonable wear and tear excepted . . . ." *Id.* at 14. Even so, the parties' undisputed course of performance over fifty years illustrates the parties'

---

26. The parties' course of performance is not inconsistent with Plaintiffs' position that "[t]he items specifically reserved were limited to only those things necessary to [a]ffect P&WV's intention to continue its existence as the annual collector of $915,000 in cash rent." Pls.' Br. at 6-7, ECF No. 199.

intent to transfer surface and subsurface rights without restriction and resolves any ambiguity in their agreement.

## 2. The Parties' Course of Performance

Beginning eight days before the commencement of the Lease, Pomeroy (acting as general counsel of Pittsburgh & West Virginia) acknowledged that the Lessor would have to transfer various agreements to Norfolk and Western and modify or enter into leases or agreements upon the request of the Lessee under Section 8(b)(4) of the Lease. The transfer included the 1947 license agreement between Pittsburgh & West Virginia and West Penn; the 1951 license agreement between Pittsburgh & West Virginia and Manufacturers; the 1919 land lease between Pittsburgh & West Virginia and Monongahela Southern; and the 1942 oil and gas lease originally between the Wells and Rankin, which Pittsburgh & West Virginia later acquired.

Moreover, in the 1966 Notice of Transfer of the Wells' oil and gas lease executed by Pittsburgh & West Virginia, it expressly represented that it leased certain parcels of land to Norfolk and Western "reserving nothing, including all [its] right, title and interest in and to the oil and gas underlying the premises conveyed and the rentals, royalties or other income and benefits arising from same . . . ." Pls.' App'x Ex. 97, ECF No. 201-97 at 3. PWV also acknowledged the transfer of its subsurface estate, without claiming any right to receive rental, royalties or other income therefrom, in its execution of the coal lease between Norfolk and Western and Twilight in 1974 and in its response to Questa's inquiry regarding leasing acreage for oil and gas exploration in 1987.

Aside from those transactions that Pittsburgh & West Virginia/PWV facilitated, the Lessor became aware of other third-party agreements relating to the subsurface of the Demised Property, such as Norfolk & Western's coal lease with Y&O in 1981. At that time, the Lessee

advised PWV that "[a]ny proceeds received by NW as a result of the proposed lease should be subject to the P&WV First Mortgage." Pls.' App'x Ex. 156 at 1, ECF No. 201-156. Once again, PWV claimed no interest in the subsurface rights or the income generated from the lease.

In fact, there is no record evidence that, during the fifty-year history of the Lease, Pittsburgh & West Virginia/PWV ever disputed that the Lease provides Plaintiffs with the right to enter into these third-party agreements. Nor has Pittsburgh & West Virginia/PWV ever (until now) sought payment for, claimed any interest in, or contested the (Sub)-Lessee(s) exclusive entitlement to the benefits generated by a third-party agreement. The parties' undisputed course of performance instead demonstrates that Pittsburgh & West Virginia acknowledged that it had transferred to Norfolk and Western all right, title, and interest in the Demised Property, including the subsurface rights and the coal, oil, gas, and mineral estate.

### 3. Pennsylvania Law

Notwithstanding the broad language of the Lease and the parties' extensive course of performance, Defendants espouse the position that, because the parties' agreement does not explicitly convey the subsurface interests, the (Sub)-Lessee(s) had no right to enter into the third-party agreements relating to the oil and gas, coal or minerals underlying the Demised Property.[27] Relying on their interpretation of Pennsylvania law, Defendants contend that a lease, unlike a deed, "only grant[s] rights that are explicitly enumerated to be part of the demised premises. In other words, if subsurface rights are not specifically granted in a lease, they remain the lessor's rights." Defs.' Br. in Opp. at 63, ECF No. 213 (citing *Trustees of Proprietors of Kingston v. Lehigh Valley Coal Co.*, 84 A. 820 (Pa. 1912)); *see also* Defs.' Br. at 66, ECF No. 197 ("[W]hen

---

27. Defendants do not assert that the interests related to the other third-party agreements—the licenses, easements, and land leases—fall within one of the five enumerated exceptions in Section 2 of the Lease. Defendants instead argue that Plaintiff did not properly account for the income generated from those agreements. The Court will address this issue below.

a **deed** (rather than a **lease**) grants <u>all</u> rights in real property, such grant includes the subsurface rights (if they were held by grantor), even when not explicitly enumerated.") (emphasis in original). According to Defendants, the Supreme Court of Pennsylvania's decision in *Trustees of Proprietors of Kingston* is the "controlling precedent" on this issue. *See* Defs.' Reply at 336, ECF No. 221.

In *Trustees of Proprietors of Kingston*, the Supreme Court reviewed, in an equity proceeding, the findings of the trial judge who held that a sixty-year-old lease (the "Bennett lease") with the operative words "demise, set and to farm let" was for "agricultural purposes only, and conferred no authority on the lessee to mine and remove coal from the premises, or to use the passageways resulting from the removal of the coal." 84 A. at 820-21. The Court ultimately affirmed the decree, observing that the issue was not preserved for appeal. *See id.* 820-21. But the Court continued to "suggest[ ] in passing" that the tenant was "impeachable for waste." *Id.* at 821. In doing so, the Court discussed *Griffin v. Fellows*, 81 1/2 Pa. 114, 114 (1873), which "held that the defendant was not impeachable for waste in opening and working coal and stone mines, on the distinct ground that the estate of the lessee was enlarged by the words above quoted, used in the habendum, which, in a deed, determines what estate is granted." 84 A. at 821. The Supreme Court also observed that, in *Griffin*, it "further held that its interpretation of the lease was sustained by the fact that the lessee had for more than half a century operated the mines with the knowledge of the lessors, who had regularly received the stipulated rent." *Id.* Applying that decision "to the case at bar," the Supreme Court indicated that both the language of the agreement and the parties' course of performance must be considered in interpreting the lease. *See id.* at 821-22 ("[T]he operative words in the lease are simply 'demise, set and to farm let,' without any words in any part of the lease referring to the

minerals, which were never opened on the premises. For 60 years immediately subsequent to the letting, the parties had treated the lease as one for agricultural purposes only.”).

Distilled to its essence, the rule thus remains the same whether the instrument is a lease or a deed: the parties’ intent remains the focus when interpreting their agreement. And here, the unambiguous language of the Lease along with the fifty-year course of performance make clear that Pittsburgh & West Virginia transferred to Norfolk and Western all right, title, and interest in the Demised Property (including the subsurface rights), ceased all business operations, and sought to only collect the cash rental under the Lease. The Court will not now rewrite the terms of the Lease to make it seem more reasonable to the Defendant(s) or ignore the parties’ undisputed course of performance to avoid an unwelcome result.

Accordingly, the Court will **GRANT** Plaintiffs’ motion for summary judgment as to Count Five (to the extent it concerns the third-party agreements) and as to the Eighth Counterclaim; and it will **DENY** Defendants’ motion for summary judgment regarding same.

### B. Indebtedness

At Count Five, Plaintiffs seek to have this Court declare that Norfolk Southern has met its obligations to provide an accounting of the balance of the indebtedness arising under the Lease and that the 5% cap in Section 16(a) only applies to PWV’s preexisting debt obligations. At Count Eight, Plaintiffs seek to have this Court declare that that Norfolk Southern is not in default of the Lease for failing to pay PWV $341,768 in additional rent as demanded on April 7, 2013, that any amounts accrued under the Settlement Account are not due until termination of the Lease, and that no interest is due on the amounts accounted for in the Settlement Account.

Defendants’ Third Counterclaim seeks a declaration that the amount of indebtedness reflected in the Settlement Account cannot exceed 5% of the value of PWV’s assets, that the

Settlement Account balance is not indefinite in duration, that the gross proceeds from Asset Sales in 2006, 2007 and 2011 are properly treated as short-term debt due on demand; and that these transactions accrue interest consistent with the alternate federal rate ("AFR"); their Fifth Counterclaim seeks to hold Norfolk Southern liable for breach of contract based on its alleged failure to provide notice of, account for, and/or track as indebtedness the proceeds from licenses, easements, and leases, which they consider to be "dispositions" under Section 9;[28] their Sixth Counterclaim seeks to hold Norfolk Southern liable for breach of contract because, in their view, the proceeds from those third-party agreements should have been paid to PWV in cash since at least 1983, when the 5% cap on the Settlement Account under Section 16(a) was surpassed; their Seventh Counterclaim seeks to hold Norfolk Southern liable for fraud regarding its alleged misrepresentations of the balance of the Settlement Account to PWV; and their Eleventh and Twelfth Counterclaims seek this Court, respectively, to declare that Norfolk Southern is in default under Section 4(b)(1) of the Lease and to hold Norfolk Southern liable for breach of contract for failing to pay PWV $341,768 in additional rent for the year 2012.

For the reasons that follow, the Court concludes that the licenses, easements, and leases are not "dispositions" under Section 9 of the Lease; that the 5% cap on the balance of indebtedness is no longer applicable; that Norfolk Southern neither breached the Lease nor defrauded PWV in connection with its treatment of the Settlement Account or its obligations to provide statements related to the balance of indebtedness; that Norfolk Southern is not in default for failing to pay $341,768 in additional rent for 2012; that the balance of the Settlement

---

28. At Counterclaim Five, Defendants aver a breach of the implied duty of good faith and fair dealing. *See* Second Suppl. to Countercls. at 39-40, ECF No. 106. The Court notes that "under Pennsylvania law, a 'claim for breach of the implied covenant of good faith and fair dealing is subsumed in a breach of contract claim.'" *Burton v. Teleflex Inc.*, 707 F.3d 417, 432 (3d Cir. 2013) (quoting *LSI Title Agency, Inc. v. Evaluation Servs., Inc.*, 951 A.2d 384, 392 (Pa. Super. Ct. 2008)). "Therefore, while Pennsylvania law generally recognizes a duty of good faith in the performance of contracts, this duty 'does not create independent substantive rights.'" *Id.* (quoting *Com. v. BASF Corp.*, No. 3127, 2001 WL 1807788, at *12 (Pa. Com. Pl. Mar. 15, 2001)).

Account is not due until the termination of the Lease; and that interest is not due on the amounts accounted for in the Settlement Account.

### 1. Section 9

Section 9 of the Lease includes a relevant distinction: the first sentence provides that "[s]uch demised property as shall not in the opinion of Lessee be necessary or useful may be **sold, leased or otherwise disposed** of by Lessee," provided that "such sales, leases, or other dispositions" are made in compliance with Lessor's mortgages or other related agreement(s); however, the second sentence requires that only "[t]he proceeds of **sale, condemnation, or other disposition** of the demised property of Lessor shall, subject to the provisions of any mortgage or other agreement relating to such property, be paid to Lessee and shall be indebtedness of Lessee to Lessor." Pls.' App'x Ex. 1 at 11-12, ECF No. 201-1 (emphasis added).[29] In addition, the third sentence of Section 9 provides that "Lessee shall also be indebted to Lessor for the salvage value of demised property upon its retirement or abandonment or other disposition or use to the extent that salvage value thereof is not included in the proceeds referred to in the preceding sentence." *Id.*

The Court finds that the contractual text supports the interpretation offered by Plaintiffs: under Section 9, the only "dispositions" that must be tracked as indebtedness are fee simple conveyances of title to a portion of the Demised Property—*e.g.*, outright sales, condemnations, or abandonments—rather than the licenses, easements, and leases at issue in this case.[30] The first

---

29. Although this distinction appears at first blush to be sloppy draftsmanship, the parties do not contend and the Court does not find that it is the result of a scrivener's error. *See generally Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers, AFL-CIO v. Murata Erie N. Am., Inc.*, 980 F.2d 889, 907 (3d Cir. 1992) (citations omitted). Moreover, there is no evidence of record that is "'clear, precise, convincing and of the most satisfactory character' that a mistake has occurred and that the mistake does not reflect the intent of the parties." *Id.* (quoting *In re Estate of Duncan,* 232 A.2d 717, 720 (Pa. 1967)).

30. The explanation offered by Plaintiffs as to why "[t]he cash received from these third-party agreements was transferred to Norfolk and Western under the Lease" was "so it could be used to address the operational

sentence of Section 9 specifically includes "leases" and sets forth the discretionary authority of the Lessee to sell, lease, or otherwise dispose of the Demised Property. But there is no mention of "leases" in the remainder of Section 9. The second sentence instead requires that the proceeds of any sale, condemnation, or other disposition of the Demised Property shall be an indebtedness of Lessee to Lessor. The third sentence is no different. It requires that the Lessee shall be indebted to Lessor for the salvage value of the Demised Property upon its retirement, abandonment, or other disposition or use to the extent that the salvage value is not included in the proceeds referred to in the second sentence. Nowhere does Section 9 require that proceed(s) from leases or other non-possessory interests in the Demised Property be an indebtedness of Lessee to Lessor. The intent of the original parties is thus apparent: the licenses, easements, and leases at issue are not Section 9 dispositions.

The parties' course of performance supports this interpretation. For at least thirty years, Norfolk and Western/Norfolk Southern assisted with the preparation of PWV's tax returns and financial statements, and in doing so, represented the balance of the Settlement Account on an annual basis. None of the representations reflected the income received from the third-party agreements. Until now, PWV never disputed the representations of the Settlement Account's balance, even though it transferred to Norfolk and Western the third-party agreements that predated the Lease, assisted Norfolk and Western/Norfolk Southern with the execution of new third-party agreements, and knew that the Lessee received the proceeds from the third-party agreements. As Plaintiffs highlight, those proceeds included the $5,000 paid to Norfolk and Western by the Board of Education for the easement that PWV facilitated, the royalty payments

---

inconvenience and expense of potential interference, as well as to administer these arrangements indigenous to the rail line's usage since 1964." Pls.' Br. at 50, ECF No. 199; *see also id.* ("As operators of the rail line, Plaintiffs obligated themselves under the Lease for all related expenses from all sources, including expenses resulting from shutdowns and stoppages from licenses, easements, and leases.").

from the Y&O coal lease and Peoples oil and gas lease, and the income from land leases entered into for erecting and maintaining billboards, a type of third-party agreement that Defendants' current management was well-aware of in May 2010 when it discussed the Larson proposal.

Defendants also rely on the parties' course of performance to support their position that the Lessee relied on Section 9 for certain "dispositions." First, Defendants cite the Secretary's Certificates or resolutions for sales of or easements over the Demised Property prepared by Norfolk and Western. *See* Defs.' Br. at 72-73, ECF No. 197 (citing Defs.' CSMF at 49-50, ECF No. 202 (citing Defs.' App'x Exs. 119-125, ECF Nos. 204-21–27)). However, those documents do not prove that a lease is a disposition for which Norfolk Southern must account. They only reference the first sentence of Section 9 to reflect the discretionary power of the Lessee to sell, lease, or otherwise dispose of the Demised Property, reciting that a said parcel is neither necessary nor useful to Norfolk and Western or that the conveyance would not impair or in any manner interfere with its operation. Second, Defendants rely on a 1979 letter from a Norfolk and Western representative regarding a proposed coal lease. *See id.* (citing Defs.' CSMF at 49-50, ECF No. 202 (citing Defs.' App'x Ex. 137, ECF Nos. 204-40)). But that letter also does not support Defendants' position; it reiterates that "[t]he proceeds of sale must be paid to P&WVA or reflected as indebtedness of NW to P&WVA, subject to any applicable mortgage provisions" and recommends that the parties' execute a mining lease rather than a conditional sale. *Id.* Finally, Defendants highlight a line item from PWV's 1974 Annual Report which reflects that it received roughly $13,000 in coal royalties that year, as well as a portion of Noe's deposition in which he apparently admits that coal royalties serve to increase the Settlement Account. *See* Pls.' App'x Ex. 17 at 006645, ECF No. 201-17; Defs.' App'x Ex. 57 at 166-68, ECF No. 202-58. A review of that deposition transcript reveals, however, that Noe only testified that it appeared a

coal royalty was credited as income in the Settlement Account that year and that he did not know enough about the royalty to state whether it was consistent with the terms of the Lease. Thus, the parties' course of performance is not "in conflict" as Defendants suggest.

In sum, the language of the Lease, along with the parties' course of performance, demonstrates that the third-party agreements are not Section 9 "dispositions" that must be tracked as indebtedness. Accordingly, the Court will **GRANT** Plaintiffs' motion for summary judgment as to Count Five of the First Amended Complaint and Defendants' Fifth Counterclaim to the that extent those claims concern the tracking of proceeds of third-party agreements as indebtedness; and it will **DENY** Defendants' motion for summary judgment regarding same.

### 2. The 5% Cap

Section 16(a) provides, in relevant part, that "the total of such indebtedness owing from Lessee to Lessor . . . shall not exceed at any time an amount equal to 5% of the value at such time of the total assets of Lessor **as long as any of the obligations of Lessor which have been assumed by Lessee in this Lease remain outstanding and unpaid**." Pls.' App'x Ex. 1 at 17, ECF No. 201-1 (emphasis added). The parties disagree on whether the "5% cap" on the balance of indebtedness still applies.

Plaintiffs take the position that the 5% cap was only to apply to the Lessee's agreement to pay or discharge on behalf of Lessor the debt obligations existing prior to the date of the Lease in accordance with Section 7, and therefore, it no longer applies because the PWV debt assumed by Norfolk and Western has been paid off since 1982. Defendants submit that the 5% cap remains operative because Norfolk Southern still has outstanding and ongoing obligations which it has assumed on PWV's behalf, including the payment of property taxes related to the Demised Property and the operation of the Rail Line. According to Defendants, the $16,660,850.63

balance of the Settlement Account balance exceeds the cap of $457,5000, or 5% of PWV's asset value of $9,150,000.

The "obligations of Lessor which have been assumed by Lessee" is undefined in the Lease, but the language that follows indicates that it refers to the debt obligations of PWV assumed by Norfolk and Western. The term "as long as" suggests a temporal limitation; if the 5% cap encompassed, for example, Norfolk Southern's assumption of the operation of the Rail Line, the language would be rendered superfluous. The plain meaning of "outstanding" and "unpaid" also supports Norfolk Southern's interpretation. *See* Black's Law Dictionary 1213 (9th ed. 2009) (defining "outstanding" as 1. Unpaid; uncollected <outstanding debts>. 2. Publicly issued and sold <outstanding shares>.). And the sentence that immediately follows the 5% cap in Section 16(a) impliedly references the Lessee's obligations under Section 7: "All cash payments made by Lessee to Lessor as provided in this subdivision (a) shall immediately be used by Lessor to pay and discharge indebtedness of Lessor to others as may be designated by Lessee." Pls.' App'x Ex. 1 at 17, ECF No. 201-1. In sum, the parties' intent as expressed in the Lease favors Norfolk Southern.

Aside from the language of Section 16, the parties' course of performance is once again relevant in interpreting the Lease. As outlined above, the Annual Reports of PWV reflect that it no longer reported the balance of the Settlement Account beginning in 1983, the year after its debt obligations became satisfied in full, because it would have distorted its financial picture had it done so. Moreover, PWV has since repeatedly stated that it would not report the value of the Settlement Account in light of the indefinite settlement date at the expiration of the Lease. *See, e.g.*, Pls.' App'x Ex. 26 at F-7, ECF No. 201-26 ("At December 1, 1983, the non-cash [S]ettlement [A]ccount had a balance of $3,900,000 receivable from Norfolk and Western;

however, because the account will not be settled until the expiration of the [L]ease, no value has been reported in 1983 for the balance of the account or the transactions affecting the balance."). Thus, Norfolk Southern has not been in default of Section 16(a) for the past thirty-one years because once Norfolk and Western paid off PWV's third-party debt in 1982, the 5% cap was no longer effective.

Accordingly, the Court will **GRANT** Plaintiffs' motion for summary judgment as to Count Five and the Third and Sixth Counterclaims to the extent that those claims concern the 5% cap and payment under Section 16(a); and it will **DENY** Defendants' motion for summary judgment as to Count Five and the Third Counterclaim regarding same.

### 3. The Reporting of the Settlement Account

Section 16(b) requires that "[f]rom time to time a balance of the indebtedness arising under this Lease of Lessor to Lessee and of Lessee to Lessor shall be determined." Pls.' App'x Ex. 1 at 17, ECF No. 201-1. The parties have historically used the Settlement Account as an accounting mechanism for tracking indebtedness pursuant to Sections 4(b)(1)-(4), Section 6, Section 7, Section 9 and Section 16(a) of the Lease.

### a. Breach of Contract

Count Five of the First Amended Complaint and Defendants' Fifth Counterclaim both include allegations regarding the (in)-accuracy of Plaintiffs' reporting of the balance of the Settlement Account. Because the third-party agreements are not Section 9 dispositions and the 5% cap no longer applies, as explained above, Norfolk Southern has not underreported the Settlement Account, and therefore, it has not breached the Lease as alleged in Defendants' Fifth Counterclaim. Norfolk Southern has thus met these obligations under the Lease. Accordingly, the Court will **GRANT** Plaintiffs' motion for summary judgment as to Plaintiffs' Count Five of

the First Amended Complaint and Defendants' Fifth Counterclaim to the extent they concern the reporting of the balance of the Settlement Account; and it will **DENY** Defendants' motion for summary judgment regarding same.

### b. Fraud

Defendants' Seventh Counterclaim asserts a similar fraud claim, arising from the alleged failure to report the Settlement Account balance. In Pennsylvania, a party must establish the following elements to sustain a common law fraud claim: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994). The parties disagree on whether Defendants have articulated any misrepresentation or the intent to mislead by Norfolk Southern. In the alternative, Norfolk Southern argues that the gist of the action doctrine bars the fraud claim. As the Court has already explained, Norfolk Southern has not misrepresented the balance of the Settlement Account. Even so, the Court will address the alternative arguments of the parties.

Until recently, the Supreme Court of Pennsylvania "had scant occasion to opine as to how the gist of the action doctrine should be employed to ensure that a party does not bring a tort claim for what is, in actuality, a claim for a breach of contract." *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 60 (Pa. 2014). However, in *Bruno v. Erie Insurance Company*, the Court discussed the doctrine at length and observed that "[it] has consistently regarded the nature of the duty alleged to have been breached, as established by the underlying averments supporting the claim in a

plaintiff's complaint, to be the critical determinative factor in determining whether the claim is truly one in tort, or for breach of contract." *Id.* at 68. As the Court explained:

> In this regard, the substance of the allegations comprising a claim in a plaintiff's complaint are of paramount importance, and, thus, the mere labeling by the plaintiff of a claim as being in tort, e.g., for negligence, is not controlling. If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract. If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort.

*Id.* (internal citations omitted). The Pennsylvania Supreme Court thus reaffirmed the "duty-based demarcation" as "the touchstone standard for ascertaining the true gist or gravamen of a claim pled by a plaintiff in a civil complaint." *Id.* at 69. Accordingly, this Court must ask "whether the nature of the duty upon which the breach of contract claims rest is the same as that which forms the basis of the tort claim[ ]." *Id.* at 69 n.17.

Upon review of the fraud counterclaim, the Court finds that it arose in the course of the parties' contractual relationship and concerns Norfolk Southern's alleged violation of the Lessee's commitment(s) under the Lease to report the balance of the Settlement Account. As the pleading states, "[u]pon information and belief, in breach of the Lease, Norfolk Southern has intentionally omitted numerous dispositions of P&WV's property required under the Disposition of Property Provision of the Lease when representing the amount of the Settlement Account and/or indebtedness to P&WV on a yearly basis." Second Suppl. to Countercls. at 41, ECF No. 106. Defendants' theory that the fraud counterclaim "is not based on a separate breach of the Lease," but on "Norfolk Southern's false, extra-contractual annual representations concerning the Settlement Account balance" is thus misplaced. Defs.' Br. in Opp. at 55, ECF No. 213. In fact, Defendants' fraud counterclaim is nothing more than a restatement of its breach of contract

counterclaim(s), and therefore, the Court concludes that Defendants' fraud counterclaim against Norfolk Southern is barred by the gist of the action doctrine. Accordingly, the Court will **GRANT** Plaintiffs' motion for summary judgment as to Defendants' Seventh Counterclaim.[31]

### 4. Section 4(b)(1) Additional Rent

Under Section 4(b)(1) of the Lease, additional rent owed by Norfolk Southern to PWV includes "[s]ums equal to the deduction for depreciation or amortization with respect to the demised property allowed to Lessor for such year under the provisions of the then effective United States Internal Revenue Code." *See* Pls.' App'x Ex. 1 at 4, ECF No. 201-1. On February 15, 2013, Norfolk Southern represented to PWV that the amount of depreciation and amortization on PWV's tax returns for the year 2012 was $341,768. Through a series of correspondences that followed, PWV demanded and Norfolk Southern refused payment of that amount in cash.

Section 16(a) provides the Lessee with a choice regarding the "[t]he portion of the additional rent, or any part thereof, payable to Lessor" pursuant to Sections 4(b)(1)-(4) and Section 9: to either (1) pay PWV in cash—in which case it must use that cash to pay down its debt obligations; or (2) credit PWV with the same as indebtedness in the Settlement Account. *Id.* at 17. The indebtedness option is, of course, subject to the 5% cap as long as the assumed obligations remain outstanding and unpaid. As the Court has explained, that limitation no longer applies because the assumed obligations had previously been paid by Norfolk and Western. Therefore, Norfolk Southern is not required to make cash payments under Section 16(a) and may

---

31. Because the Court does not find that Norfolk Southern committed fraud, it will not impose a constructive trust as requested by Defendants in their Seventh Counterclaim. *See* Second Suppl. to Countercls. at 42, ECF No. 106; *see generally Louis Dolente & Sons v. U.S. Fid. & Guar. Corp.*, 252 F. Supp. 2d 178, 182 (E.D. Pa. 2003) ("Courts will impose a constructive trust only where the defendant has acquired the property at issue as a result of fraud, duress, undue influence, mistake, abuse of a confidential relationship, or other such circumstances suggesting unjust enrichment.") (citations omitted).

elect (as it has) to track the $341,768 in Section 4(b)(1) rentals for 2012 in the Settlement Account without defaulting on its obligations under the Lease.

Accordingly, the Court will **GRANT** Plaintiffs' motion for summary judgment as to Count Eight to the extent it concerns to the payment of additional rent and as to Defendants' Eleventh and Twelfth Counterclaims; and it will **DENY** Defendants' motion for summary judgment regarding same.

### 5. Payment of the Balance of the Settlement Account

The Lease is silent on when the Lessee must pay the balance of the indebtedness credited to the Lessor and tracked under their agreement. Nevertheless, the parties' course of performance demonstrates that they intended for the balance of indebtedness to not be due until the termination of the Lease.

Until recently, PWV had accepted and acknowledged this aspect of the Lease time and time again. The record is replete with examples. *See supra* Part I.A.4.e. For example, PWV has represented to the ICC that, to the extent Norfolk and Western's payment of debt exceeded PWV's tax deductions for depreciation and amortization, PWV is indebted to Norfolk and Western, but that amount "is payable only out of income after termination of the [L]ease." Pls.' App'x Ex. 79 at 11, ECF No. 201-79. It has also advised its shareholders in Annual Reports (as recently as 2010) that the Settlement Account would not be paid until the expiration of the Lease. *See, e.g.*, Pls.' App'x Ex. 53 at D025370, ECF No. 201-53 ("Although the [L]ease provides for additional rentals to be recorded, these amount do not increase cash flow or net income as they are charged to NSC's settlement account with no requirement for payment except at termination of the [L]ease. Because of the indeterminate settlement date for these items, such transactions and balances have not been reported in the financial statements since 1982."). And PWV's own

Audit Committee (as well as its accounting firm) has recognized the historical treatment of the Settlement Account and the indeterminate date of payment. *See* Pls.' App'x Ex. 178 at 1, ECF No. 201-178; *see also* Pls.' App'x Ex. 180 at F-8, ECF No. 201-180. Indeed, both the Audit Committee and Gibbons & Kawash have noted the incentive for Norfolk Southern to renew the Lease after the initial 99-year term because it must pay the balance of indebtedness of (what was then) over $13 million only at termination. *See id.*; *see also* Pls.' App'x Ex. 179 at 3, ECF No. 201-179 (explaining, in a 2005 letter from PWV to the SEC, that "[t]he Trustees and Audit Committee believe there is sufficient penalty upon the Lessee that the [L]ease will be renewed into perpetuity.").

PWV cannot now ignore history by simply calling its own past actions irrelevant. Nor can it challenge that precept of the Settlement Account by invoking the codification of the economic substance doctrine, which cannot apply to the Lease based on its effective date. The Settlement Account also is not, as PWV suggests, a short-term debt due on demand—a concept that is unsupported by the text of the Lease and disconnected from its historical representations regarding indebtedness. The balance of the Settlement Account may have changed following tax and accounting changes in the late-1970's and early-1980's in manners that the parties did not anticipate in 1962, but the parties' treatment of the Settlement Account has remained the same until now.

Moreover, PWV's reliance on tax law and accounting principles do not change the outcome. As a threshold matter, the Court cannot determine liability for taxes under the Declaratory Judgment Act, *see* 28 U.S.C. § 2201, which Defendants' theories would necessarily have the undersigned do, *see* Defs.' Br. in Opp. at 67, ECF No. 213 ("Norfolk Southern's deduction of additional rent is inconsistent with more recent tax rules, including IRC § 467,

because the net present value of Norfolk Southern's obligation under the Settlement Account (as defined by Norfolk Southern's definition) is significantly less than the rent deduction of additional rent which it has claimed as deductions on its tax returns."). Defendants also lack standing to challenge Norfolk Southern's treatment of its taxes, which the IRS monitors with a "full-time" auditor assigned to Norfolk Southern. *See generally* Defs.' Br. in Opp. at 89, ECF No. 213 ("Either [Norfolk Southern] falsely under-reported its taxes to the IRS or it must change its position relative to the Settlement Account."). Defendants' position is therefore unavailing.

The task before this Court is to examine the Lease and ascertain the intent of the contracting parties as objectively manifested by them. In doing so, the Court has concluded that Plaintiffs' proposed interpretation is consistent with the terms of the parties' agreement and their course of performance; a review of the Lease and the historical representations of PWV simply do not support their newfound position. Accordingly, the Court will **GRANT** Plaintiffs' motion for summary judgment as to Count Eight of the First Amended Complaint and Defendants' Third Counterclaim to the extent they concern the payment of the balance of the Settlement Account; and it will **DENY** Defendants' motion regarding same.

### 6. The Accrual of Interest on the Balance of the Settlement Account

The Lease mentions the accrual of interest twice, and neither occasion relates to indebtedness owed from Lessee to Lessor. First, Section 11 provides that "[a]ny indebtedness of Lessor to Lessee under this Lease shall, after termination of this Lease, be payable by Lessor to Lessee only if and to the extent that Lessor shall have net income available for such purpose before payment of any dividends upon its capital stock, plus interest on any unpaid amounts at the rate of 6% per annum." *See* Pls.' App'x Ex. 1 at 15, ECF No. 201-1. Second, Section 12 states that "Lessor shall be entitled to payment of all damages suffered by Lessor by reason of or

arising out of the breach or default of Lessee or termination of this Lease, with interest thereon at 6% per annum . . . ." *Id.* at 16. To be sure, the Lease does not provide for the accrual of interest on the additional rent or the balance of indebtedness payable to Lessor by Lessee.

Defendants' request that the Court declare that certain asset sales and the Settlement Account accrue interest consistent with the AFR thus finds no support in the Lease, and the parties' course of performance sheds no additional light on this issue. Accordingly, the Court will **GRANT** Plaintiffs' motion for summary judgment as to Count Eight of Plaintiffs' First Amended Complaint and the Third Counterclaim to the extent they relate to the accrual of interest; and it will **DENY** Defendants' motion for summary judgment regarding same.

### C. The Tax Memorandum

At Count One, Plaintiffs seek to have this Court declare that the amount owed to Defendants as a result of the disposition of the West End Branch is the amount of the income tax payments, that Plaintiffs will be fully compliant with Section 4(b)(7) of the Lease upon payment of that amount, that Plaintiffs are not required to pay Defendants' attorneys' fees under Section 4(b)(6) of the Lease, and that Defendants are prohibited from declaring Plaintiffs in default of the Lease or otherwise interfering with their use of the Demised Property. At Count Seven, Plaintiffs seek a declaration that Norfolk Southern is not in default of the Lease for failing to reimburse PWV for legal fees as demanded on March 23, 2012.

Defendants' Second Counterclaim seeks a declaration that Norfolk Southern is in default under the Lease for failing to pay PWV's Section 4(b)(7) tax payments as additional rent; and their First and Tenth Counterclaims seek a declaration that Norfolk Southern is in default of Section 4 of the Lease for, respectively, (1) failing to pay PWV $4,487.50 in attorney's fees it incurred in connection with its review of the contractual and tax issues related to the West End

Branch sale; and (2) refusing to reimburse PWV for legal fees incurred, as demanded on March 23, 2012.

For the reasons that follow, the Court concludes that Norfolk Southern is not in default of Section 4(b)(7) of the Lease; and that Norfolk Southern is not required to pay Defendants' attorney's fees related to the sale of the West End Branch or otherwise.

### 1. Section 4(b)(7) Rent

Section 4(b)(7) provides that additional rent includes "[a]ll taxes, assessments and governmental charges, ordinary and extraordinary, . . . which are lawfully imposed upon Lessor or the demised property or its income or earnings . . . " and that "[t]he foregoing sums shall be paid or discharged by Lessee as and when they become due and payable." Pls.' App'x Ex. 1 at 5-6, ECF No. 201-1. Under the Lease, Section 4(b)(7) additional rent may not be treated as indebtedness pursuant to Section 16, which only references Sections 4(b)(1)-(4) additional rent.

Defendants have repeatedly relied upon Section 4(b)(7) in seeking a cash payment from Norfolk Southern as additional rent. Initially, PWV cited Section 4(b)(7) in the Tax Memorandum in their pursuit of $1.2 million in shareholder distributions related to the West End Branch sale. By all accounts, Defendants have since abandoned this theory. *See supra* n.14. Defendants now contend that Norfolk Southern deducted $69,663.00 from the Settlement Account, rather than pay this amount to PWV as additional rent. Norfolk Southern concedes that it made this accounting error but that it has since corrected its mistake. *See supra* n.15. In turn, Defendants argue that "Norfolk Southern's treatment of the Section 4(b)(7) tax payment in this

way is inconsistent with how 'additional rent' is to be treated under the Lease and is the equivalent of paying PWV with its own money." [32] Defs.' Br. in Opp. at 75, ECF No. 213.

There are fundamental flaws with Defendants' most recent position. As a threshold matter, there is no evidence in the record that P&WV's taxes have not been paid by Norfolk Southern when they become due and payable pursuant to Section 4(b)(7). Additionally, as Plaintiffs highlight, "[t]o the extent P&WV's tax returns were incorrect, P&WV is indemnified for taxes. P&WV has suffered no detriment in any event, as there is no record evidence that the IRS has found any deficiencies in its tax filings." Pls.' Br. in Opp. at 14, ECF No. 210. Without any evidence to the contrary, the Court cannot conclude that Norfolk Southern is in default of the Lease. Accordingly, the Court will **GRANT** Plaintiffs' motion for summary judgment as to Count One and Defendants' Second Counterclaim to the extent they concern the payment of additional rent under Section 4(b)(7).

---

32. Although it is somewhat unclear, PWV's position appears to be that Norfolk Southern should have paid in cash an amount that corresponded with the payment/discharge of its taxes and/or any reduction in the Settlement Account. As Defendants states in its pleading:

> 179. Under Section 4(b)(7), the tax payment to P&WV or discharged on P&WV's behalf constitutes "additional rent." Thus, Norfolk Southern's obligation to pay or discharge P&WV's taxes requires that Norfolk Southern provide a cash payment to P&WV as additional rent representing the payment due to various taxing authorities for P&WV's income taxes . . . .

> 185. A voluntary "reduction" in the "Settlement Account" by Norfolk Southern is permissible under the terms of the Lease. Accordingly, all payments by Norfolk Southern denominated as payments for P&WV's taxes are not 4(b)(7) payments of additional rent but represent voluntary payments to reduce the balance owed P&WV under the "Settlement Account." These payments do not excuse Norfolk Southern's obligation to reimburse P&WV's taxes as additional rent under Section 4(b)(7) of the Lease.

Defs.' Am. Answer and Countercls. at 25-26, ECF No. 71. This position runs counter to the parties' longstanding understanding (and practice) that the only cash payment due under the Lease is the $915,000 rental. *See supra* Part I.A.4.e..

### 2.  Demands for Attorney's Fees

The relevant provisions of the Lease with regard to the dispute regarding the payment of attorney's fees are Sections 4(b)(5) and 4(b)(6).  Section 4(b)(5) provides that additional rent includes:

> all interest, expenses, fees and any other sums (except for principal, sinking fund payments or other sums to be paid or advanced pursuant to Section 7 hereof and except for any obligations incurred by Lessor solely for the benefit of its stockholders or reasonably allocable thereto) payable by Lessor . . . . The foregoing sums shall be paid or discharged by Lessee as and when they become due and payable.

Pls.' App'x Ex. 1 at 5, ECF No. 201-1.  Under Section 4(b)(6), additional rent also includes:

> Such sums, if any, as may be required to pay all obligations reasonably incurred by Lessor for the doing of all acts and things which Lessor may be lawfully required to do or perform under the provisions of this Lease or of any law or by any public authority, or for the doing of all acts and things necessary or desirable for the protection during the existence of this Lease of Lessor's rights in the demised property or the rentals or other sums payable pursuant to this Lease, except such obligations incurred by Lessor solely for the benefit of its stockholders or reasonably allocable thereto, or in connection with nondemised property or reasonably allocable thereto.

*Id.*  Notably, neither Section 4(b)(5) nor Section 4(b)(6) mention "attorney's fees."  However, the drafters did know how to provide for attorney's fees because they otherwise did so.  *See id.* at 14 ("Lessee shall indemnify Lessor against liability, including costs and attorneys' fees, which may be incurred by Lessor under its collective bargaining agreements . . . ."); *id. at* 16 ("Lessor shall be entitled to payment of all damages suffered by Lessor by reason of or arising out of the breach or default of Lessee or termination of this Lease, with interest thereon at 6% per annum, plus a reasonable attorney's fee and costs and expenses of Lessor.").

Defendants' nevertheless seek a declaration that Norfolk Southern is in default for failing to pay, as additional rent, its legal fees incurred "in connection with a 'necessary or desirable' legal review of issues relating to [the West End Branch sale]" and relating to this action.  Defs.'

Br. at 41, ECF No. 197. From Defendants' perspective, "[t]his action was brought by Norfolk Southern and WLE and is fundamentally about rights under the Lease – it is necessary that PWV is represented by counsel and desirable to understand the rights of the parties under the Lease." *Id.* The Court cannot agree.

Under Pennsylvania law, "[c]ounsel fees are recoverable only if permitted by statute, clear agreement of the parties, or some other established exception." *Knecht, Inc. v. United Pac. Ins. Co.*, 860 F.2d 74, 80 (3d Cir. 1988) (citing *Corace v. Balint*, 210 A.2d 882, 887 (Pa. 1965)). Applying Pennsylvania law, the United States Court of Appeals for the Third Circuit has held that contract language "such sum or sum 'as may be justly due'" did not include attorney's fees absent an express provision allowing for recovery. *See Knecht*, 860 F.2d at 81 ("Yet in United's bond no reference was made to attorney's fees. In the circumstances, we conclude that attorney's fees are not recoverable in this action."). Relying on that decision, other courts have concluded that language which more closely resembles the Lease was insufficient to shift attorney's fees under Pennsylvania law. *See, e.g.*, *In re Bradstreet*, No. 01-18357DWS, 2002 WL 31987287, at *6 (Bankr. E.D. Pa. Dec. 31, 2002) (observing that the generalized language of a Lease—"Lessee agrees to pay as rent . . . any and all damages, costs, and expenses which the Lessor may suffer or incur by reason of any default of the Lessee or failure on his part to comply with the covenants of this lease"—was not a "'clear agreement' which would support an exception to the American Rule thereby shifting attorneys' fees and litigation costs to the other party").

At the same time, the interpretation of broad contractual language is a context-specific task when deciding whether attorney's fees and litigation costs are within the purview of an agreement. For example, in *Sloan & Co. v. Liberty Mutual Insurance Co.*, our court of appeals

held that the term "expenses and costs" includes attorneys' fees in addition to other litigation-related expenses and costs when used in "in a paragraph discussing procedural mechanisms for lawsuits and other dispute resolution proceedings." 653 F.3d 175, 186-87 (3d Cir. 2011) (citations omitted)

Section 4(5) and Section 4(b)(6) have no similar context; they relate to the payment of additional rent. Nor is there any statutory authority or other recognized exception to the rule present here. Without more, the Court cannot conclude that those sections represent a clear agreement of the parties to shift attorney's fees and costs. In fact, had the parties intended to include a fee-shifting provision for circumstances now envisioned by Defendants, they could have explicitly done so just as they did elsewhere in the Lease. But they did not. Accordingly, the Court will **GRANT** Plaintiffs' motion for summary judgment as to Count One, Count Seven, and the First and Tenth Counterclaims to the extent they concern the payment/reimbursement of attorney's fees; and it will **DENY** Defendants' motion for summary judgment regarding same.

### D.  The Books and Records Demands

At Count Two, Plaintiffs seek to have this Court declare that Norfolk Southern is not in default of the Lease by failing to agree to provide Defendants with access to all of the books and records which they requested in their January 6, 2012 and subsequent letters and that Defendants may not conduct a track inspection; and to declare the proper and reasonable scope of the books and records which Defendants may inspect under Section 8(a)(3). At Count Six, Plaintiffs seek to have this Court declare that Norfolk Southern is not in default of the Lease with respect to the March 5, 2013 Books and Records demand.

Defendants' Fourth Counterclaim seeks a declaration that Norfolk Southern is in default of Section 8(a)(3) of the Lease based on its failure and/or refusal to provide PWV with access to

the books and records included in the January 6, 2012 Letter; that Plaintiffs may not prohibit and/or prevent PWV from conducting a track inspection; and (3)that Norfolk Southern is in breach of the Lease based on its refusal to permit PWV to conduct a track inspection. Defendants' Ninth Counterclaim seeks a declaration that Norfolk Southern is in default of the Books and Records Provision of the Lease based on its failure and/or refusal to provide PWV with full and complete access to the books and records included in the March 5, 2013 demand.

For the reasons that follow, the Court concludes that Plaintiffs are not in default of Section 8(a)(3) of the Lease and that Norfolk Southern is not in breach of the Lease with regard to the track inspection demand. The Court does, however, decline to issue an "advisory opinion" regarding the proper and reasonable scope of the Books and Records Provision.

Section 8(a)(3) of the Lease provides that the Lessor or the Lessee "shall permit at any and all reasonable times such person or persons as the [other] may designate to inspect the books and records of [the other] for any purpose whatsoever." Pls.' App'x Ex. 1 at 9, ECF No. 201-1. The only limitation on Section 8(a)(3) is reasonableness.

In PWV's January 6, 2012 letter, it demanded that within two business days (five days altogether) Norfolk Southern make available its books and records related to the following:

> • Financial Statements including detail and support related to all revenues, expenses, cash-flows, assets and liabilities (including working capital, capital assets, deferred maintenance, and related records) • Tax returns, including all schedules and support work • From the commencement of the Lease, a historical accounting of the "Settlement Account," including each addition and subtraction and supporting documentation • From the commencement of the Lease, all property additions, improvements and replacements, including any planned or projected additions, improvements and replacements to the demised property • From the commencement of the Lease, all details related to all sales of PWV property and all tax reimbursements payments related thereto • Railway volume in terms of car loadings, tons transported, revenues and other metrics tracked by Lessee on a per customer and per-category basis • Customer lists including billings/usage • Track maintenance, including past, planned and deferred maintenance capital expenditure • Current track condition reports and known

issues or degradation of track • Machinery, equipment, supplies, motive power, rolling stock and cash needed to operate the railroad in a manner which will meet the requirements of law and of shippers or passengers desiring transportation • Properly descriptions, plans and specifications, including all interconnection points with other railroad companies • Correspondence related to the Lease or PWV • ICC/STB and governmental records, including all correspondence between Lessee and any governmental authority • Any existing or pending litigation related to the operations of PWV's railroad [and] • Insurance.

Defs.' App'x Ex. 68, ECF No. 202-69. A demand that broad in volume and scope, with only two business days' notice and in the midst of this litigation, is a far cry from reasonable. In fact, it is entirely unreasonable to expect Norfolk Southern—whose size has been repeatedly highlighted in this litigation by Defendant(s)—to comply with a demand for a litany of historical records dating back fifty years which seeks information as open-ended as "Financial Statements including detail and support related to all revenues, expenses, cash-flows, assets and liabilities" or as sweeping as "Railway volume in terms of car loadings, tons transported, revenues and other metrics tracked by Lessee on a per customer and per-category basis." *Id.* Worse yet, even after Plaintiffs changed course, Defendants rebuffed their attempts to narrow the scope of the request so that they could actually comply with the demand and instead insisted on declaring a default under the Lease. To the Court, the evidence points in one direction: Defendants' new management attempted to manufacture a default of the Lease.

As for the March 2013 Books and Records Demand, the various correspondences exchanged between the parties' and their attorneys reflect that Plaintiffs complied with Defendants' request. Upon receiving notice, Plaintiff(s) located in a storage facility and produced over 23,000 pages of records at their expense. Plaintiffs have since supplemented that production with financial and accounting records. The flaw in Defendants' theory is that they couch alleged discovery abuses as violations of the Lease—whether it is their argument that the March 2013 documents were responsive to the January 2012 demand or their current position

that Plaintiffs have not yet produced all of the books and records sought.  *See* Defs.' Br. at 58, ECF No. 197 ("Plaintiffs' dilatory and incomplete production raises the issue of what other documents it may possess which it has not yet turned over.  In any event, Plaintiffs' untimely production is clear proof of a default under Section 8(a)(3) of the Lease, which default is not curable . . . . Incomplete production is wholly inconsistent with the clear terms of Section 8(a)(3).").  Of course, Section 8(a)(3) says nothing of production.

Finally, neither Section 8(a)(3) nor any other section of the Lease mentions or alludes to the right to a track inspection.  A "track" is neither a "book" nor a "record."  The Court is thus at a loss as to how it could declare that "Norfolk Southern is in breach of the Lease based on its refusal to permit P&WV to conduct a track inspection," as Defendants request.  Defs.' Suppl. Counterclaims at 9, ECF No. 40.

Accordingly, the Court will **GRANT** Plaintiffs' motion for summary judgment as to Counts Two and Six and the Fourth and Ninth Counterclaims; and it will **DENY** Defendants' motion for summary judgment regarding same.

## IV. Conclusion

For the reasons hereinabove stated, the Court concludes (1) that the Lease affords the Lessee (and thus its Sublessee) the right to enter into, control, and receive the benefits from third-party agreements, including those agreements that relate to the subsurface; (2) that the licenses, easements, and leases are not "dispositions" under Section 9 of the Lease; (3) that the 5% cap on the balance of indebtedness is no longer applicable; (4) that Norfolk Southern neither breached the Lease nor defrauded PWV in connection with its treatment of the Settlement Account or its obligations to provide statements related to the balance of indebtedness; (5) that Norfolk Southern is not in default for failing to pay $341,768 in additional rent for 2012; (6) that

the balance of the Settlement Account is not due until the termination of the Lease; (7) that interest is not due on the amounts accounted for in the Settlement Account; (8) that Norfolk Southern is not in default of Section 4(b)(7) of the Lease; (9) that Norfolk Southern is not required to pay Defendants' attorney's fees related to the sale of the West End Branch or otherwise; (10) that Plaintiffs are not in default of Section 8(a)(3) of the Lease; and (11) that Norfolk Southern is not in breach of the Lease with regard to the track inspection demand.

Accordingly, the Court will **GRANT** Plaintiffs' partial motion for summary judgment, **DENY** Defendants' partial motion for summary judgment, and **DENY** Plaintiffs' Supplemental Motion to Deem Admitted Certain Paragraphs of Plaintiffs' Statement of Material Facts and Plaintiffs' Additional Undisputed Facts and to Strike Objections. An appropriate Order and Judgment will follow.


McVerry, S.J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **NORFOLK SOUTHERN RAILWAY COMPANY and WHEELING & LAKE ERIE RAILWAY COMPANY,** | ) ) ) ) |
| **Plaintiffs,** | ) ) ) |
| **vs.** | ) ) ) |
| **PITTSBURGH & WEST VIRGINIA RAILROAD and POWER REIT**, | ) ) ) ) |
| **Defendants.** | ) ) |

**2:11-cv-1588-TFM**

## ORDER OF COURT

AND NOW, this 22nd day of April, 2015, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** as follows:

(1) the MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 196) filed by Defendants/Counterclaim Plaintiffs Pittsburgh & West Virginia Railroad and Power REIT is **DENIED**;

(2) the MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 198) filed by Plaintiffs/Counterclaim Defendants Norfolk Southern Railway Company and Wheeling & Lake Erie Railway Company is **GRANTED**; and

(3) PLAINTIFFS' SUPPLEMENTAL MOTION TO DEEM ADMITTED CERTAIN PARAGRAPHS OF PLAINTIFFS' STATEMENT OF MATERIAL FACTS AND TO STRIKE OBJECTIONS (ECF No. 226) is **DENIED**.

**IT IS FURTHER ORDERED** that a telephonic status conference with counsel will be conducted by the Court regarding the future direction of this litigation on Wednesday, April 29,

2015 at 9:00 AM. Counsel are responsible for coordinating the call to Chambers on one telephone line at that time.

BY THE COURT:
s/Terrence F. McVerry
Senior United States District Judge

cc: **Samuel W. Braver**
Email: samuel.braver@bipc.com
**Stanley Parker**
Email: stanley.parker@bipc.com
**Kathleen J. Goldman**
Email: kathleen.goldman@bipc.com
**Bradley J. Kitlowski**
Email: bradley.kitlowski@bipc.com

**Edward P. Gilbert**
Email: egilbert@morrisoncohen.com
**Patricia L. Dodge**
Email: pld@muslaw.com
**Nicholas J. Bell**
Email: njb@muslaw.com

(via CM/ECF)