**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **NORFOLK SOUTHERN RAILWAY COMPANY and WHEELING & LAKE ERIE RAILWAY COMPANY,** | ) ) ) )     **2:11-cv-1588-TFM** |
| **Plaintiffs,** | ) ) |
| **vs.** | ) ) |
| **PITTSBURGH & WEST VIRGINIA RAILROAD and POWER REIT**, | ) ) ) |
| **Defendants.** | ) ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.    Introduction

The remaining claims in this four-year-old saga are breach of contract (Count Three) and fraud (Count Four) brought by Plaintiffs Norfolk Southern Railway Company and Wheeling & Lake Erie Railway Company against Defendants Pittsburgh & West Virginia Railroad and Power REIT.  Both counts are set forth in Plaintiffs' Second Supplement to Complaint and incorporated by reference in their First Amended Complaint.  Plaintiffs seek injunctive relief and monetary damages.

On August 3 through August 6, 2015, the Court conducted a non-jury trial during which witness testimony and evidence was presented.  All parties were represented by counsel who presented and argued the issues skillfully and effectively.  The transcript of the proceedings has been filed of record, and the parties have filed Proposed Findings of Fact and Conclusions of Law.[1]  The matter is now ripe for disposition.  Accordingly, the Court issues the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).

---

1.  During the course of the non-jury trial, Plaintiffs also filed a Trial Brief (ECF No. 250) and Bench Memoranda regarding Defendants' Rule 52(c) motion (ECF Nos. 251, 252).

## II.    Findings of Fact

### A.    The Parties

1.    This action concerns a lease dated July 12, 1962 entered into between The Pittsburgh & West Virginia Railway Company ("Pittsburgh & West Virginia") and Norfolk and Western Railway Company ("Norfolk and Western").  *See* Joint Ex. 3.[2]  Under the Lease, Pittsburgh & West Virginia leased to Norfolk and Western all of its right, title, and interest in and to certain of its properties, including a 112-mile portion of main line railroad (the "Rail Line") and approximately twenty miles of branch rail lines that run from Western Pennsylvania through West Virginia and into Ohio.

2.    Plaintiff Norfolk Southern Railway Company ("Norfolk Southern") is the successor to the interest of Norfolk and Western in the Lease.

3.    Plaintiff Wheeling & Lake Erie Railway Company ("Wheeling & Lake Erie"), formerly Wheeling Acquisition Corporation, became the Sublessee on May 17, 1990 when it entered into an agreement with Norfolk Southern to assume the rights, interest, duties, obligations, liabilities, and commitments of Norfolk and Western as lessee, including the role of being principal operator of the Rail Line (the "Sublease").  Pls.' Ex. 48.

4.    Defendant Pittsburgh & West Virginia Railroad ("PWV") is a business trust and the successor-in-interest to The Pittsburgh & West Virginia Railway Company.

5.    Defendant Power REIT is a real estate investment trust which was formed in 2011 as part of a reverse triangular merger of PWV.  After that reorganization, PWV became a wholly-owned subsidiary of Power REIT.

---

2.  The Exhibit List mistakenly identifies Joint Exhibit 3 as "7/22/10 Emails between Lesser to Wenger," (ECF No. 353), instead of the Lease.  *See generally* Aug. 3, 2015 Tr. at 148 (referring to Joint Exhibit 3 as the Lease).

**B.    The Lease**

6.    The Lease is dated July 12, 1962 and became effective October 16, 1964.  At present, the Lease remains in effect.

7.    The term of the Lease is 99-years, renewable in perpetuity at the option of the Lessee absent a default.   The same terms and conditions, including the economic provisions of the Lease, remain in effect with each renewal.

8.    Rent under the Lease consists of a cash payment fixed at $915,000 per year (Section 4(a)) as well as additional items attributable to the real properties (Section 4(b)).  At all relevant times, Norfolk Southern has paid annual rent solely to PWV.

9.    As long as the Lease remains in effect, the parties agree to abide by several covenants. Section 8 of the Lease sets forth the "Covenants of Lessor," which bind PWV.

10. Under Section 8(a)(1), PWV is required to "take all action, insofar as within its control, necessary to maintain and preserve to the extent of its rights and powers its corporate existence, subject to the provisions of Section 16(c)" of the Lease – a limited exception designed to permit the Lessor to became a real estate investment trust.  Joint Ex. 3 at 8.

11. Section 8(a)(2) restricts PWV from issuing stock without the written consent of Norfolk Southern: "Lessor shall not issue, without the prior written consent of Lessee, which shall not be unreasonably withheld, any stock (or options to purchase such stock) . . . ." *Id.*

12. Section 8(a)(5) also prohibits PWV from borrowing money or making advances: "Lessor shall not borrow any money, assume any guaranty, make advances . . . or enter into an agreement to make advances, including advances to a debtor or debtors· in order to· provide the latter with funds with which to pay the principal of, premium, if any, or interest on indebtedness . . . ." *Id.* at 9.

13. Section 8(b)(1) similarly limits the amount of dividends that PWV may declare:

> (b) After the commencement of the term of this Lease and during any renewal thereof:
>
>> (1) Lessor shall not declare any dividend on its common stock in amount exceeding
>>
>>> (i)  Nondemised property (and nondemised property substituted therefor), the proceeds thereof and income therefrom, and
>>>
>>> (ii)  The rent paid or to be paid pursuant to Section 4(a) hereof,
>>
>> any income taxes payable in respect thereof and less any taxes or obligations incurred by Lessor solely for the benefit of its stockholders or reasonably allocable thereto or in connection with nondemised property or reasonably allocable thereto.

*Id.* at 10.

## C. The Sublease

14. Under the Sublease, Norfolk Southern subleased to Wheeling & Lake Erie all of its rights under the Lease and interest therein for a period commencing on the Closing Date and ending one year prior to the end of the initial term of the Lease.

15. Wheeling & Lake Erie thus assumed "all of the duties, obligations, liability and commitments of [Norfolk and Western] as lessee . . . except the balance in the account due Lessor because of dispositions of property under Section 9 of the Lease," which is referred to as the "Settlement Account" in the Sublease. Pls.' Ex. 48 at 2. The so-called "Settlement Account" is a term historically used by the parties to refer to an accounting mechanism for tracking indebtedness under Sections 4(b)(1)-(4), Section 6, Section 7, Section 9 and Section 16(a) of the Lease. That term does not appear in the Lease. Even so, the Settlement Account reportedly had a balance of approximately $16.6 million in favor of PWV as of December 31, 2012. Aug. 4, 2015 Tr. at 65.

16. The Sublease requires Wheeling & Lake Erie to indemnify, defend, and hold harmless Norfolk Southern "from and against any and all liability, loss, damage, costs, judgments, claims and expenses arising out of occurrences during the term of [the Sublease], (including, without limitation attorneys' fees."). Pls.' Ex. 48 at 4.

**D.    PWV's Change in Management**

17. From the commencement of the Lease until 1995, the administrative functions of PWV were handled through International Mining, a company affiliated with Lewis Harder, one time Chairman of the Board of Trustees for PWV.

18. In 1995, PWV relocated all administrative functions to the office of Port Amherst in Charleston, West Virginia.

19. Port Amherst was the family business of Herbert E. Jones Jr. ("Mr. Jones Jr."), Charles Jones, and Herbert Jones, III ("Mr. Jones III) all of whom served as Trustees at various times since the inception of the Lease.

20. PWV moved its principal place of business to West Babylon, New York in 2011 after David Lesser gained control of the company.

21. Lesser is currently the Chairman of the Board, the Chief Executive Officer, Secretary, and Treasurer of both PWV and Power REIT. He previously worked as an investment banker for Merrill Lynch in the late-1980s and mid-1990s, during which time he participated in the "dawn of the modern REIT era" that occurred after a major change in tax law. Aug. 6, 2015 Tr. at 70. In 1995, Lesser joined Crescent Real Estate Equities as an in-house advisor and founded Hudson Bay Partners, LP, an investment firm that focuses on real estate and alternative energy. Lesser also owns a real estate company, DHL Realty, and serves as the chairman and CEO of

Millennium Investment and Acquisition Company. Based on the breadth of his experience, Lesser considers the "REIT space" his "particular expertise." Aug. 3, 2015 Tr. at 40.

22. Sometime in 2007, Lesser began accumulating stock in PWV (then-a publically traded company), eventually having obtained a large number of shares. Aug. 6, 2015 Tr. at 60. At that time, the sole nature of PWV's business was to receive rentals, pay corporate expenses, and make dividend payments to its shareholders. *Id.* at 61. In fact, Lesser considered PWV an attractive investment because it had one asset, no debt, and paid a rate of return in the form of a dividend – all of which he learned through his review of PWV's public filings with the U.S. Securities and Exchange Commission ("SEC"). *Id.* at 60-61.

23. At the same time, however, Lesser viewed PWV's corporate organization – a publicly traded, single purpose entity – as unusual for a REIT. Aug. 5, 2015 Tr. at 42, 44. In his experience, a REIT typically features a publicly-traded parent company with a subsidiary partnership that owns the (real estate) assets or interest therein through further subsidiary entities, such as a special purpose vehicle. *See* Aug. 3, 2015 Tr. at 40; *see also* Aug. 5, 2015 Tr. at 43-44 ("[Lesser]: The typical REIT today would organize with a parent company, which would be public -- for a public REIT. There are private REITs. For a public REIT, it would own typically what is referred to as an UPREIT that would in many cases have other partners. Then typically the actual asset, the real estate assets, would be owned by a series of separate entities, typically kind of referred to as special purpose entities, so you would really break up the ownership of the assets into multiple subsidiary entities. That would be the typical modern structure for a REIT."); Aug. 6, 2015 Tr. at 70-71, 111 (describing an Umbrella Partnership REIT ("UPREIT") structure). Lesser nevertheless continued to acquire shares of PWV's stock over the next two years.

24. In early 2009, Lesser expressed his interest in becoming a Trustee of PWV. *See* Defs.'

Ex. 201.

25. As the then-Chairman of the Board, Mr. Jones Jr. responded to Lesser's inquiry in a

February 7, 2009 letter, advising as follows:

> As you are aware, the activities of PW are governed by the terms of a long-term lease with Norfolk Southern Corporation (NS) executed in 1967. In recent years, we have spoken to NS about their willingness to alter this relationship to afford opportunities to potentially improve PW's net income. NS is quite disposed to the existing relationship; however, they will consider any formal proposal submitted to them.
>
> This being the case, we Trustees have concentrated our efforts on containing the operating costs of keeping PW listed and traded in the most economical way possible. More recently, PW has qualified to file as a small reporting company with the SEC in order to reduce certain established requirements.
>
> For the above reasons, the Trustees have concluded for now, that keeping the number of Trustees at four is in the best interest of our shareholders. We suggest to any party interested in changing the relationship of PW and NS to contact NS directly with a specific proposal to solicit interest. Trustees of PW will be pleased to work with all parties to facilitate a change that we believe will benefit our shareholders.

*Id.* Later that year, a vacancy opened on the Board and Lesser joined PWV as a Trustee. At that

time, PWV had fixed income, increasing business expenses, and corresponding decreases in

profits.

26. Once on the Board, Lesser learned of the other Trustee's position that the Lease limited

PWV's options to expand its business due to restrictions on its ability to issue shares and/or incur

debt without the consent of Norfolk Southern.[3] In other words, Lesser understood that the

Trustees "were convinced that they could do nothing other than sit back, collect four rent

---

3. According to Mr. Jones III, PWV had considered business ventures outside of holding the Lease. At trial, Mr. Jones III testified (via his videotaped deposition) that "[the Trustees] were always looking at options because our income was limited and our expenses were going up" but that they "never considered doing anything to compromise the [L]ease." Aug. 4, 2015 Tr. at 144.

payments a year, presumably pay four dividend payments . . . and operate essentially as a captive entity to Norfolk Southern." Aug. 3, 2015 Tr. at 40.

27. Apparently dissatisfied with this long-held view, Lesser soon devised a plan to maximize PWV's value through expansion and growth by reorganizing it into his vision of an ideal REIT structure, with a focus on alternative energy assets. As the following correspondences and outlines depict, several proposals and various iterations emerged over the next eighteen (or so) months, culminating in the reverse triangular merger through which PWV became a wholly-owned subsidiary of Power REIT. *See generally* Pls.' PFFCL at 2 (depicting a timeline of Lesser's involvement with PWV/Power REIT from July 2010 (and earlier) to December 2011). At every step, however, Lesser pursued restructuring PWV to escape decades-old restrictions in the Lease, intending to seize upon its status as a publicly-traded company and obtain unfettered access to capital. This plan began to unfold in early to mid-2010.

**E.    Lesser's Business Plan(s)**

28. On July 8, 2010, the Chairman of PWV's Board of Trustees, Mr. Jones Jr., passed away. Around that time, Lesser began to outline his vision of PWV's future to his then-fellow Trustees, Mr. Jones III (the son of Mr. Jones Jr.), Virgil Wenger, and Larry Parsons. Aug. 5, 2015 Tr. at 30.

29. On each occasion, Lesser discussed restructuring PWV to deal with restrictions in the Lease. *See* Joint Exs. 2, 7, 10. And in doing so, he consistently suggested a corporate restructuring in which PWV would lose its status as a public company and become the wholly-owned subsidiary of a newly-formed parent company. *See id.*; Aug. 6, 2015 Tr. at 147.

### 1. The July 22, 2010 E-mail

30. Lesser first expressed his ideas in writing in an e-mail sent to Mr. Jones III on Thursday, July 22, 2010 as a follow-up to a conversation they had earlier that week. *See* Joint Ex. 2. At the request of Mr. Jones III, Lesser also forwarded this e-mail to Wegner on July 22, 2010. *See id.*

31. In his e-mail, Lesser expressed his desire to serve as the new Chairman of the PWV Board of Trustees and explained his view regarding PWV then-existing assets: "As I see it, the company essentially has two assets: (i) the NNN [triple net] leased property[;] and (ii) the public company which, I believe, has the potential to be used as a platform for growth. I remain convinced that the Directors are obligated to explore alternatives to maximize overall value including exploring transactions to expand and diversify its asset base." *Id.* at D019851.

32. Notably, in his e-mail, Lesser also set forth what he believed to be "three clear paths to deal with the restrictions contained in the [L]ease that need to be explored to determine the best strategy:" (1) PWV could sell its property subject to the Lease; (2) PWV could restructure its operation such that it would become a wholly-owned-subsidiary; or (3) PWV could renegotiate the terms of the Lease. *Id.* at D019851-52. Under the structure proposed in the second scenario, Lesser further explained his view that "the subsidiary would retain the existing restrictions but the newly formed parent company would be free to raise capital and pursue transactions." *Id.* at D019852. According to Lesser, he did not intend for his e-mail to be all-inclusive and was simply recounting a few ideas "off the top of [his] head." Aug. 6, 2015 Tr. at 64.

33. For his part, Mr. Jones III "liked [Lesser's] ideas" but "was not sure about his execution." Aug. 4, 2015 Tr. at 145. Mr. Jones III believed that "[i]t was very important for [PWV's Trustees] to honor the [L]ease and our distribution to our shareholders and [he] just didn't like ideas that threatened that," such as Lesser's proposal to reorganize PWV. *Id.* at 149.

34. After this initial exchange, Lesser continued to engage in several conversations with Mr. Jones III and the other Trustees for feedback on his proposals. Aug. 6, 2015 Tr. at 66-67. As part of these discussions, Lesser undertook efforts to educate his fellow Trustees on REITs and PWV's then-existing structure. *Id.* at 67.

## 2. The December 2010 Board Discussion Outline

35. Lesser became the Chairman of the Board of Trustees of PWV on December 7, 2010. As of December 2010, PWV had no working capital to engage in any activities beyond its longstanding operation: the collection of rent, payment of corporate expenses, and distribution of dividends to its shareholders. *Id.* at 72. In Lesser's view, PWV historical and continued existence as a public company and a single purpose entity "did not make sense" and was not "a viable plan." Aug. 5, 2015 Tr. at 42-43.

36. Around the time of his election, Lesser drafted a document he labeled "PW Board Discussion Outline December 2010," (the "December 2010 Outline") which he sent to Wenger as an e-mail attachment on December 13, 2010.[4] *See* Joint Ex. 10.

37. In the December 2010 Outline, Lesser identified the "Current Status" of PWV as having no debt and two assets: (1) the "Railroad pursuant to lease ($915,000);" and (2) a "Public company 'shell'" with an annual cost of $165,000. *Id.* at D032741.

38. Under the heading "Public company 'shell,'" Lesser once again referenced the restrictions of the Lease: "Restructuring required based on lease restrictions." *Id.*

39. The "Current Status" also noted that PWV "currently is a single purpose REIT," that the "[c]osts of public company compliance continue to grow," that the Lease is long-term with no

---

4. Lesser maintains that as of December 13, 2010 he "personally had an idea, but not really a business plan" as to the future direction of PWV, insisting that he did not have a "business plan" until August 2011. Aug. 6, 2015 Tr. at 68, 112, 138. The Court does not find this claim to be credible. As discussed earlier, Lesser consistently suggested a corporate restructuring of PWV from the very beginning of his involvement. It was not until August 2011 that the Board formally decided to implement that idea through a reverse triangular merger.

escalations, that the reasons to be public include "[v]aluation/mark to market" and "[a]cess to capital," and that "[w]ithout expansion there is no value to being public." *Id.* at D032742.

40. The December 2010 Outline also set forth several areas to explore for growth opportunities, such as PWV "us[ing] the shell to finance additional 'special purpose' assets." *Id.* at D032743. This section of the outline further indicated that Lesser has a focus on alternative energy assets and that the REIT structure is well-suited to pursue that avenue. *Id.*

41. Three pages of the December 2010 Outline are titled "Power REIT." *Id.* at DD032744-46. One page lists asset types associated with alternative energy, including wind farms, geothermal, hydro, and solar. *Id.* at D032746. According to Lesser, the reference to "Power RIET" related to the concept of a potential business plan of a REIT focused on alternative energy, which did not exist in the market at that time. Aug. 6, 2015 Tr. at 69-70.

42. The last page of the December 2010 Outline is titled "Next Steps." Joint Ex. 10 at D032747. Under the heading "Announce new strategy," the steps included a name change to Power REIT and a "Rights Offering to existing shareholders" that would "require Lessee approval for share issuance."[5] *Id.* Other "Next Steps" were to "[p]ursue transactions," which were "already in process," to "[h]ire a deal person," and to "[f]inalize plans for restructure based on lease restrictions and update corporate organization." *Id.* This last step included hiring Morrison Cohen, LLP "to finalize approach," reorganizing into an UPREIT, and negotiating with the Lessee. *Id.* Defendant(s) did not employ an UPREIT structure. Aug. 6, 2015 Tr. at 71.

43. When Lesser prepared the December 2010 Outline, PWV's Board had not (allegedly) formally made any decision(s) about its future. *See* Aug. 6, 2015 Tr. at 72. Lesser continued to

---

5. A rights offering is an investor-friendly way for a public company to raise capital by offering new shares to its shareholders. Aug. 6, 2015 Tr. at 70-71. According to Lesser, he proposed the possibility of a rights offering because PWV needed working capital to, for example, hire lawyers, retain consultants, and pay for deal pursuit costs. *See id.* at 72.

engage his fellow trustees in discussions regarding the future of PWV after December 2010. *See id.*

44. At around this time, Lesser engaged Arun Mittal, a consultant with whom Lesser worked on a transaction several years before. *Id.* at 73. Mittal had no formal role at PWV until April 2011 when he became its vice president, treasurer and secretary. Aug. 3, 2015 Tr. at 96, 122. Mittal also serves as the sole owner of Caravan Partners, a consulting firm. *Id.* at 102.

### 3. The January 2011 Board Discussion Outline & The Board Resolution

45. In early-January 2011, Lesser provided to the Board of Trustees of PWV a Power Point presentation titled PW BOARD DISCUSSION that he prepared with assistance from Mittal (the "January 2011 Presentation"). *See* Joint Ex. 7. The five members of the PWV Board at this time were Lesser, Wenger, Parsons, Mr. Jones, III, and Patrick R. Haynes, III.

46. The January 2011 Presentation was based in large part on the December 2010 Outline; it included pages labeled "Current Status" and "Explore Growth Opportunities" that made representations substantially similar to its earlier iteration. *See id.* For instance, Lesser once again represented that the Rail Line and Public Company Shell were PWV's two assets, that "[r]estructuring [was] required based on lease restrictions," and that "[w]ithout growth, there is no reason to be public." *Id.* at 1-2.

47. Several pages of the January 2011 Presentaiton were titled "VISION FOR PW: A LEADING POWER REIT." *Id.* at 4-14. These slides outlined a proposed strategy, the large market opportunity, near and long-term market dynamics favorable to the proposed strategy, multi-year pro-forma projections that depicted an increase in outstanding shares after one, three, and five years, and potential transactions which included wind farm companies. *Id.*

48. Much like the December 2010 Outline, the January 2011 Presentation also set forth several "Next Steps" for PWV, including plans for PWV to raise working capital through a rights offering, a change in its dividend policy, or a stock offering to "[p]ursue transactions (already in progress)." *Id.* at 15.  In summarizing the plan for a potential rights offering, the January 2011 Presentation notes that PWV "[n]eed[ed] Lessee approval for share issuance pursuant to Section 8(a)(2) of [the] Lease." *Id.*  The Next Steps once again call for PWV to "[f]inalize plans for restructuring based on lease restrictions and update corporate organization." *Id.* at 17.

49. Another page, titled "NEXT STEPS: ILLUSTRATIVE STRUCTURE," proposed "[r]eorganzing existing REIT into Power REIT" and included an illustration depicting Power REIT as a parent holding company, which notes that the "[e]xisting Lessor-Lessee relationship does not change as a result of reorganization." *Id.* at 18.  PWV never reorganized as depicted in the illustrative structure.  Aug. 6, 2015 Tr. at 77.

50. On January 3, 2011, Lesser and Mittal met with Wenger to discuss the proposals in the January 2011 Presentation.  *See* Pls.' Ex. 71 at D036461.  The following day, Lesser followed-up with Wenger via e-mail, referencing his proposed business plan and a related board resolution:

> We made some minor changes to address some things that came up in our meeting yesterday.  We tried to highlight that this plan is the best opportunity to try to preserve and ultimately grow the dividend.  We also highlighted that this plan does NOT contemplate changing the existing lease relationship at this time.
>
> Arun and I met with [Trustee] Patrick [Haynes, III] last night and updated him. He is going to work with us to try to get Herb [Jones, III] on Board.  I have sent an email to Larry Parsons to arrange a conference call with him
>
> I have also attached a draft of the Board Resolution for your review.

*Id*.  Wenger responded to Lesser later that day, writing that "[t]he strategic plan you have developed and proposed for PW makes good sense.  It is an intelligent, timely, and common sense approach to the long term needs of PW shareholders." *Id.*

51. Lesser circulated a form titled "Action of Trustee by Written Consent" and dated January 3, 2011 (the "January Board Resolution") to the entire PWV Board to approve the plan outlined in the January 2011 Outline. It stated, in relevant part, as follows:

> **WHEREAS**, all Trustees of PW have received the PW Board Discussion Packet dated 1/3/2011 (the "Discussion Packet") and have had a chance to review the information with David Lesser.
>
> **RESOLVED**, that the Board hereby votes to proceed with the plan as generally outlined in the Discussion Packet. Specifically, the Board authorizes proceeding with: (i) the Rights Offer to shareholders; (ii) retaining Morrison Cohen as general corporate counsel; (iii) formation of an Executive Committee consisting of Virgil Wenger, Patrick Haynes and David Lesser.

Pls.' Ex. 70. Lesser, Haynes, and Wenger each executed and returned the January Board Resolution as drafted within days of its receipt. *See id.* Mr. Jones, III also signed the written consent, but struck-out, without explanation, two of the three resolutions: the retention of Morrison Cohen and the formation of the Executive Committee. *See* Aug. 6, 2015 Tr. at 82-83.

52. On January 5, 2011, Lesser had also requested that Parsons, a Trustee who was also the Chairman of Wheeling & Lake Erie, provide written consent on behalf of the Sublessee, pursuant to Section 8(a)(2) of the Lease, so that PWV could issue shares for the rights offering. Pls.' Ex. 72. Parsons did not respond as of January 12, 2011.

53. While approval of the January Board Resolution remained outstanding, PWV (through either Lesser or Mittal) registered the "pwreit." internet domain name on January 6, 2011. At that time, PWV did not have a web presence, which is unusual for a publicly-held company in Lesser's experience. According to Lesser, the domain name was simply a combination of PWV's ticker symbol ("PW") and its structure, a "REIT."

54. On January 12, 2011, Lesser sent Parsons a follow-up e-mail in which he noted that "a majority of the Board has already signed the [January Board] Resolution" and sought the

approval of Wheeling & Lake Erie once again. Pls.' Ex. 74. It is unclear whether Parsons ever responded to Lesser's e-mail. Nonetheless, Wheeling & Lake Erie never issued its consent, leading PWV to approach Norfolk Southern for same. *See* Joint Ex. 72; Aug. 6, 2015 Tr. at 91.

**F.    The Consent of Norfolk Southern**

55. PWV first approached Norfolk Southern in mid-January 2010 to obtain the requisite consent. *See* Joint Ex. 4.

56. Later that month, Lesser began speaking with Randy S. Noe, the then-General Attorney at Norfolk Southern, about obtaining the Lessee's consent to issue stock. *See id.* Noe was the sole Norfolk Southern representative with whom either Lesser or Mittal communicated regarding the consent. *See* Aug. 4, 2015 Tr. at 71

57. From January 25, 2011 through early-February 2011, Lesser and Noe were in virtual daily contact. *See* Joint Ex. 4.

58. At all times, PWV supposedly tried to act in good faith with its counterparty and Lessee, Norfolk Southern. *See* Aug. 5, 2015 Tr. at 24 ("Q: . . . But you had that obligation, you understood that, you had to act in a candid, sincere, good faith way with them? [Lesser]. I can't say whether we had the obligation. I can say that we certainly tried to act in good faith."). Yet Lesser never told Noe that PWV had a plan to deal with the restriction in the Lease,[6] restructure PWV and update the corporate organization, and pursue alternative energy assets,[7] *see* Aug. 6,

---

6.  According to Lesser, "to deal with the restrictions meant to respect the restrictions." Aug. 6, 2015 Tr. at 147; *see also id.* at 156-57 ("[Lesser]: Again, dealing with the restrictions in the [L]ease in my mind was respecting them and allowing [PWV] to move forward with a plan to, you know, with an ability to create shareholder value."). To the Court, this position, taken at trial, is a post hoc attempt by Lesser to recast his words in a more favorable light.

7.  In fact, Lesser admitted that he could have – but did not – inform Norfolk Southern that PWV was exploring a potential investment in property related to a wind farm. *See* Aug. 5, 2015 Tr. at 52-53 ("Q. If you took the numbers out and just said, this is what we are proposing, that was available information, that wouldn't have been confidential, would it?  A [Lesser]: In theory, we could have -- in theory, we could have given them information that we were looking at a wind farm transaction.  Q. In candor and in good faith you could have given them that information too, couldn't you?  A. I guess you could say it that way.").

2015 Tr. at 155-57, despite consistent requests from Noe for additional information in a series of e-mail exchanges in late-January and early-February 2011, *see* Joint Ex. 4.

59. On January 25, 2015, Lesser sent Noe the first e-mail seeking the consent of Norfolk Southern:

> When we spoke yesterday, you indicated that NSC was not in a position to focus on providing the consent that PWV is seeking with respect to issuance of shares until it finalized it[s] earnings announcement. As I am sure you are aware, NSC announced earnings this afternoon. As discussed PWV is under time pressure so as not to disrupt its dividend schedule and based on certain compliance issues with AMEX. In the interest of keeping things moving, I have attached a draft form of consent.

Joint Ex. 4 at D019866. Noe responded the following day, indicating that he was not in a position to discuss the consent until he spoke with representatives from the accounting and financial departments. *See id.* The consent attached to Lessser's original e-mail was never signed by Noe or any other Norfolk Southern representative. *See* Pls.' Ex. 75.

60. Additional e-mails were exchanged in the following days in which Lesser and Noe arranged telephone calls to discuss the consent. During a conference call on January 31, 2010, Noe asked Lesser to provide PWV's plan for the use of proceeds from the rights offering. Aug. 5, 2015 Tr. at 16. Lesser responded that PWV intended to issue shares to raise general working capital to broaden its business and that it would issue debt if Norfolk Southern did not provide the requested consent for the issuance of shares. *See id.* at 16-17.

61. On February 3, 2011, Noe sent an e-mail to Lesser in which he again asked for additional information:

> I [Noe] have spoken with representatives of our Finance Department about your request for Norfolk Southern to consent to PWV's issuance of 150,000 shares of common stock. As lessees of PWV's property, we need to satisfy ourselves that the issuance of these shares does not impair the asset. When you and I spoke a couple of days ago, I believe you told me the purpose of issuing additional shares was to increase general working capital as part of a plan to broaden PWV's

business. We would like you to offer more details about your plan and what you intended to do with the additional working capital so we can better understand how it might affect Norfolk Southern's interest in the asset leased from PWV.

Joint Ex. 4 at D019968-69. Minutes later, Lesser responded:

I fail to understand how the issuance of equity will impair the asset. I am not sure what additional details you feel you need but we are certainly interested in getting you what we can to get this done. Having said that, I am not sure what more we can give or what you are looking for.

We are under significant time pressure and feel that we have already given you everything you should require to provide this approval. I am traveling but can try to do a call tomorrow AM. Please let me know your availability. If we cannot connect[,] I encourage you to work through this with Arun Mittal who is copied on here and has been involved in these discussions as well.

*Id.* at D019868. The same day Lesser sent this e-mail to Noe, he also circulated a "proposed resolution related to the Rights Offering and other corporate clean up items" (the "February Board Resolution"). Pls.' Ex. 171. The e-mail was sent to the then-Trustees Wenger, Haynes, Parsons, and Mr. Jones III and to Mittal and Robert McCoy, who was the then-secretary and treasurer of PWV. After receiving this correspondence, Mr. Jones, III asked Mittal whether he was being paid by PWV, which was not supposed to have any employees. *See* Aug. 4, 2015 Tr. at 151-52. Mittal, who was using an e-mail address with the "pwreit" domain name as of February 2011, apparently evaded the question. *See id.*; Joint Ex. 4 at D019870. Ultimately, Lesser, Haynes, and Wenger voted in favor of the Board Resolution, after which Mr. Jones, III resigned from PWV's Board of Trustees.

62. On February 4, 2011, Noe sent another e-mail to Lesser in which he again indicated that Norfolk Southern still required additional information:

Arun Mittal and I spoke late yesterday afternoon after I returned a call from him. I understood him to say that PWV plans to raise capital to hire consultants, lawyers, and other professionals to explore ways to broaden PWV's business. However, he did not tell me that PWV has any particular business plan in mind.

It is this degree of uncertainty along with the size of the offering that warrants further investigation.

We are struggling to understand why it makes sense for a company with a market capitalization of approximately $18 million to raise $1.8 million to explore new, as yet undefined opportunities that may or may not prove to be worthy of further investment. For many companies, 10% of their market capitalization would represent the magnitude of the new opportunity rather than just the expenditure of the professional services.

As the lessee of all of PWV's assets, NS has a stake in the financial viability of PWV. Indeed, the consent requirement at issue reflects that linkage and is designed to protect NS' interest in that regard. NS cannot exercise its rights in a meaningful and adequate manner without a better understanding of the purpose of the transaction and how it fits into the overall business scheme and capital structure of PWV.

Joint Ex. 4 at D019868. Wheeling & Lake Erie's general counsel was cc'd on this email.

63. On February 6, 2011, Lesser sent Noe an e-mail in which he stated that "NS' concerns are neither well founded nor have a basis in the agreement between NS and PW." Pls.' Ex. 78. To Lesser, "[Noe's] concerns about the financial viability of PWV being negatively impacted by raising equity does not make any sense." *Id.* Lesser further wrote:

As I have previously advised you, PW seeks to raise capital to protect the long term viability of the company. The company seeks to shore up its finances in a corporate environment in which the costs of a public company continue to rise. The lease agreement provides only that PWV must put NS on notice of its rights offering and while NS' consent is required, i[t] may not unreasonably be withheld. There is no contractual basis in the lease for NS to overrule the business judgment of the PW board or impose its own business judgment on PWV.

*Id.* In that same e-mail, Lesser also referenced and attached consents to issuances of shares and indebtedness related to the expansion of PWV's business beyond the ownership of the Rail Line in the 1960's when it reorganized into a business trust and sought to acquire shopping centers. *Id.* In closing, Lesser stated: "[w]ithout waiving PWV's rights under the lease agreement with respect to NS' withholding of consent, [he was] prepared to make one final effort to secure NS'

consent." *Id.* Lesser also proposed to have a "constructive dialogue" with Noe or an appropriate Norfolk Southern representative as soon as possible (the e-mail was sent on Sunday at 8:09 PM; Lesser listed his availability for Monday morning). *Id.*

64. Noe did not respond by the following afternoon, prompting Lesser to send him another e-mail later that day. *See* Joint Ex. 4 at D019871.

65. On February 7, 2011, Lesser sent Noe a copy of the Form S-3 Registration Statement that had been prepared with respect to the rights offering (the "Proposed S-3"). *See id.*; *see also* Joint Ex. 13. In doing so, Lesser represented that the Proposed S-3 "**contains all available information of PWV's plans at this point**." Joint Ex. 4 at D019871 (emphasis added). Lesser further noted that he was "sending this document in the hope of securing the consent that [he and Noe] had been discussing since early January." *Id.* "If PWV d[id] not receive the consent at this point," wrote Lesser, "[it] will be forced to proceed under the premise that NS is improperly withholding consent and take such other actions as PWV deems necessary and in its best interest." *Id.*

66. Noe e-mailed Lesser later that day, advising that he and the relevant decision-makers were at Norfolk Southern's annual management meeting. *Id.* Noe assured Lesser that he would try to discuss the consent with Norfolk Southern's finance representatives at dinner that evening and respond as soon as possible. *Id.* A day or so later, Noe advised that he met with Norfolk Southern's "finance folks . . . but still have a few more internal process to work through." Joint Ex. 12 at 000516.

67. On February 9, 2011, Lesser contacted Noe to arrange a telephone call to discuss the update. *Id.* at 0000515. In response, Noe reported that he was traveling and offered to talk the following day. *Id.* Lesser then replied: "Randy – we really need to finalize the consent. Is there

someone else I should speak to?" *Id.* Shortly thereafter, Noe wrote back: "I don't think that will help. I've involved all of the right people. We just need to work through our process. It's a big organization and we have to work through the appropriate level of authority." *Id.* Frustrated with that response, Lesser sent Noe another e-mail later that day:

> Randy – I understand that NS is a big organization but that does not change the obligation under the lease to provide the consent ("not to be unreasonably withheld"). Unfortunately you have been unable to provide anything to allow us to believe that this process will result in the long overdue consent. We need to have a clear understanding of the status and what can be expected so as to determine our next course of action.
>
> Please call to discuss or provide the name of another person I can speak to immediately to keep this moving.

*Id.* While this e-mail exchange was ongoing, Noe had reviewed the Proposed S-3 and consulted with other representatives of Norfolk Southern, including John H. Friedman, Vice President of Strategic Planning, Marcellus Kirchner, Director of Strategic Planning, and Trevor Pardee, Assistant Vice President of Finance. Aug. 4, 2015 Tr. at 38-39.

68. On February 14, 2011, Noe sent an e-mail to Lesser attaching Norfolk Southern's Consent to Issue Stock (the "Consent") signed by Friedman. *See* Joint Ex. 4 at D019872. Friedman did not personally read the Proposed S-3 before signing the Consent, although he did discuss it with Noe. Aug 3, 2015 Tr. at 175.

69. The Consent stated, in relevant part, as follows: "Pursuant to Section 8(a)(2) of the Lease and subject to the truth and correctness of the foregoing representation [the Proposed S-3], NSR hereby consents to, and only to, the use of proceeds described therein." Joint Ex. 4 at D019872. It further stated Norfolk Southern's "consent shall not be construed to modify, impair, or affect any of the terms of the Lease." *Id.*

70. The Proposed S-3 represented that PWV intended to offer to its existing shareholders the right to subscribe for and purchase up to an aggregate of 113,250 common shares of PWV, with anticipated gross proceeds of $1,019,250.  Joint Ex. 13 at 0000526.  The stated purpose of the rights offering was also set forth in the Proposed S-3 under the heading "Use of Proceeds:"

> The purpose of this rights offering is to raise equity capital in a cost-effective manner that gives all of our stockholders the opportunity to participate.  The proceeds of the rights offering will be used to provide working capital for the initial steps of this broadening of PW's business.  Specifically, PW will use the proceeds to: hire employees, advisors and/or consultants that will assist it with developing and implementing a new, broader business plan; to undertake diligence on potential business or investment opportunities consistent with its status as a REIT; and for other purposes related to our intended business-broadening, and, to the extent any proceeds remain after the foregoing, for general corporate purposes (including expenses related to our status as a public company).  PW can give no assurances that it will be successful in its business-broadening plan.  See "Risk Factors."

*Id* at 0000562.  The "Risk Factors" include several "Risks Relating to PW," including the following statements:

> We cannot assure you that we will be able to expand our market presence in our existing markets or successfully enter new markets or that any such expansion will not adversely affect our results of operations.  In addition, our existing lease agreement imposes certain restriction on PW's operations, which may affect PW's ability to pursue growth opportunities.

*Id.* at 0000536.  Aside from the "Risk Factors," the Proposed S-3 also includes a rather rote explanation regarding forward-looking statements.  *Id.* at 0000530.  For instance, the Proposed S-3 cautions that "[a]lthough [PWV] believe[s] that [its] plan, objectives, prospectus and expectations reflected in, or suggested by, such forward-looking statements are reasonable at the present time, [PWV] may not achieve them or [it] may modify them from time to time."  *Id.*

71. The Proposed S-3 fails to reference PWV's plan to "deal with the restrictions" in the Lease, restructure PWV "based on lease restrictions" and invest in alternative energy ventures, such as the wind farm investments that PWV's management was actively pursuing at the time.

To be sure, all of this information was detailed in Lesser's July 22, 2010 e-mail to Mr. Jones, III, his December 2010 Outline, and/or his January 2011 Presentation, which was voted on and approved by the Board. *See* Joint Exs. 2, 7, 10. And yet PWV (through Lesser) failed to disclose any of that written material to Norfolk Southern or the plans contained therein. Instead, Lesser assured Noe that the Proposed S-3 contained all available information on PWV's plans at that point.

72. The representations made to Noe by Lesser in that February 7, 2011 e-mail were false. *Compare* Joint Ex. 4 *with* Joint Exs. 2, 7, 10.

73. Undoubtedly, Norfolk Southern relied on PWV's representations in Lesser's e-mail and the Proposed S-3 in issuing its consent. *See* Aug. 4, 2015 Tr. at 88 ("[Noe]: [T]he reason we gave the consent was because we had received the S-3."). As Noe later explained, Norfolk Southern "grew increasingly confident that if Mr. Lesser was willing to make a representation in an S-3, it was good enough for us. That if he was willing to say this to the Securities and Exchange Commission, that it was probably true."[8] Aug. 4, 2015 Tr. at 89. At the same time, Norfolk Southern weighed its decision to issue the consent against the backdrop of Lesser's insistent demands and consistent threats to initiate legal action if the consent was not immediately provided. Aug. 4, 2015 Tr. at 88-90.

74. Be that as it may, Norfolk Southern's decision-making process in evaluating the requested consent would have been different had it known that PWV sought to invest in alternative energy projects. *See* Aug. 3, 2015 Tr. at 170-71. As Friedman explained at trial,

---

8. Noe offered this testimony in the context of explaining comments that he made at his deposition, namely that the market would judge whether the contents of the S-3 were a good reason to issue additional shares. *See* Aug. 4, 2015 Tr. at 90 (quoting Dep. of Noe at 124). When asked about these comments at trial, Noe represented that, after hearing his testimony read aloud, he does not "really understand what [he] meant by that." *Id.* at 89. Even so, Noe testified, credibly, that Norfolk Southern "didn't see any risk to [its] asset, which is the leasehold interest, because if all they [PWV] were doing was spending a million dollars or so to hire lawyers and professionals to investigate other business opportunities, [Norfolk Southern] didn't see that that would result in anything that would affect [its] interest." *Id.* at 87.

Norfolk Southern generally does not encourage others to compete with its customers – *e.g.*, oil, coal, and utility companies – which require and use a rail line for transport. *Id.* at 169-71.

75. Norfolk Southern would not have issued its consent to PWV's rights offering had it been aware that PWV would take actions inconsistent with the limitations set forth in its February 14, 2011 letter. Aug. 3, 2015 Tr. at 163-64.

**G.   The Rights Offering**

76. Lesser became the Chief Executive Officer ("CEO") of PWV on February 14, 2011, the same day that Norfolk Southern provided its consent to the plan(s) outlined in the Proposed S-3.

77. On February 15, 2011, PWV filed its Form S-3 Registration Statement with the SEC (the "Form S-3"). *See* Joint Ex. 14. The SEC reviewed the Form S-3 and provided comments to PWV on its filing. PWV revised its Form S-3 to incorporate the SEC's comments and filed an amended version. The SEC ultimately approved the contents of the Form S-3.

78. Afterward, PWV proceeded with the issuance of shares pursuant to the Form S-3 and completed its rights offering in March 2011, raising slightly over one million dollars in gross proceeds. Aug. 3, 2015 Tr. at 120.

79. By all accounts, Norfolk Southern did not contact PWV after the rights offering to inquire into the results. *Id.* at 178-80; Aug. 4, 2015 Tr. at 90-93. Moreover, Norfolk Southern never contacted PWV to ask whether it used the proceeds from the rights offering for the purpose stated in the Proposed/Form S-3 or whether its plans had been achieved or modified. *Id.*. Norfolk Southern also never requested to inspect PWV's Books and Records regarding the rights offering. Aug. 3, 2015 Tr. at 180; Aug. 6, 2015 Tr. at 101. According to Noe, Norfolk Southern did not "police the representations that P&WV made" because Lesser "had represented to us through the S-3 that they were going to use the money to hire employees and consultants and

spend whatever was left on the expenses of running a publicly traded company."  Aug. 4, 2015 Tr. at 92.  Noe presumed that, if PWV had changed its plan, Lesser would seek another consent, in light of the limited consent given by Norfolk Southern, the parties' historical course of performance, and a reasonable interpretation of the Lease.  *Id.* at 93.

80. After the proceeds from the rights offering were obtained, PWV entered into a formal consulting agreement with Caravan Partners, Mittal's firm, under which he was paid $7,500 per month for his services.  *See* Joint Ex. 15 at 5.  On April 1, 2011, Mittal became Vice President of Business Development of PWV and replaced McCoy as Secretary-Treasurer.  *See id.*

81. Around this time, PWV also met with investment banking firms and advisors to source potential investments, focusing on alternative energy deals with a real estate component.  Aug. 6, 2015 Tr. at 102.

82. PWV also retained several law firms, including Morrison Cohen and Leech Tishman, to assist it with matters such as REIT tax advice and structuring alternative energy/infrastructure investments.  *Id.* at 103-04.

83. In addition, PWV approached Norfolk Southern to explore the possibility of modifying the Lease, but that dialogue never went beyond a few preliminary conversations between Trustee William Susman and his contacts at Norfolk Southern.[9]  *Id.* at 109.

84. PWV never hired any employees as part of or in connection with the Consent or the Form S-3.  Aug. 3, 2015 Tr. at 31, 120; Aug. 5, 2015 Tr. at 88.

**H.    The Reverse Triangular Merger**

85. Shortly after the rights offering, PWV also took action in furtherance of its plan to restructure.  At the outset, PWV contacted the American Stock Exchange ("AMEX") about the

---

9.  Susman joined PWV as a Trustee sometime in 2011 when the Board decided not to re-nominate Parsons due to a purported conflict of interest.  *See* Joint Ex. 15.

restructuring and received guidance regarding same on April 11, 2011. Pls.' Ex. 164 at D024750. The Board continued to review the reorganization at a meeting in late-May 2010, during which they apparently discussed simplifying the Lease and exploring a "true up" of the Settlement Account. *See* Joint. Ex. 15. The following month, Leech Tishman filed a fictitious name registration for "Power REIT." Pls.' Ex. 91.

86. In early-August 2011, PWV prepared several confidential presentations that included diagrams of restructuring transactions that depict Power REIT as a parent holding company with PWV merging into a bottom level subsidiary. Pls.' Ex. 164 at D024751; Defs.' Ex. 227 at D024756. The Board formally decided to proceed with the re-organization in mid-August 2011. *See* Pls.' Ex. 85.

87. On August 26, 2011, Power REIT was formed as a real estate investment trust under the laws of Maryland. *See* Joint Exs. 17 at 1, 18 at 1. Three days later, on August 29, 2011, Power REIT PA, LLC, a Pennsylvania limited liability company, was formed as a wholly-owned subsidiary of Power REIT. *Id.*

88. Both Power REIT and Power REIT PA, LLC were created for the purpose of consummating a reverse triangular merger. *Id.* In this type of transaction, the acquiring company creates a subsidiary that merges into the target company; the target survives as the wholly-owned subsidiary of the acquiring company.

89. On December 1, 2011, PWV, Power REIT, and Power REIT PA, LLC entered into an Agreement and Plan of Merger (the "Merger Agreement"). Joint Ex. 6. The following day, PWV and Power REIT consummated the reverse triangular merger to complete the restructuring. *See id.*

90. On December 2, 2011, Power REIT PA, LLC merged with and into PWV, with PWV surviving as a wholly-owned subsidiary of Power REIT (Power REIT PA, LLC thus ceases to exist). *Id.* As part of the restructuring, holders of PWV common shares received one newly issued common share of Power REIT for each common share of PWV that they owned. *Id.* In turn, Power REIT received all outstanding shares of PWV. *See* Joint Ex. 17 at i.

91. In conjunction with the reverse triangular merger, PWV and Power REIT jointly filed a Form 8-K with the SEC on December 2, 2011, disclosing that the transaction had occurred. *See* Joint Ex. 6.

92. Attached to the Form 8-K is a (poorly drafted) joint press release (the "Joint Press Release") in which they represent that "Power REIT is the reincorporated, successor company to Pittsburgh & West Virginia Railroad." *Id.* The Joint Press release further states that "[i]n many cases infrastructure assets are supported by long term contracts with credit worth counterparties. For example, Power REIT leases its existing railroad asset to Norfolk Southern Corporation pursuant to a 99-year lease." *Id.*

93. In related joint filings with the SEC, PWV and Power REIT further represented that PWV's "name will change from 'Pittsburgh & West Virginia Railroad' to 'Power REIT.'" Joint Ex. 17 at 2; *see also* Joint Ex. 18 at 2.

94. Power REIT also succeeded to PWV's SEC reporting history and its listing on the NYSE under the ticker symbol "PW." *See id.*; Joint Ex. 6.

95. As of August 2012, Power REIT had represented on its website that it "is continuing the tradition that was established in 1967 by its subsidiary by focusing on innovative solutions to invest in infrastructure assets through the real-estate investment trust structure" and that it "has

over 40 years of experience as an infrastructure REIT . . . ." Pls.' Ex. 45. PWV does not have its own website. Aug. 6, 2015 Tr. at 84.

## I. Post-Reorganization Activities of PWV & Power REIT

96. After the restructuring, PWV continues to exist as an entity: it still remains a party to and bound by the Lease with Norfolk Southern; it still owns the Rail Line and related properties; it still receives rent payments from its lessee; and it still makes dividend payments to its shareholder, Power REIT. *See* Aug. 6, 2015 Tr. at 119-21.

97. The business and management of Power REIT "continued as they were" for PWV immediately before the reverse triangular merger. Joint Ex. 18 at 2.

98. Immediately after the restructuring, Power REIT's "assets, liability and dividend policies" also were "substantially the same" as those of PWV immediately before the reverse triangular merger. *Id.* Accordingly, Power REIT's only source of income in December 2011 was "lease revenue generated by PW." *Id.* at 13.

99. At first, Power REIT paid expenses and made dividend payments to its shareholders with the funds received from PWV. Aug. 3, 2015 Tr. at 127-28. Power REIT stopped paying a dividend to its shareholders altogether sometime in 2014 due (in part) to the cost and expense of this litigation. Aug. 6, 2015 Tr. at 151, 155.

100. PWV and Power REIT maintain separate bank accounts and each has a Board of Directors which conducts meetings, records minutes, and handles decisions by written resolution.[10] *Id.* at 120-23; Joint Exs. 20, 21.

---

[10] Virgil Wenger does not recall PWV and Power REIT ever having informed their Boards that this litigation contained allegations of fraud on their part. Aug. 4, 2015 Tr. at 167-68. Wenger served on the PWV Board before and after the restructuring and on the Power REIT Board since its creation. Aug. 5, 2015 Tr. at 8-9.

101.  PWV and Power REIT have the same officers and Trustees.  Joint Ex. 17 at 2-3; Joint Ex. 18 at 2, 4.  PWV and Power REIT also share the same headquarters and physical office in West Babylon, New York.  Joint Ex. 17 at 2.

### 1.  The Shelf Registration

102.  After the restructuring, Power REIT continued to issue shares.  For example, Power REIT had a weighted number of shares outstanding in the first three months of 2014 of approximately 1.68 million, which increased to 1.71 million during the same period the following year.  Joint Ex. 38 at 4.

103.  On December 29, 2011, Defendants' management made a presentation to Power REIT's Board in which they discussed the preparation of a shelf offering for 10,000,000 shares.  Pls.' Ex. 93 at D035407.

104.  In April 2012, Power REIT approved the filing of a preliminary Form S-3 Registration Statement in contemplation of a shelf registration enabling it to sell a combination of shares, rights, and warrants aggregating up to $100 million.  Joint Exs. 22, 23.

105.  On May 10, 2012, Power REIT filed a Form S-3 Registration statement with the SEC in connection with the shelf registration.  Defs.' Ex. 255.

106.  Power REIT did not advise Norfolk Southern of the shelf registration or seek its consent to do so.  Aug. 3, 2015 Tr. at 71-72; Aug. 5, 2015 Tr. at 119.

107.  Lesser has taken the position that Power REIT is not bound by the restrictions in the Lease.  Aug. 3, 2015 at 131-32, 137.  Power REIT has thus never sought the prior written consent of Norfolk Southern for any issuance of shares.  *Id.* at 54.

108.  As a now privately held business entity, PWV has no need to issue shares.  *Id.* at 9-10. PWV has not expanded its business since the restructuring.  *Id.* at 54-55.

### 2. Expansion of Power REIT's Business

109. Aside from PWV, Power REIT now owns three other single-purpose direct subsidiaries PW Salisbury Solar, LLC, PW Tulare Solar LLC, and Power REIT Financo LLC, as well as an indirect subsidiary, PW Regulas Solar, LLC. Aug. 3, 2015 Tr. at 85-86. PWV has no ownership or other interest in any subsidiary of Power REIT. Aug. 6, 2015 Tr. at 124. Ultimately, all of the income of Power REIT's subsidiaries "flows up" to their parent company. *Id.* As their names suggest, the subsidiaries own real property associated with solar farms. Aug. 5, 2015 Tr. at 47.

110. Moreover, in December 2012, Power REIT formed the wholly-owned subsidiary PW Salisbury Solar, LLC ("PWSS") to acquire approximately fifty-four acres of land in Salisbury, Massachusetts. Joint Ex. 38 at 6. PWSS leases the land to an operational solar farm for a term of twenty-two years. Pls.' Ex. 148 at 7. PWSS partially financed the acquisition by a bridge loan from Hudson Bay Partners, the wholly-owned affiliate of Lesser. Joint Ex. 38 at 9-10. On July 5, 2013 PWSS borrowed $750,000 from a regional bank to refinance the bridge loan. *Id.* at 10.

111. In July 2013, Power REIT formed the wholly-owned subsidiary PW Tulare Solar, LLC ("PWTS") to acquire approximately one-hundred acres of land near Fresno, California for approximately $1.55 million. *Id.* at 7. PWTS leases the land to five solar farms for a term of twenty-five years. *Id.* PWTS partially funded the acquisition by loans from Hudson Bay Partners in the total amount of $1.65 million. *Id.* at 9.

112. In April 2014, Power REIT formed the wholly-owned subsidiary Power REIT Financo, LLC ("Financo") to enter into a credit facility with a major institutional lender. *Id.* at 7. The same month, PW Regulas Solar, LLC ("PWRS") was formed as a wholly-owned subsidiary of Financo to acquire 447 acres of land in Kern County, California for approximately $9.2 million.

*Id.* PWRS leases the land to a solar project for a primary term of twenty years. *Id.* As part of the closing of the acquisition by PWRS, approximately $6,891,000 was drawn on the credit facility. *Id.* at 9.

113. In response to Power REIT's need for working capital – perhaps to fund these acquisitions – PWV loaned $100,000 to Power REIT in September 2013. Defs.' Ex. 282. Moreover, PWV did not declare a dividend to pass along the monies. Aug. 6, 2015 Tr. at 153. Instead, Lesser considered the loan an advance by definition. *Id.* At trial, Lesser admitted that, if the loan constitutes an advance, PWV breached Section 8(a)(5) of the Lease. *See* Aug. 6, 2015 Tr. at 153-54.

### 3. The Litigation & Alleged Damages[11]

114. The events leading up to this litigation predate the reverse triangular merger, but they relate to Defendants efforts to access working capital to pursue the restructuring and acquire alternative energy assets. Distilled to its essence, Plaintiffs seek damages related to (1) their alleged loss of use of proceeds related to the West End Branch dispute; (2) their alleged loss of use of royalty payments; and (3) the alleged "devaluation" of the Lease.[12]

### a. The Tax Memorandum

115. On June 23, 2011, Mittal sent a letter and memorandum to Noe that outlined purported tax issues under the Lease (the "Tax Memorandum"). *See* Joint Ex. 1. The Tax Memorandum related to a proposed sale of an unused segment of the Rail Line known as the "West End Branch" by Wheeling & Lake Erie to the Pennsylvania Department of Transportation

---

11. The Court has detailed this litigation's extensive procedural history in earlier Memorandum Opinions, and it incorporates those discussions by reference. *See Norfolk S. Ry. Co. v. Pittsburgh & W. Virginia R.R.*, No. 2:11-CV-1588-TFM, 2014 WL 2808907, at **9-13 (W.D. Pa. June 19, 2014); *Norfolk S. Ry. Co. v. Pittsburgh & W. Virginia R.R.*, -- F. Supp. 3d --, 2015 WL 1859127, at *22 (W.D. Pa. April 22, 2015).

12. As discussed in greater detail below, Wheeling & Lake Erie presented no testimony or evidence at trial, including with regard to any damages it claimed to have sustained.

("PennDOT") for $580,000.00 in connection with an ongoing construction project. *Id.* In essence, PWV advanced the position that Norfolk Southern must reimburse PWV for distributions to its shareholders based on a "recursive payment" theory, which made very little sense and has since been abandoned by Defendant(s). *See id.*; *see also Norfolk S. Ry. Co. v. Pittsburgh & W. Virginia R.R.*, -- F. Supp. 3d --, 2015 WL 1859127, at *16 n.14 (W.D. Pa. April 22, 2015).

116. Moreover, the Tax Memorandum set forth PWV's position that Wheeling & Lake Erie's sale of the West End Branch for approximately $580,000 would require Norfolk Southern, under Section 4(b)(7) of the Lease, to pay to PWV between $980,000 and $2,000,000 (depending on the tax basis in the property) in "additional rent." *Id.* at D028635-36. The Tax Memorandum further outlined PWV's view that "the Trust believes that its tax returns were improperly prepared [by Norfolk Southern] and did not reflect the ordinary taxable income created by NSC's 4(b)(7) additional rent payments in prior years." *Id.* PWV thus proposed an amendment to the Lease to "eliminate [Norfolk Southern's] considerable additional rent obligation" and to "reduce the Trust's tax burden (and its concerns related to continued REIT qualification as a result of the [t]ransaction or future transactions)." *Id.* In closing, PWV reiterated its position that "[it] believes that the Lease needs to be updated . . . . ." *Id.* at D028637

117. Mittal also attached to the June 23, 2011 letter an invoice that totaled $4,487.50 in attorneys' fees for services rendered by attorneys at Morrison Cohen as of March 31, 2011, allegedly "in connection with the review of the Lease and the tax issues related to the proposed sale." *Id.* at D028634, D028638.

118. The Tax Memorandum is just one example among the many novel theories advanced by Defendants' management throughout this litigation.[13] *See id.* at *12 ("Until this litigation, PWV also never disputed the treatment of the Settlement Account, submitted a demand for all or part of the indebtedness tracked by the Settlement Account, or requested payments that related to any third-party party agreements concerning the Demised Property.").

119. Be that as it may, the demands contained in the Tax Memorandum ultimately led Plaintiffs to the file the Complaint in Declaratory Judgment against PWV and Power REIT on December 15, 2011. Among the relief sought in their pleading, Plaintiffs requested that the Court declare:

> that the amount owed to Defendants as a result of the disposition of the West End Branch is the amount of the income tax payment, that upon payment of that amount, Plaintiffs will be fully compliant with Section 4(b)(7) of the Lease Agreement, that Plaintiffs are not required to pay Defendants' attorneys' fees under Section 4(b)(6) of the Lease Agreement, and that Defendants are prohibited from declaring Plaintiffs in default of the Lease Agreement or otherwise interfering with Plaintiffs' use of the Property.

Compl., ECF No. 1 at 17. Following the commencement of this action, PWV and Power REIT entered into a broad "indemnity" agreement in which PWV would indemnify Power REIT for any actions related to PWV's business (*i.e.*, this litigation). Aug. 3, 2015 Tr. at 71-76. The indemnity agreement was never memorialized in any writing. *Id.* It is instead "a general understanding" between Lesser and Mittal, acting in their capacities as officers of PWV and Power REIT. *Id.* at 71. The Board(s) of PWV or Power REIT were not consulted regarding the indemnification agreement. *Id.* at 74.

---

[13] Defendants have touted the potential benefits of this litigation on the value of Power REIT's stock in investor presentations posted to its website during the pendency of this action. For example, in a February 2015 investor presentation, Power REIT set forth the "Possible Range of Litigation Outcomes," which represented that its "wholly-owned subsidiary, P&WV has multiple claims against NSC." Pls.' Ex. 148 at 12. This page also indicates that a "Win" by PWV would have a total value of approximately $24.6 million to Power REIT's shareholders and an upside of over 150 percent to the current share price of Power REIT. *Id.*

120. In response to Plaintiffs' Complaint, PWV asserted three counterclaims (to which Power REIT was later joined) that sought the Court to declare, in relevant part, that "gross proceeds due from the sale of the West End Branch, to the extent paid to Norfolk Southern, are due on demand . . . ." Answer, Affirm. Defenses, and Countercls., ECF No. 16 at 32.

121. The Surface Transportation Board ("STB") had jurisdiction over the West End Branch. Aug. 4, 2015 Tr. at 55. To complete the sale, Wheeling & Lake Erie was required to obtain the STB's authority to discontinue service and abandon the common carrier obligation(s) associated with the West End Branch, which required the participation of PWV as the owner of the property. *Id.* at 56. The STB consummated abandonment of the West End Branch sometime in October 2011 after which the sale could have closed. *Id.* at 127.

122. The sale of the West End Branch to PennDOT has not yet closed, allegedly due to this litigation. Aug. 4, 2015 Tr. at 58-59.

123. For nearly four years after the abandonment of the West End Branch occurred, Norfolk Southern never asked PWV to execute any document in order to close the transaction and secure the funds. Aug. 4, 2015 Tr. at 128. Nor has Norfolk Southern ever made a claim against Wheeling & Lake Erie or sought indemnity from its sublessee due to the loss of use of the proceeds from the West End Branch. *Id.* at 132. Wheeling & Lake Erie has also taken no action during that time to close the transaction and secure the funds. *Id.* at 128-29. In fact, neither Norfolk Southern nor Wheeling & Lake Erie have pursued any legal mechanism to close the transaction and secure the funds, such as seeking injunctive relief or requesting that the funds be placed in escrow pending the outcome of this litigation. *Id.*

124. It was not until May 8, 2015 (*i.e.*, after the Court ruled on the cross-motions for summary judgment) that Norfolk Southern sent a letter to PWV requesting that it execute a deed

effectuating the transaction. Defs.' Ex. 273. PWV has not yet received a deed to execute from either Plaintiff. Aug. 5, 2015 Tr. at 132. This letter was the first instance since the abandonment by PWV in 2011 that it was contacted regarding the possibility of a closing. *Id.*

125. At trial, no representative from PennDOT testified regarding its potential purchase of the West End Branch, the sale price, or the reason the sale has not closed. Instead, Noe testified that Norfolk Southern chose not to proceed with the closing on the sale of the West End Branch for two reasons: (1) PWV's claim that Norfolk Southern owed it $1.3 million upon the sale; and (2) Norfolk Southern did not want to risk a default under the Lease based upon the counterclaim that PWV was owed the proceeds of the sale. Aug. 4, 2015 Tr. at 57-58. Noe also testified that $70,000 of the $580,000 sale price was paid to Wheeling & Lake Erie at some indeterminate time. *Id.* at 132-33. According to Noe, the closing of the West End Branch sale will result in payment of $510,000 by PennDOT to Plaintiffs to be divided among them in accordance with the terms of the Sublease. *Id.* at 58. Aside from the testimony of Noe, Plaintiffs offered no evidence regarding the sale price or the payment of $70,000 to Wheeling & Lake Erie, including by whom, why or when it was paid. *See id.* at 58-59, 132-33.

126. Plaintiffs nevertheless seek an award of compound interest, totaling $121,616.97, as damages resulting from the three-year-and-nine-month delay in payment of $510,000 by PennDOT to Plaintiffs, allegedly caused by Defendant(s).

### b. Royalty Payments

127. Defendants' management also sought to access working capital by seeking certain benefits under the Lease, such as royalty payments related to oil / gas and coal leases, despite the contracting parties' undisputed course of performance over the course of fifty years. *See id.* at

**8-16.  In doing so, Lesser has represented that certain royalty payments should have been delivered to PWV, either directly or indirectly.  Aug. 3, 2015 Tr. at 83.

128. As part of these efforts, PWV added counterclaims (to which Power REIT was later joined) concerning mineral and oil / gas rights related to the Demised Property.  *See* Second Suppl. to Countercls., ECF No. 106.  In particular, Defendant(s) asserted a counterclaim for conversion against Wheeling & Lake Erie, alleging that Wheeling & Lake Erie improperly deprived PWV of its rights in or use of the Demised Property by allowing third parties to drill for oil and gas and extract coal from same.  *Id.* at 42-43.

129. The factual underpinning for this counterclaim occurred on January 10, 2013 when PWV's current management was contacted by Larry Skrzysowski, a representative of Chesapeake Appalachia, LLC ("Chesapeake Appalachia"), seeking ratification of an oil and gas lease it entered into with Wheeling & Lake Erie.  *See* Aug. 4, 2015 Tr. at 174-84; Aug. 6, 2015 Tr. at 132-33.  Skrzysowski explained that, if the ratification was not signed, Chesapeake Appalachia would escrow any royalties owed until the ratification was received.  Aug. 4, 2015 Tr. at 182.  Chesapeake Appalachia never received the requested ratification.  Aug. 4, 2015 Tr. at 18.

130. At trial, Plaintiffs presented no testimony or evidence to substantiate this aspect of their claim.  It thus remains entirely unclear whether royalties related to that particular oil and gas lease were ever paid or are held in escrow.[14]  Aug. 4, 2015 Tr. at 185-87.

---

14.  In their Pretrial Statement, Plaintiffs claimed that Chesapeake Appalachia and Southwestern Energy Company "have withheld over $50,000 in royalty payments under oil and gas leases on portions of the Demised Property." ECF No. 235 at 9.  As such, Plaintiffs sought $2,732.00 (in compound interest) related to their alleged loss of use of royalty payments.  *Id.*

### c. The "Devaluation" of the Lease

131. The real thrust of Plaintiffs' damages claim is that the creation of Power REIT, in an attempt to escape the Lease restrictions, has "devalued" the Lease. Plaintiffs detail this aspect of their claim in their Second Supplement to Complaint, which sets forth their alleged damages related to Count Three (breach of contract) and Count Four (fraud):

> Plaintiffs have been damaged in that Norfolk Southern can no longer limit the issuance of shares by the successor of P&WV, which could adversely impair the value of the Lease Agreement and adversely impair the ability of the Plaintiffs to continue to operate the railroad as they have for nearly fifty years and as they have the right to continue to do under the Lease Agreement into the future. Such circumvention has devalued the Lease Agreement.

> Plaintiffs will be further damaged to the extent that Defendants are permitted to continue to utilize their new corporate structure to circumvent the restrictions in the Lease Agreement and leverage their assets.

> Defendants' actions have caused and will continue to cause irreparable harm to Plaintiffs' property interests in the Lease Agreement which cannot be fully and adequately remedied by money damages alone.

Second Suppl. to Compl. at 11-12, 15-16, ECF No. 58. As for the damages related to their fraud claim, Plaintiffs also include one additional averment: "As a direct and proximate result of Norfolk Southern's justifiable reliance of Defendants' material misrepresentations and omissions, Plaintiffs have been damaged including the loss of Plaintiffs' contractual and property rights under the Lease Agreement." *Id.* at 15.

132. At trial, Friedman submitted that three types of harm flowed from the formation of Power REIT: (1) "the rental income that we [Norfolk Southern] are paying PW is now being used to promote alternative energy to the possible detriment of our customers;" and (2) "it has the potential to devalue the lease;" and (3) "the entry of PW, now Power REIT, into risky businesses such as alternative energy raises the risk of Power REIT's performance under the lease." Aug. 3, 2015 Tr. at 171-72. Friedman did not identify a single customer (other than in the broadest of

terms) that has sustained any actual detriment as a result of Power REIT's pursuit of alternative energy assets. *See* Aug. 3, 2015 Tr. at 169. Nor did Friedman suggest that any damage to its customers caused any actual and calculable damages to Norfolk Southern. Friedman also equivocated on whether (and how) the Lease has actually been devalued. *See id.* at 188 ("[Friedman]: Well, we haven't tried to sell the lease, for example, or transfer it. So I can't tell you whether it's been devalued or not. But given the long-term nature of the lease, another approximately 50 years on the current lease, plus unlimited long-term renewals, my concern is to the future . . . . I guess I would say it's my view that the lease has been devalued by the additional risks taken on by P&WV/Power REIT.").

133. Much like Friedman, Noe also testified that the Lease has been devalued. In his view, "the rationale for that is the creation of Power REIT and the reorganization's intended effect on allowing escape from the restrictions in the lease could create creditor's risk and that the risk devalues the lease." Aug. 4, 2015 Tr. at 124. At the same time, Noe testified "that the risk has not been realized and that [Norfolk Southern] ha[s] done no calculation" regarding the devaluation of the Lease. *Id.* at 125; *see also id.* at 64-65. Noe also testified that other instances of alleged harm suffered by Norfolk Southern include its deteriorated business relationship with PWV, although he could not place a value on the apparent fallout between the two entities. *Id.* at 65. The only figure that Noe offered relevant to Norfolk Southern's alleged damages was the costs that it has incurred in this litigation: $4 million. *Id.* at 64.

134. Marcellus Kirchner, Norfolk Southern's Director of Strategic Planning and its corporate designee during discovery, offered similar testimony. *See* Aug. 6, 2015 Tr. at 42-46. For instance, Kirchner claimed that the Lease was devalued "[b]ecause the changes in corporate structure involving the Defendants have allowed them to evade the restrictions contained in the

lease." *Id.* at 43. Kirchner also testified that the basis for the compensatory damages sought by Norfolk Southern included the cost and expense of defending against the counterclaims as well as the "diminution of the protections afforded by the lease through the restrictions on issuance of stock and other such actions." *Id.* at 44-45. When asked to offer an estimated amount of that diminution, Kirchner responded "I don't know if a monetary value is calculable at this juncture." *Id.* at 46. As for the "other such actions," Kirchner claimed that Power REIT "*could* become involved in business arrangements that *could* lead to default or bankruptcy, which *could* impair the assets that are the subject of the lease." *Id.* at 46 (emphasis added).

## III.  Conclusions of Law

1. The non-jury trial in this matter concerned claims of breach of contract and fraud asserted by Plaintiffs at Counts Three and Four of their Second Supplement to Complaint, which is incorporated by reference in their First Amended Complaint. Pennsylvania law controls the disposition of these remaining claims.

### A.  Breach of Contract

2. "Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract action must establish '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'" *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (quoting *CoreStates Bank, N.A. v. Cutillo,* 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).

3. "It is fundamental contract law that one cannot be liable for a breach of contract unless one is a party to that contract." *Electron Energy Corp. v. Short*, 597 A.2d 175, 177 (Pa. Super. Ct. 1991) (citing *Viso v. Werner*, 369 A.2d 1185 (Pa. 1977)). Similarly, in the absence of a

contractual relationship, there can be no basis for asserting a breach of the implied duty of good faith and fair dealing. *SEPTA v. Holmes*, 835 A.2d 851, 859 (Pa. Commw. Ct. 2003).

4.  With those considerations in mind, the Court finds and rules that Wheeling & Lake Erie cannot prevail on its breach of contract claim. Wheeling & Lake Erie is not a party to the Lease between Norfolk Southern and PWV, and it has no contractual relationship with either Defendant. It thus has no contractual rights to pursue. Accordingly, the Court will enter judgment in favor of Defendants and against Wheeling & Lake Erie on Count Three.

### 1.  Norfolk Southern v. Power REIT

5.  Much like Wheeling & Lake Erie, Power REIT also is not a party to the Lease between PWV and Norfolk Southern. Norfolk Southern claims that Power REIT is nevertheless bound to the Lease under the doctrines of successor liability and veil piercing. *See* Pls.' PPFCL at 59. The Court will discuss these concepts seriatim.

### a.  Successor Liability

6.  The ordinary rule of corporate successor liability "states that a firm that buys assets from another firm does not assume the liabilities of the seller merely by buying its assets." *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 464 (3d Cir. 2006) (citing *Luxliner P.L. Export Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69 (3d Cir. 1993); *Polius v. Clark Equip., Co.*, 802 F.2d 75 (3d Cir. 1986); 15 WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 7122 ((perm. ed., rev. vol. 2004)). "There are four traditional exceptions, all founded in corporate and contract law." *Id.*

7.  The general rule of non-liability may be overcome if (1) the purchaser expressly or implicitly agrees to assume liability; (2) the transaction was entered into fraudulently for the purpose of escaping liability; (3) the purchase amounts to a consolidation or merger; or (4) the

purchaser is a mere continuation of the seller.[15] *See Cont'l Ins. Co. v. Schneider, Inc.*, 873 A.2d 1286, 1291 (Pa. 2005) (citations omitted); *see also Berg Chilling Sys., Inc.*, 435 F.3d at 464-65. The third and fourth exceptions "are generally treated identically . . . as both arise where there is continuity of identity between the buyer and seller." *Berg Chilling Sys., Inc.*, 435 F.3d at 464-65 (citing *Ruiz v. Blentech Corp.*, 89 F.3d 320, 325 (7th Cir. 1996); *Luxliner P.L. Exp., Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 73 (3d Cir. 1993)).

8.    If the original entity still exists, however, there is no successor, and therefore, no successor liability. *See Hyjurick v. Commonwealth Land Title Ins. Co.*, No. 3:11CV1282, 2012 WL 1463633, at *4 (M.D. Pa. Apr. 27, 2012) ("Fidelity cannot be Commonwealth's successor if Commonwealth exists as a separate corporation, albeit one that is a wholly owned subsidiary."); *see also In re Welding Fume Products Liab. Litig.*, 1:03-CV-17000, 2010 WL 2403355, at *7 (N.D. Ohio June 11, 2010) ("Of course, if the original entity still exists, there is no successor— and no successor liability."); *White v. Cone-Blanchard Corp.*, 217 F. Supp. 2d 767, 772 (E.D. Tex. 2002) ("'It is axiomatic that to establish corporate successor liability there must in fact be a corporate successor.'") (quoting *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 879 F. Supp. 407, 410 (D. Vt. 1995)). Moreover, the transfer of all or substantially all of the assets of one corporation to another is typically a prerequisite to corporate successor liability. *See Nat'l Soffit & Escutcheons, Inc. v. Superior Sys., Inc.*, 98 F.3d 262, 266 (7th Cir. 1996) ("In order for one corporation to be deemed a successor corporation in the first place, it must be a successor to all, or substantially all, of another corporation's assets."); *Grand Labs., Inc. v. Midcon Labs of*

---

15. Pennsylvania law also recognizes other exceptions not applicable in this case. *See Cont'l Ins. Co. v. Schneider, Inc.*, 873 A.2d 1286, 1291 n.8 (Pa. 2005) ("This Commonwealth has also recognized a 'product-line' exception to the general rule against successor liability, which permits successor liability to be imposed for injuries caused by defective products manufactured by a predecessor if the successor continues to manufacture the product."); *see also Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 465 n.3 (3d Cir. 2006) ("Some states recognize transfer for inadequate consideration as an additional exception, *see, e.g., Lopata v. Bemis Co., Inc.*, 383 F. Supp. 342 (E.D. Pa. 1974); however, this seems more properly viewed as a form of constructive fraud.").

*Iowa*, 32 F.3d 1277, 1281 n.5 (8th Cir. 1994) ("Most jurisdictions hold that a prerequisite to the imposition of liability against a corporation under any of the four exceptions to the nonliability of successors is a transfer or sale of all, or substantially all, the assets of the predecessor to the successor.") (citing *Acheson v. Falstaff Brewing Corp.*, 523 F.2d 1327, 1329-30 (9th Cir. 1975); *Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1132 (10th Cir. 1991)); *see also Carreiro v. Rhodes Gill & Co., Ltd.*, 68 F.3d 1443, 1448 (1st Cir. 1995) (collecting cases).

9. At the same time, at least one district court has concluded that, under Pennsylvania law, a corporation need not completely cease to exist for the de facto merger exception to apply. *Lehman Bros. Holdings v. Gateway Funding Diversified Mortgage Servs., L.P.*, 989 F. Supp. 2d 411, 436 (E.D. Pa. 2013). There, the district court observed that the "cessation of ordinary business operations" factor (one of four in the analysis) may be satisfied when the predecessor does not dissolve, but is reduced to an assetless shell. *Id.*

10. Unlike that case, PWV is not an assetless shell; it still owns the Rail Line and has the same obligations under the Lease. In fact, the result of the reverse triangular merger was a stock purchase, not a purchase of PWV's assets. *See generally Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 423 (3d Cir. 2010) ("[A] stock sale, unlike a sale of assets, does not alter the corporate entity."). Afterward, PWV has never ceased its ordinary business operations, liquidated or dissolved. It still collects its rental payments from Norfolk Southern and declares a dividend to its (now sole) shareholder. To be sure, PWV's corporate existence and nature of its business has not changed in any meaningful way as a result of the reverse triangular merger – which is specifically designed to preclude the imposition of successor liability. *See Baldwin Enterprises, Inc. v. Retail Ventures, Inc.*, 09-CV-0159-MJR-PMF, 2010 WL 624261, at **5-8 (S.D. Ill. Feb. 18, 2010); *Saginaw Prop., LLC v. Value City Dep't Stores, LLC*, 08-13782-BC,

2009 WL 3536616, **8-9 (E.D. Mich. Oct. 30, 2009); *Kaufmann v. LVA Holdings, Inc.*, 2006 U.S. Dist. LEXIS 49499, at **1-3 (D. Colo. July 20, 2006); *Morgan v. Powe Timber Co.*, 367 F. Supp. 2d 1032, 1035-40 (S.D. Miss. 2005); *see also Allstate Ins. Co. v. Countrywide Fin. Corp.*, 842 F. Supp. 2d 1216, 1231-33 (C.D. Cal. 2012); *In re Welding Fume Products Liab. Litig.*, 2010 WL 2403355, at *7 n.67; *Binder v. Bristol-Myers Squibb, Co.*, 184 F. Supp. 2d 762, 771-72 (N.D. Ill. 2001); *Equity Grp. Holdings v. DMG, Inc.*, 576 F. Supp. 1197, 1203-05 (S.D. Fla. 1983). In sum, PWV continues to exist. As such, the Court finds and rules that the reverse triangular merger effectuated in this case did not create successor liability on the part of Power REIT as a matter of law.

### b. Veil Piercing

11. There is a strong presumption under the law against piercing the corporate veil, as doing so undermines the well-established rule that corporations enjoy a legal existence separate from their owners. *See Lumax Indus., Inc. v. Aultman*, 669 A.2d 893, 895 (Pa. 1995). Veil piercing may be appropriate when it is necessary to "prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001) (quoting *Zubik v. Zubik*, 384 F.2d 267, 273 (3d Cir. 1967)). *Accord Ragan v. Tri-Cnty. Excavating, Inc.*, 62 F.3d 501, 508 (3d Cir. 1995) ("Pennsylvania courts have largely embraced the flexible tenor of the *Ashley* standard, holding, for instance, that no finding of fraud or illegality is required before the corporate veil may be pierced, but rather, that the corporate entity may be disregarded whenever it is necessary to avoid injustice.") (citation omitted).

12. Courts have expanded on that general principle by developing various tests to determine when veil piercing is warranted. The tests go by various titles: the "alter ego" theory, the

"integration" doctrine, the "identity doctrine," to name just a few. *Id.* at 484 n.2. Norfolk Southern purports to proceed under the "alter ego" theory, but in practice "the formulations are generally similar, and courts rarely distinguish them." *Id.* No matter the theory upon which Plaintiff is proceeding, a court must consider several factors in deciding whether to disregard the corporate form:

> the failure to observe corporate formalities; non-payment of dividends; insolvency of debtor corporation; siphoning the funds from corporation by dominant shareholders; non-functioning of other officers and directors; absence of corporate records; whether the corporation is a mere façade for the operations of a common shareholder or shareholders; and gross under-capitalization.

*Eastern Minerals & Chemicals Co. v. Mahan*, 225 F.3d 330, 333 n.7 (3d Cir. 2000) (quoting *Wheeling-Pittsburgh Steel Corp. v. Intersteel, Inc.*, 758 F. Supp. 1054, 1059 (W.D. Pa. 1990)).

13. As our court of appeals has further explained in the context of an alter ego analysis, Pennsylvania law requires a showing that the subordinate company 'acted robot- or puppet-like in mechanical response to the controller's tugs on its strings or pressure on its buttons.'" *Ragan v. Tri-Cnty. Excavating, Inc.*, 62 F.3d 501, 508 (3d Cir. 1995) (quoting *Culbreth v. Amosa (Pty) Ltd.*, 898 F.2d 13, 15 (3d Cir. 1990)). This inquiry is highly fact-specific. *See* 1 WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 41,10 ("The propriety of piercing the corporate veil is highly dependent of the equities of the situation, and the inquiry tends to be highly fact-driven.") (collecting cases); *see also id.* at § 43 (discussing veil piercing in the parent-subsidiary context).

14. Applying those factors, the Court finds and rules that the evidence presented at trial weighs against piercing the corporate veil to deem PWV and Power REIT alter egos (and bind Power REIT to the Lease). PWV observes corporate formalities by holding meetings of its Board of Directors and rendering decisions by corporate resolution, it pays dividends to its

shareholder, it remains solvent and well-capitalized, and it maintains its own corporate records and bank account separate and distinct from Power REIT, which receives income from its other subsidiaries as well as the dividend from PWV. In addition, PWV continues to operate as it did prior to the reverse triangular merger; it receives an established rental payment from Norfolk Southern, pays any expenses, and issues dividends to its shareholder. The mere fact that Lesser and Mittal served as officers of both PWV and Power REIT or that their respective Boards have the same trustees does not tip the scales in favor of disregarding the corporate form. *See United States v. Bestfoods*, 524 U.S. 51, 69 (1998) ("[I]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts."); *see also In re Enter. Rent-A-Car Wage & Hour Employment Practices Litig.*, 735 F. Supp. 2d 277, 322-23 (W.D. Pa. 2010) ("The sharing by the corporations of directors and the ownership by defendant parent of one-hundred percent of ERAC–Pittsburgh's stock do not implicate that defendant parent controlled the subsidiary to the extent necessary to find that ERAC–Pittsburgh is an alter ego of defendant parent.").

15. To be clear, the Court also finds and rules that Power REIT is not equally liable for PWV's acts that predate its formation. Piercing principles do not extend to find liable an entity that was not formed at the time of the alleged wrongful acts. *See C M Corp. v. Oberer Dev. Co.*, 631 F.2d 536, 539-41 (7th Cir. 1980). At trial, the evidence associated with Power REIT's existence or activities all post-date the alleged breach of the contract by PWV.

16. Plaintiffs have thus failed to establish any basis upon which to pierce the corporate veil to hold Power REIT liable under the Lease or for the alleged acts of its subsidiary, PWV.

17. As no contract exists between Norfolk Southern and Power REIT, Norfolk Southern's breach of contract claim against Power REIT fails as a matter of law. Accordingly, the Court will enter judgment in favor of Power REIT and against Norfolk Southern on Count Three.

## 2. Norfolk Southern v. PWV

18. Norfolk Southern alleges that, based on Lesser's admissions at trial, PWV "breached the covenants of the Lease [*i.e.*, Section 8(a)(5)] prohibiting PWV from making advances." Pls.' PPFCL at 67, ¶ 15. Norfolk Southern further alleges that "PWV also breached the implied covenant of good faith and fair dealing when it sought Norfolk Southern's consent to the rights offering is early 2011, but failed to disclose that PWV was in the midst of pursuing acquisitions related to alternative energy ventures." *Id.* The Court will address the two aspects of this claim in turn.

### a. The Advance

19. The underlying factual allegations related to this breach occurred in September 2013, more than a year after the filing of Plaintiffs' May 2012 Second Supplement to Complaint in which they set forth their sole breach of contract count. Norfolk Southern has never sought to supplement or amend their pleadings to include a substantive count related to Section 8(a)(5) of the Lease.

20. Ordinarily, a claim is procedurally barred if a party fails to include it in a pleading. *See Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 676 F.3d 318, 326 (3d Cir. 2012). The Federal Rules of Civil Procedure do, however, include a relevant exception: "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." Fed. R. Civ. P. 15(b)(2). Under this rule, "[a] party may move--at any time, even after judgment--to amend the pleadings to conform them to the evidence

and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue." *Id.*

21. "Express consent may be given by stipulation or may be incorporated in a pretrial order and rarely raises any serious fact questions." 6A The Late Charles Alan Wright, et al., Federal Practice and Procedure § 1493 (3d ed. 2010). On the other hand, a finding of implied consent "is much more difficult to establish." *Id.* It depends on three factors: "'whether the parties recognized that the unpleaded issue entered the case at trial, whether the evidence that supports the unpleaded issue was introduced at trial without objection, and whether a finding of trial by consent prejudiced the opposing party's opportunity to respond.'" *Liberty Lincoln-Mercury, Inc.*, 676 F.3d at 327 (quoting *Douglas v. Owens,* 50 F.3d 1226, 1236 (3d Cir. 1995)).

22. The Court finds and rules that a breach of contract claim related to the advance made by PWV to Power REIT was tried by the implied consent of the parties.

23. At the outset, the parties undoubtedly recognized that the issue entered the case at trial when Lesser testified – on cross-examination and during Defendants' case-in-chief – that the loan, by definition, constituted an advance prohibited by the Lease:

> Q. So at the time that Power REIT asked for the loan, did it have any working capital?
>
> A. I would have to look at the time frame. I would have to look at the documents.
>
> Q. You have the exhibit at the time that the loan came in.
>
> A. What was the date of the loan? I don't have that in front of me.
>
> Q. It's in front of you, Exhibit 282.
>
> A. September, 2013. I can't sit here and tell you whether Power REIT had working capital at that point. I certainly could --
>
> Q. It had a need for money?

A. The board of P&WV made a decision to make a loan to Power REIT. And as we saw, the board of Power REIT made a determination to accept that loan.

Q. Did Power REIT need the money at the time that the loan was made?

A. Presumably there was a reason for that, yes.

Q. What was the reason? You sat on both boards. You either made the request, heard it, and then passed it back up.

A. For whatever -- sitting here I can't tell you on September 19th what the purpose was.

Q. Whatever it was, you wanted -- these monies were advanced up to the needs of Power REIT, correct?

A. They were advanced to Power REIT by definition, sure. They could have been dividended as a corporate action. In this case we determined to make a loan. We thought it was to the benefit actually of the Pittsburgh & West Virginia.

[Defense counsel]: With the Court's permission, could you please read back the answer to me. Would that be okay?

THE COURT: Sure.

[Plaintiffs' counsel]: Thank you. My question and his answer.

(Court Reporter reads back pertinent testimony.)

BY [PLAINTIFFS' COUNSEL]:

Q. Advances by definition. Could you pull up Joint Exhibit 3, please. 8(a)(5), lessor shall not borrow any money, assume any guaranty, make advances. By definition when you did that, you violated 8(a)(5) of the lease, isn't that correct, Mr. Lesser, by definition?

A. If you make advances to be what we did, then maybe we should have made a dividend and then P&WV would not have the asset that helped strengthen the balance sheet of P&WV.

Q. I am using your words what you did, both in making the request for an advance and giving the request for advance, by definition that contravened what P&WV could not do and it was directed to do and controlled its subsidiary's decision, isn't that correct, by definition of what you described?

A. Again, if that's what you believe advances meant, we may have made a mistake there and I apologize. We can certainly correct that.

Q. That's why we are here for the Court to correct it.

Aug. 6, 2015 Tr. at 152-54. From the perspective of the factfinder, this testimony is, without question, an admission of liability by Lesser on behalf of PWV. And it hardly went unnoticed.

24. Turning to the second factor, "there is 'implied consent to litigate an issue if there is no objection to the introduction of evidence on the unpleaded issue, as long as the non-objecting party was fairly apprised that the evidence went to the unpleaded issue.'" *Liberty Lincoln-Mercury, Inc.*, 676 F.3d at 327 (quoting *Francois v. Francois*, 599 F.2d 1286, 1294 n.6 (3d Cir. 1979)). This factor is also satisfied. Defendants moved for the admission of Exhibit 282, and it was admitted without objection. Of course, Defendants did not introduce this evidence to raise a breach of Section 8(a)(5) of the Lease. And Plaintiffs may have even caught Lesser by surprise during his cross-examination (after all, he tried to walk back what he meant by "advance"). But Lesser was repeatedly asked about Exhibit 282 in light of Section 8(a)(5) without any objection by Defendants, and this line of questioning was sufficient to place Defendants on notice that the evidence went to the unpleaded issue. In fact, defense counsel questioned Lesser on re-direct regarding whether he viewed an advance as equivalent to a loan; Lesser responded that PWV required the consent of Norfolk Southern under the Lease. In other words, Lesser admitted that PWV breached Section 8(a)(5) of the Lease.

25. The third factor – prejudice to the opposing party – also weighs in favor of a finding of trial by consent. In this context, "[t]he principal test for prejudice when a party seeks to assert a new theory 'is whether the opposing party was denied a fair opportunity to defend and to offer additional evidence on that different theory.'" *Alzheimer's Inst. of Am., Inc. v. Avid Radiopharmaceuticals*, 292 F.R.D. 247, 250 (E.D. Pa. 2013) (quoting *Evans Products Co. v. W.*

*Am. Ins. Co.*, 736 F.2d 920, 924 (3d Cir. 1984)).  Defendants' opportunity in this case was two-fold: on re-direct and in their Proposed Findings of Fact and Conclusions of Law.  Their filing is, however, silent on this issue.  Be that as it may, that does not change the fact that Defendants were afforded the opportunity to offer argument on this point and that they declined to do so.

26. In sum, the Court finds and rules that PWV breached the Lease when it made the advance to Power REIT.  Accordingly, the Court will enter judgment in favor of Norfolk Southern and against PWV on Count Three, as amended by the implied consent of the parties.

### b. Good Faith and Fair Dealing

27. "[U]nder Pennsylvania law, a 'claim for breach of the implied covenant of good faith and fair dealing is subsumed in a breach of contract claim.'"  *Burton v. Teleflex Inc.*, 707 F.3d 417, 432 (3d Cir. 2013) (quoting *LSI Title Agency, Inc. v. Evaluation Servs., Inc.*, 951 A.2d 384, 392 (Pa. Super. Ct. 2008)).  "Therefore, while Pennsylvania law generally recognizes a duty of good faith in the performance of contracts, this duty 'does not create independent substantive rights.'"  *Id.* (quoting *Com. v. BASF Corp.*, No. 3127, 2001 WL 1807788, at *12 (Pa. Com. Pl. Mar. 15, 2001)).

28. Plaintiffs' claim that PWV breached an implied covenant of good faith and fair dealing fails as a matter of law.  As discussed above, PWV remains a party to the Lease with Norfolk Southern, and its contractual rights and duties thereunder have not changed.  Accordingly, the Court will proceed to the remaining claim – fraud – brought by Plaintiffs against Defendants.

### B. Fraud

29.  In Pennsylvania, a party must establish the following elements to sustain a common law fraud claim: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the

intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994). "Each element of the claim must be proven by clear and convincing evidence." *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 731 (3d Cir. 1991) (citing *Scaife Co. v. Rockwell-Standard Corp.*, 285 A.2d 451, 454 (Pa. 1971)).

30. The Supreme Court of Pennsylvania has "elaborated on those actions which would constitute fraudulent behavior: 'fraud consists in anything calculated to deceive, whether by single act or combination, or by suppression of truth, or a suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture. It is any artifice by which a person is deceived to his disadvantage.'" *Id.* (quoting *In re McClellan's Estate*, 75 A.2d 595, 598 (Pa. 1950)). "A fraud also occurs when one is induced to assent when he would not otherwise have done so." *Id.* (citing *Delahanty v. First Pennsylvania Bank, N.A.*, 464 A.2d 1243, 1252 (Pa. Super. Ct. 1983)).

31. "To be actionable, a misrepresentation need not be in the form of a positive assertion but may be by concealment of that which should have been disclosed." *Gnagey Gas & Oil Co. v. Pennsylvania Underground Storage Tank Indemnification Fund*, 82 A.3d 485, 500 (Pa. Commw. Ct. 2013) (citing *Wilson v. Donegal Mutual Insurance Co.*, 598 A.2d 1310, 1315 (Pa. Super. Ct. 1991)). In other words, "[f]raudulent misrepresentation may be accomplished 'by concealment of that which should have been disclosed, which deceives or is intended to deceive another to act upon it to his detriment.'" *Tunis Bros. Co.*, 952 F.2d at 731 (quoting *Delahanty*, 464 A.2d at 1251-52). "However, while active concealment may constitute fraud, mere silence is not sufficient in the absence of a legal duty to disclose information." *Gnagey Gas & Oil Co.*, 82 A.3d at 500 (citations omitted).

32.     As with its breach of contract claim, Wheeling & Lake Erie's fraud claim is deficient.  At trial, Wheeling & Lake Erie presented no testimony or evidence that either of Defendants made any representations – material or otherwise – in connection with the consent sought by PWV to issue shares.  Absent a misrepresentation (or omission), Wheeling & Lake Erie also cannot show justifiable reliance.  And without these requisite elements, Wheeling & Lake Erie's fraud claim fails as a matter of law.  As such, the Court will enter a judgment in favor of Defendants and against Wheeling & Lake Erie on Count Four.

### 1.  Norfolk Southern v PWV

33.     Turning to the remaining claims, the Court finds and rules that Norfolk Southern has established by clear and convincing evidence that PWV committed fraud in seeking consent to the rights offering in early-2011.  *See supra* ¶¶ 71-75.

34.     In his February 7, 2011 e-mail, Lesser assured Noe that the Proposed S-3 "contains all available information of PWV's plans at this point."  The representation was material to the transaction; Lesser sent his e-mail and the Proposed S-3 "in the hope of securing the consent." The representation was also false, plain and simple.  The Proposed S-3 makes no mention whatsoever of PWV's plan(s) to "deal with the restrictions" in the Lease, restructure PWV "based on lease restrictions" and invest in alternative energy ventures, all which are detailed in Lesser's July 22, 2010 e-mail to Mr. Jones, III, his December 2010 Outline, and/or his January 2011 Presentation.

35.     As for the fourth element, the totality of the circumstances indicate that Lesser acted with the intent to mislead Norfolk Southern into relying on his material misrepresentations.  Lesser's communications with Noe reflect his appreciation that Norfolk Southern remained concerned with the financial viability of PWV, which Section 8(a)(2) of the Lease was designed to protect.

From those correspondences, Lesser surely knew that Norfolk Southern was unlikely to consent to the issuance of shares had he exposed his actual plans: to use the proceeds to fund a corporate restructuring that would allow a newly-formed, publicly-traded company to usurp the benefits of the Lease without any corresponding restrictions. Motivated to hide the truth, Lesser thus made false statements to Norfolk Southern and withheld key information to obtain the consent.

36. Norfolk Southern would not have granted PWV consent to issue shares had it known that PWV (through Lesser) would act inconsistent with the assurances made in the Proposed S-3 or the limitations of the February 14, 2011 letter from Friedman. At that time, Norfolk Southern had no reason to doubt Lesser, particularly because his purported plans were set forth in a document intended to be filed with the SEC. Thus, Norfolk Southern's reliance was justified under the circumstances.

37. With respect to the final element, "a party asserting a fraud claim "must demonstrate that the fraud proximately caused economic harm." *Eigen v. Textron Lycoming Reciprocating Engine Div.*, 874 A.2d 1179, 1190 (Pa. Super. Ct. 2005). Norfolk Southern has shown that the fraud perpetrated by PWV has harmed its interests related to the Lease, although an exact figure is nearly impossible to calculate (let alone justify) with any reasonable specificity. Even so, the Lease restrictions no longer afford Norfolk Southern the protection as bargained for by the original parties.

38. Norfolk Southern's fraud claim is not barred by the gist of the action doctrine. Until recently, the Supreme Court of Pennsylvania "had scant occasion to opine as to how the gist of the action doctrine should be employed to ensure that a party does not bring a tort claim for what is, in actuality, a claim for a breach of contract." *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 60 (Pa. 2014). However, in *Bruno v. Erie Insurance Company*, the Court discussed the doctrine at

length and observed that "[it] has consistently regarded the nature of the duty alleged to have been breached, as established by the underlying averments supporting the claim in a plaintiff's complaint, to be the critical determinative factor in determining whether the claim is truly one in tort, or for breach of contract." *Id.* at 68. As the Court explained:

> In this regard, the substance of the allegations comprising a claim in a plaintiff's complaint are of paramount importance, and, thus, the mere labeling by the plaintiff of a claim as being in tort, e.g., for negligence, is not controlling. If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—*i.e.*, a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract. If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort.

*Id.* (internal citations omitted). The Pennsylvania Supreme Court thus reaffirmed the "duty-based demarcation" as "the touchstone standard for ascertaining the true gist or gravamen of a claim pled by a plaintiff in a civil complaint." *Id.* at 69. Accordingly, this Court must ask "whether the nature of the duty upon which the breach of contract claims rest is the same as that which forms the basis of the tort claim[ ]." *Id.* at 69 n.17.

39. Moreover, in explaining the gist of the action doctrine, the Pennsylvania Supreme Court emphasized that its precedent "underscore that the mere existence of a contract between two parties does not, *ipso facto*, classify a claim by a contracting party for injury or loss suffered as the result of actions of the other party in performing the contract as one for breach of contract." *Id.* at 69. Thus, "a negligence claim based on the actions of a contracting party in performing contractual obligations is not viewed as an action on the underlying contract itself, since it is not founded on the breach of any of the specific executory promises which comprise the contract." *Id.* Rather, "the contract is regarded merely as the vehicle, or mechanism, which established the relationship between the parties, during which the tort of negligence was committed." *Id.*

40. As in *Bruno*, the Lease merely served as the vehicle which established the relationship between Norfolk Southern and PWV, during which the fraud was committed. While the Lease requires PWV to seek the consent of Norfolk Southern before it issues stock, the substance of Norfolk Southern's claim against PWV is not that it failed to abide by that covenant. It is instead predicated on the fraudulent misrepresentations/omissions of Lesser in seeking the consent. And a broader social duty requires PWV to refrain from defrauding Norfolk Southern in the process. To be sure, PWV's misrepresentations and fraudulent omissions "are what distinguish Plaintiff's tort claim from a breach of contract claim." *Gadley v. Ellis*, No. CIV.A. 3:13-17, 2015 WL 2345619, at *10 (W.D. Pa. May 15, 2015).

41. Accordingly, the Court will enter judgment in favor of Norfolk Southern and against PWV on Count Four – fraud.

### 2. Norfolk Southern v. Power REIT

42. This fraud perpetrated by PWV predates the formation of Power REIT. Moreover, Power REIT did not exist when PWV sought and obtained consent from Norfolk Southern for the rights offering, and therefore, it could not have made the misrepresentations and omissions upon which the fraud claim is based. Power REIT also is not a successor to or the alter ego of PWV. As such, the fraud claim of Norfolk Southern against Power REIT fails as a matter of law. Accordingly, the Court will enter judgment in favor of Power REIT and against Norfolk Southern on Count Four.

### C. Damages

43. Plaintiff(s) seeks compensatory damages, consequential damages, punitive damages and equitable relief. For the reasons that follow, the Court finds and rules that Norfolk Southern is entitled only to nominal damages.

### 1. Compensatory / Consequential Damages

44. Norfolk Southern seeks compensatory (and consequential)[16] damages related to (1) their alleged loss of use of proceeds related to the West End Branch dispute; (2) their alleged loss of use of royalty payments; and (3) the alleged "devaluation" of the Lease.

45. "Under Pennsylvania law, a plaintiff asserting a claim of breach of contract or fraud is required to demonstrate that the damages suffered were proximately caused by the defendant." *Zemenco, Inc. v. Developers Diversified Realty Corp.*, No. CIV.A. 03-175, 2005 WL 2545303, at *7 (W.D. Pa. Oct. 7, 2005) (citing *Gruenwald v. Advanced Computer Applications Inc.*, 730 A.2d 1004, 1014 (Pa. Super. Ct. 1999); *Logan v. Mirror Printing Co. of Altoona, Pa.*, 600 A.2d 225, 226 (Pa. Super. Ct. 1991)). "Although mathematical certainty is not typically required, the general rule in Pennsylvania, as in most jurisdictions, is that if damages are difficult to establish, an injured party need only prove damages with reasonable certainty." *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 669 (3d Cir. 1998). This standard of proof is a difficult concept to quantify. *Id.* At a minimum, it "embraces a rough calculation that is not 'too speculative, vague or contingent' upon some unknown factor." *Id.* On the other hand, this "standard does not preclude an award of damages because of "some uncertainty as to the precise amount of damages incurred." *Id.* at 670.

46. Norfolk Southern's claims for damages related to the delay in payment of the proceeds of the West End Branch sale has no casual connection to PWV's fraud in seeking the consent. By Norfolk Southern's own admission, these purported damages arise entirely from unrelated conduct: Defendants' alleged intentional interference with the closing of the sale months after PWV obtained the consent. At trial, Plaintiffs presented no evidence that the West End Branch

---

16. According to Plaintiffs, "[their] consequential damages are the loss of use of funds, and the value of such loss of use is [their] compensatory damages." Pls.' PFFCL at 70 n.6.

sale has not closed due to any conduct or inaction by PWV. The evidence instead demonstrated that it was Plaintiffs who elected not to proceed with a closing. *See supra* ¶¶ 121-25. Indeed, Plaintiffs have made no efforts to close the sale. For instance, Plaintiff(s) never scheduled a closing, provided PWV with a deed to execute, or pursued any avenue to secure the funds from PennDOT.

47. In addition, Norfolk Southern presented no evidence that the purported withholding of royalty payments related to oil and gas leases executed by Wheeling & Lake Erie was due to PWV's fraud in seeking the consent. Nor did Norfolk Southern present any evidence regarding the amount of the royalty payments purportedly being held in escrow, whether the wells on the property actually have, to date, produced gas in paying quantities, or if either Plaintiff actually ever attempted to seek payment of royalties or obtain any escrowed royalties. Simply put, this claim for damages is rooted in rank speculation.

48. Norfolk Southern also failed to prove any damages related to the advance made by PWV to Power REIT. In fact, it never even attempted to do so. Be that as it may, Norfolk Southern would be hard-pressed to show that any damages flow from this breach. After all, PWV could have simply declared a dividend in the amount of the loan, which is otherwise an asset of PWV that has helped strengthen its balance sheet.

49. In sum, Norfolk Southern is not entitled to compensatory or consequential damages. There is no record evidence that establishes what amounts, if any, that are due from the purported loss of use proceeds or which shows that said loss relates to either the fraud in seeking the consent or the breach of contract in making the advance.

50. Where, as here "a party is able to prove breach of contract but can show no damages flowing from the breach, the party is entitled to recover nominal damages." *Haywood v. Univ. of*

*Pittsburgh*, 976 F. Supp. 2d 606, 645 (W.D. Pa. 2013) (citations omitted). Nominal damages are also available as a remedy for fraud under Pennsylvania law. *See Peerless Wall & Window Coverings, Inc. v. Synchronics, Inc.*, 85 F. Supp. 2d 519, 536 (W.D. Pa. 2000), *aff'd*, 234 F.3d 1265 (3d Cir. 2000) (citing *Sands v. Forrest*, 434 A.2d 122, 124 (Pa. Super. Ct. 1981)); *see also Sands v. Forrest*, 434 A.2d 122, 124 (Pa. Super. Ct. 1981) ("If plaintiffs were entitled to a verdict on the cause of action alleged [fraud and deceit], but were unable to prove damages, they were nevertheless entitled to a verdict for nominal damages."). In *Stevenson v. Economy Bank of Ambridge*, 197 A.2d 721, 728 (1964), the Pennsylvania Supreme Court held that because "the basic unit of American money is the dollar . . . when nominal damages are awarded in our courts, one dollar ($1) shall be the measure thereof." Applying Pennsylvania law, the Third Circuit Court of Appeals has followed this rule. *See Nicholas v. Pennsylvania State University*, 227 F.3d 133, 146 (3d Cir. 2000) (citations omitted).

51. Accordingly, the Court will award Norfolk Southern nominal damages in the amount of one-dollar ($1.00) on the breach of contract and fraud claims.

### 2. Punitive Damages

52. "The standard governing the award of punitive damages in Pennsylvania is settled." *Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766, 770 (Pa. 2005). "Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Id.* As the name suggests, "punitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct. *Id.* (citations omitted). Moreover, "[t]he purpose of punitive damages is to punish a tortfeasor for outrageous conduct and to deter him or others like him from similar conduct." *Id.* (citations omitted). Thus, "'to justify an award of

punitive damages, the fact-finder must determine that the defendant acted with a culpable state of mind, *i.e.,* with evil motive or reckless indifference to the rights of others.'" *Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A., Inc.*, 801 F.3d 347, 360 (3d Cir. 2015) (quoting *Hutchinson v. Penske Truck Leasing Co.,* 876 A.2d 978, 983-84 (Pa. Super. Ct. 2005)).

53. Pennsylvania law requires that plaintiff support a punitive damages claim "'by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk.'" *Id.* (quoting *Hutchison*, 870 A.2d at 772). "That 'conscious disregard' is critical: an appreciation of the risk is a necessary element of the mental state required for the imposition of [punitive] damages." *Id.* (citations omitted)

54. The Court must also ensure that any award of punitive damages does not violate due process. *Id.* at 362 (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996)). The United States Supreme Court "has established three guideposts to determine whether a punitive damages award was grossly excessive: (1) the degree of reprehensibility of the defendant's actions; (2) the disparity between the harm or potential harm suffered by the plaintiff and its punitive damages award; and (3) the difference between the punitive damages award and the civil penalties authorized or imposed in comparable cases. *Id.* at 362-63 (citing *Gore*, 517 U.S. at 574-75). The first factor "is '[p]erhaps the most important indicium of the reasonableness of a punitive damages award.'" *Id.* at 363 (citing *Gore*, 517 U.S. at 575). And because it is so important to the analysis, the Supreme Court has further instructed courts to consider the extent to which the following subfactors apply:

> (1) the harm caused was physical as opposed to economic; (2) the tortious conduct evinced an indifference to or reckless disregard of the health or safety of others; (3) the target of the conduct had financial vulnerability; (4) the conduct

> involved repeated actions or was an isolated incident; and (5) the harm was the
> result of intentional malice, trickery, or deceit, or mere accident.

*Id.* (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003)).  "'The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff.'"  *CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 499 F.3d 184, 192 (3d Cir. 2007) (quoting *Gore*, 517 U.S. at 575).  At this step, the Supreme Court has cautioned that "'in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.'"  *Id.* (quoting *Gore*, 517 U.S. at 580); *see, e.g.*, *CGB Occupational Therapy, Inc.*, 499 F.3d at 193 ("[W]e conclude that the 18:1 ratio in this case crosses the line into constitutional impropriety.").

55.  Having weighed all of these factors, the Court finds and rules that Norfolk Southern is not entitled to punitive damages.

56.  Of the *Gore* factors, four of the five weigh against Norfolk Southern.  At the outset, the harm to Norfolk Southern was, at best, economic in nature.  After all, the "devaluation" of the Lease and the default remedy of nominal damages is the only real harm that Norfolk Southern has suffered.  Similarly, the fraudulent conduct of PWV did not evince indifference to or reckless disregard of the health or safety of others.  It instead showed that PWV, through Lesser, has a absolute disregard for the nearly fifty-year course of performance of the parties as well as a recent proclivity for sharp business practices.  Norfolk Southern, as the target of the fraud, also was not financially vulnerable in the sense that courts frame and analyze this factor – *i.e.* it is not a small company with few employees now in a detrimental position due to the fraud of PWV.  *C.f. CGB Occupational Therapy, Inc.*, 499 F.3d at 190.  In fact, Norfolk Southern did not identify a single customer that has sustained any actual detriment as a result of PWV's fraud, let

alone suggest that any (potential) damage to its customers caused any actual and calculable damages to it. Finally, the evidence at trial showed that the fraudulent conduct of PWV – Lesser's February 7, 2011 e-mail to Noe assuring him that the Proposed S-3 contained all available information – amounted to an isolated incident. Although Norfolk Southern attempted to prove that the fraudulent conduct of PWV (really, Lesser) extended further and pervaded all subsequent events – this litigation, the West End Branch dispute, and the withholding of royalties – it did not accomplish same.

57. As for the final factor, the harm suffered by Norfolk Southern was (at best) the result of trickery or deceit by Lesser on behalf of PWV. More likely, it was the result of intentional malice. To be sure, the actions of PWV by Lesser were dishonest and calculated. And his plans were designed to essentially eliminate decades-old restrictions in a Lease that may, perhaps, require updating to reflect the change in times. Be that as it may, the fraud perpetrated by PWV and against Norfolk Southern was wrong, to say the least. It reflects a business practice motived by greed and driven by deception. Yet when considered against the backdrop of *Gore* and its progeny, the Court cannot justify this factor outweighing the other four factors that do not apply in this case. If not constrained by binding precedent, the Court would certainly impose an award of punitive damages to punish the evil motive with which PWV's plan was devised and executed. But it is nevertheless bound to follow the applicable law. Accordingly, the Court will not award punitive damages to Norfolk Southern.

### 3. Equitable Relief

58. Finally, Norfolk Southern asks the Court to enjoin Power REIT from issuing stock without first seeking its consent and to order Power REIT to retrieve the 69,419 shares acquired pursuant to the rights offering by affiliates of Lesser. This request is little more than a backdoor

attempt to obtain the sort of relief – a permanent injunction and rescission – which the Court has previously ruled out. *See Norfolk S. Ry. Co.*, 2014 WL 2808907, at *22 ("The failure to include those remedies is wholly distinguishable from the omission of nominal damages from the prayer for relief . . . ."). Accordingly, the Court will not grant Norfolk Southern's requested equitable relief.

## IV. Conclusion

For the reasons hereinabove set forth, a verdict and judgment are hereby entered in favor of Plaintiff, Norfolk Southern Railway Company and against Defendant Pittsburgh & West Virginia Railroad on Counts Three and Four, for the amount set forth in the foregoing opinion; in favor of Defendant Power REIT and against Plaintiff Norfolk Southern Railway Company on Count Three and Count Four; in favor of Defendants Pittsburgh & West Virginia Railroad and Power REIT and against Plaintiff Wheeling & Lake Erie Railway Company on Count Three and Count Four. An appropriate Order follows.


McVerry, S.J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NORFOLK SOUTHERN RAILWAY COMPANY and WHEELING & LAKE ERIE RAILWAY COMPANY,** | ) ) ) ) | **2:11-cv-1588-TFM** |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | |
| **PITTSBURGH & WEST VIRGINIA RAILROAD and POWER REIT**, | ) ) ) | |
| **Defendants.** | ) ) | |

## ORDER OF COURT

AND NOW, this 29th day of December, 2015, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that a verdict is entered (1) in favor of Plaintiff Norfolk Southern Railway Company and against Defendant Pittsburgh & West Virginia Railroad on Count Three and Count Four of the First Amendment to Complaint; (2) in favor of Defendant Power REIT and against Plaintiff Norfolk Southern Railway Company on Count Three and Count Four of the First Amendment to Complaint; and (3) and in favor of Defendants Pittsburgh & West Virginia Railroad and Power REIT and against Plaintiff Wheeling & Lake Erie Railway Company on Count Three and Count Four of the First Amendment to Complaint. It is **FURTHER ORDERED** that Plaintiff Norfolk Southern Railway Company is entitled to monetary damages from Defendant Pittsburgh & West Virginia Railroad in the amount of $1.00 at Count Three and Count Four. A separate Judgment will follow.

BY THE COURT:

s/Terrence F. McVerry
Senior United States District Judge